## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| **PAUL DAVID STOREY,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| | § | |
| -VS- | § | **CIVIL NO. 4:11-CV-00433-Y** |
| | § | |
| | § | **\*\*\*DEATH PENALTY CASE\*\*\*** |
| | § | |
| **RICK THALER, Director,** | § | |
| **Texas Department of Criminal Justice,** | § | |
| **Correctional Institutions Division,** | § | |
| | § | |
| **Respondent.** | § | |

---

### MEMORANDUM OF LAW AND EXHIBITS IN SUPPORT OF
### PETITION FOR A WRIT OF HABEAS CORPUS

### THIS IS A DEATH PENALTY CASE

**MICHAEL LOGAN WARE**
**1407 TEXAS STREET, SUITE 102**
**FORT WORTH, TEXAS 76102**
**(817) 338-4100**
**(817) 698-0000 FAX**
ware@mikewarelaw.com

**ATTORNEY FOR PAUL DAVID STOREY**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES

I.    JURISDICTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II.   CLAIMS PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

CLAIM FOR RELIEF NUMBER ONE:

PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL AS A RESULT OF HIS LEGAL TEAM'S FAILURE TO ADEQUATELY INVESTIGATE AND PRESENT MITIGATION EVIDENCE, INCLUDING PETITIONER'S LOW RISK OF FUTURE DANGEROUSNESS, IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION. *ROMPILLA V. BEARD*, 545 U.S. 374 (2005); *WIGGINS V. SMITH*, 539 U.S. 510 (2003); *LEWIS V. DRETKE*, 355 F.3d 364 (5th Cir. 2003) . . . . . . . . . . . . . . . . 4

CLAIM FOR RELIEF NUMBER TWO:

PETITIONER'S FOURTEENTH AMENDMENT RIGHT TO EQUAL PROTECTION UNDER THE LAW AND DUE PROCESS WAS VIOLATED WHEN THE STATE WAS ALLOWED TO USE A PEREMPTORY STRIKE ON AN AFRICAN AMERICAN JUROR BASED ON RACE. BATSON *V. KENTUCKY*, 476 U.S. 79 (1986); *SNYDER V.* LOUISIANA, 128 S.Ct. 1203 (2008); MILLER-EL *V. DRETKE*, 545 U.S. 231 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

CLAIM FOR RELIEF NUMBER THREE:

ARTICLE 37.071 OF THE TEXAS CODE OF CRIMINAL PROCEDURE (THE DEATH PENALTY SENTENCING STATUTE) IS UNCONSTITUTIONAL AS APPLIED TO PETITIONER AND ON ITS FACE, VIOLATING THE PETITIONER'S FIFTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

i

CLAIM FOR RELIEF NUMBER FOUR:

    THE TEXAS DEATH PENALTY SCHEME VIOLATES PETITIONER'S RIGHT
TO DUE PROCESS UNDER THE UNITED STATES CONSTITUTION BECAUSE
THE PUNISHMENT SPECIAL ISSUE RELATING TO MITIGATION FAILS TO
REQUIRE THE STATE TO PROVE THE ABSENCE OF SUFFICIENT
MITIGATING CIRCUMSTANCES BEYOND A REASONABLE DOUBT. . . . 5

III.   STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    A.   CONFINEMENT AND RESTRAINT . . . . . . . . . . . . . . . . . . . . . . . . . 5

    B.   PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    C.   STATEMENT CONCERNING SUCCESSIVE WRIT PROVISION . . . . 6

    D.   STATEMENT CONCERNING FILING DATE . . . . . . . . . . . . . . . . . 6

IV.   STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

V.   CLAIMS FOR RELIEF - RESTATED AND ARGUMENT
AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    CLAIM FOR RELIEF NUMBER ONE . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL
AS A RESULT OF HIS LEGAL TEAM'S FAILURE TO ADEQUATELY
INVESTIGATE AND PRESENT MITIGATION EVIDENCE, INCLUDING
PETITIONER'S LOW RISK OF FUTURE DANGEROUSNESS, IN VIOLATION
OF PETITIONER'S RIGHTS UNDER THE SIXTH, EIGHTH, AND
FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.
*ROMPILLA V. BEARD*, 545 U.S. 374 (2005); *WIGGINS V. SMITH*, 539 U.S. 510
(2003); *LEWIS V. DRETKE*, 355 F.3d 364 (5th Cir. 2003)

    STANDARD OF REVIEW AND REQUEST FOR AN EVIDENTIARY
HEARING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

CLAIM FOR RELIEF NUMBER TWO . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

PETITIONER'S FOURTEENTH AMENDMENT RIGHT TO EQUAL
PROTECTION UNDER THE LAW AND DUE PROCESS WAS VIOLATED
WHEN THE STATE WAS ALLOWED TO USE A PEREMPTORY STRIKE ON
AN AFRICAN AMERICAN JUROR BASED ON RACE. *BATSON V. KENTUCKY,*
476 U.S. 79 (1986); *SNYDER V.* LOUISIANA, 128 S.Ct. 1203 (2008); MILLER-EL
*V. DRETKE,* 545 U.S. 231 (2005)

CLAIM FOR RELIEF NUMBER THREE . . . . . . . . . . . . . . . . . . . . . . . . . 49

ARTICLE 37.071 OF THE TEXAS CODE OF CRIMINAL PROCEDURE (THE
DEATH PENALTY SENTENCING STATUTE) IS UNCONSTITUTIONAL AS
APPLIED TO PETITIONER AND ON ITS FACE, VIOLATING THE
PETITIONER'S FIFTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.

CLAIM FOR RELIEF NUMBER FOUR: . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

THE TEXAS DEATH PENALTY SCHEME VIOLATES PETITIONER'S RIGHT
TO DUE PROCESS UNDER THE UNITED STATES CONSTITUTION BECAUSE
THE PUNISHMENT SPECIAL ISSUE RELATING TO MITIGATION FAILS TO
REQUIRE THE STATE TO PROVE THE ABSENCE OF SUFFICIENT
MITIGATING CIRCUMSTANCES BEYOND A REASONABLE DOUBT.

VI.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

VII.  ATTACHED EXHIBITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

# I. JURISDICTION

This Court has subject matter jurisdiction of this case pursuant to 28 U.S.C. §§ 2241(d) & 2254(a). Petitioner, Paul Storey, was indicted, convicted, and sentenced to death for the offense of capital murder in Criminal District Court Number 3 of Tarrant County, Texas which is in the Northern District of Texas. Petitioner is confined on death row at the Polunsky Unit of the Texas Department of Corrections in West Livingston, Texas. He is in custody of the Respondent, Rick Thaler, Director of the Texas Department of Criminal Justice Institutional Division pursuant to this judgment of conviction and death sentence. His confinement is in violation of the Constitution and laws of the United States.

# II. CLAIMS PRESENTED

CLAIM FOR RELIEF NUMBER ONE:

PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL AS A RESULT OF HIS LEGAL TEAM'S FAILURE TO ADEQUATELY INVESTIGATE AND PRESENT MITIGATION EVIDENCE, INCLUDING PETITIONER'S LOW RISK OF FUTURE DANGEROUSNESS, IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION. *ROMPILLA V. BEARD*, 545 U.S. 374 (2005); *WIGGINS V. SMITH*, 539 U.S. 510 (2003); *LEWIS V. DRETKE*, 355 F.3d 364 (5th Cir. 2003).

CLAIM FOR RELIEF NUMBER TWO:

PETITIONER'S FOURTEENTH AMENDMENT RIGHT TO EQUAL PROTECTION UNDER THE LAW AND DUE PROCESS WAS VIOLATED WHEN THE STATE WAS ALLOWED TO USE A PEREMPTORY STRIKE ON AN AFRICAN AMERICAN JUROR BASED ON RACE. BATSON *V. KENTUCKY*, 476 U.S. 79 (1986); *SNYDER V. LOUISIANA*, 128 S.Ct. 1203 (2008); MILLER-EL *V. DRETKE*, 545 U.S. 231 (2005).

CLAIM FOR RELIEF NUMBER THREE:

ARTICLE 37.071 OF THE TEXAS CODE OF CRIMINAL PROCEDURE (THE DEATH PENALTY SENTENCING STATUTE) IS UNCONSTITUTIONAL AS APPLIED TO PETITIONER AND ON ITS FACE, VIOLATING THE PETITIONER'S FIFTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS.

CLAIM FOR RELIEF NUMBER FOUR:

THE TEXAS DEATH PENALTY SCHEME VIOLATES PETITIONER'S RIGHT TO DUE PROCESS UNDER THE UNITED STATES CONSTITUTION BECAUSE THE PUNISHMENT SPECIAL ISSUE RELATING TO MITIGATION FAILS TO REQUIRE THE STATE TO PROVE THE ABSENCE OF SUFFICIENT MITIGATING CIRCUMSTANCES BEYOND A REASONABLE DOUBT.

## III. STATEMENT OF THE CASE

### A.   CONFINEMENT AND RESTRAINT

Petitioner is currently being held in confinement by the Director of the Texas Department of Criminal Justice, Institutional Division, at the Polunsky Unit, in West Livingston, Texas. Petitioner is confined pursuant to a conviction of capital murder, in cause number 1042204D, from Criminal District Court Number 3 of Tarrant County, Texas, the Honorable Elizabeth Berry presiding. The sentence of death was delivered by the court in response to the jury's answers to three special issues, such answers being incorporated in the judgment of the court signed September 15, 2008.

B.     PROCEDURAL HISTORY

Petitioner's conviction and death sentence were affirmed on direct appeal by the Texas Court of Criminal Appeals on October 6, 2010. *Storey v. State,* No. AP-76,018 (unpublished). A petition for a writ of certiorari was filed with the United States Supreme Court on January 3, 2011 and was denied on April 4, 2011. Petitioner filed an Application for Writ of Habeas Corpus in Criminal District Court Number 3 of Tarrant County, Texas, on May 26, 2010 while the direct appeal was still pending. The Texas Court of Criminal Appeals denied relief on Petitioner's Application for Writ of Habeas Corpus on June 15, 2011.

C.     STATEMENT CONCERNING SUCCESSIVE WRIT PROVISION

This is Petitioner's first application for a writ of habeas corpus in federal court following the exhaustion of his state remedies.

D.     STATEMENT CONCERNING FILING DATE

The Texas Court of Criminal Appeals denied Petitioner's State Application for Writ of Habeas Corpus on June 15, 2011. This Petition is timely filed if filed on or before June 14, 2011.

## IV. STATEMENT OF FACTS

Growing up, Paul Storey ("Petitioner") was the often ridiculed, unathletic, obese kid on the playground. He was not intelligent and he performed poorly in school. Later, pre-trial and post-conviction intelligence testing would establish Mr. Storey as Borderline Intelligence Functioning with an I.Q. in the low 80's. Mr. Storey's father abandoned him when he was

very young and his mother brought numerous men into the home, some of whom engaged in criminal activity in front of Mr. Storey as he was growing up.

Mr. Storey had recently turned twenty-two years old when his co-defendant, Mark Porter, and he committed this offense. Mr. Storey had no prior criminal convictions or arrests and was living with his mother at the time.

[Taken from the "Statement of Facts" in the Texas Court of Criminal Appeals opinion on direct appeal].

> Petitioner was charged with intentionally causing the death of Jonas Cherry while in the course of committing or attempting to commit robbery. The record reflects that around 8:15 a.m. on October 16, 2006, Cherry left his house and went to work at the Putt-Putt Golf and Games in Hurst, Texas ("the Putt-Putt"). When Cherry arrived for work, he passed through the east door, which was the employees' entrance, and at 8:43 a.m., he disarmed the security alarm system. When a co-worker, Timothy Flow, arrived about ten minutes later, he found Cherry lying in a pool of blood in the office area. Flow noticed that Cherry was holding a key to the door of the manager's office, which was locked. Concerned that the perpetrator might still be present, Flow retreated outside. Once he saw that only his and Cherry's cars were in the parking lot, he went back inside to check on Cherry. Based on his observations, he believed that Cherry was dead. Flow then walked back outside while calling 9-1-1 on his cell phone, and he waited in his truck until the police arrived. Officer Samantha Wilburn and Corporal Lonnie Brazell responded first. After speaking with Flow and observing Cherry's body, they called for the assistance of additional officers.

> With the help of the manager, Patrick Arenard, police officers gained entry to the manager's office, where the business's surveillance equipment was kept. Four separate videocassette recorders ("VCRs") should have been set up for surveillance. However, one VCR had been stolen, and videotapes had been stolen from two other VCRs. The fourth VCR still contained a surveillance videotape and was functioning. It was connected to a video camera that monitored a section of the business's driveway that led from the road and into the parking areas. When officers played the videotape, they observed a red two-door Ford Explorer with its hood up and its lights flashing, rolling from

7

the direction of the road into the public parking area, and then moving out of view as it continued through the parking lot. A few minutes later, the Explorer came back into view, and then it passed out of view again as it rolled toward the employees' parking area. This videotape was released to the media and aired on the local news.

One of petitioner's friends reported that petitioner had told her he was present during the offense and saw who committed it. She provided the police with petitioner's telephone number. Detective Rick Shelby, a Hurst police officer, contacted petitioner by telephone. Petitioner acknowledged that he was a former employee of the Putt-Putt and he admitted that the Explorer that was being shown on the news was his. He stated that he was willing to meet with Shelby at the police station but that he did not have transportation because his Explorer was not working. He accepted Shelby's offer of a ride and provided Shelby with directions to his house. Shelby and Sergeant Craig Teague then drove to petitioner's house, where they met petitioner, petitioner's brother and a friend. Petitioner and his brother showed them the Explorer. Petitioner explained that the license plates on the Explorer did not match the ones in the video that was being shown on the news because he had switched the plates in order to do a "gas run." Petitioner then accompanied Shelby and Teague to the police station to make a statement.

Over the next few days, [Petitioner] made three oral statement to police . . . In his third statement, he admitted that he [and his co-defendant Mark Porter] had planned and participated in the robbery . . .

·  ·  ·  ·  ·

Petitioner stated that Porter accidentally fired the first shot and then [Petitioner] just "kind of got caught up in all of it."

## V. CLAIMS FOR RELIEF - RESTATED AND ARGUMENT AND AUTHORITIES

## CLAIM FOR RELIEF NUMBER ONE

PETITIONER RECEIVED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL AS A RESULT OF HIS LEGAL TEAM'S FAILURE TO ADEQUATELY INVESTIGATE AND PRESENT MITIGATION EVIDENCE, INCLUDING PETITIONER'S LOW RISK OF FUTURE DANGEROUSNESS, IN VIOLATION OF PETITIONER'S RIGHTS UNDER THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION *ROMPILLA V. BEARD*, 545 U.S. 374 (2005); *WIGGINS V. SMITH*, 539 U.S. 510 (2003); *LEWIS V. DRETKE*, 355 F.3d 364 (5th Cir. 2003)

## **ARGUMENT AND AUTHORITIES**

Under the Texas death penalty scheme, a defendant convicted of capital murder has a separate punishment hearing, after which the jurors are asked to answer 3 special issues, based on the evidence presented at the punishment phase, as well as that presented at guilt/innocence. Depending on how the jurors answer the three issues, the defendant receives either life without parole, or death. One favorable vote on one issue will result in a sentence of life without parole. Tex. Code Crim. Proc. Art. 37.071, § 2.

The first special issue asks the jurors whether they have found from the evidence beyond a reasonable doubt that there is a possibility that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. If the jurors do not unanimously answer that special issue "yes", the court will impose a sentence of life without parole. *Id.*

The second special issue asks the jurors whether they have found from the evidence beyond a reasonable doubt that the defendant actually caused the death of the victim, or did

9

not actually cause the death but intended to kill the victim or another or anticipated that a human life would be taken. If the jurors do not unanimously answer that special issue "yes", the court will impose a sentence of life without parole. *Id.*

The third special issue asks the jurors whether taking into consideration all of the evidence including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, they find that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment [without parole] rather than a death sentence be imposed. If the jurors do not unanimously answer that special issue "no", the court will impose a sentence of life without parole. *Id.*

Failure of trial counsel, in a death penalty case to adequately and competently investigate the facts and evidence as to each one of the three issues, resulting in a failure to uncover and present relevant evidence at trial as to those issues, falls below an objective standard of reasonableness and is a clear violation of the first prong of *Strickland v. Washington*, 466 U.S. 688 (1984). See, also, *Wiggins v. Smith*, 539 U.S. 510 (2003) and *Rompilla v. Beard*, 545 U.S. 374 (2005) If there is a reasonable probability that but for counsel's error, at least one juror would have answered either issue differently, the second prong of *Strickland* is met and the death sentence should be vacated.

First, in their mitigation investigation, trial counsel failed to effectively utilize a mental health professional and thereby failed to discover or utilize crucial evidence as to all three issues. Trial counsel retained Dr. Randy Price to perform a limited mental examination

10

of Petitioner.  Dr. Price examined Petitioner shortly before jury selection began and issued his short report on September 4, 2008, two days after testimony in the trial began.  It appears that trial counsel had Mr. Storey initial Dr. Price's short report on September 10, 2008, the day punishment evidence began.  Dr. Price was not called as a witness at either stage of the trial and his brief report was never offered into evidence.  In essence, he was a "consulting expert".  As a part of his July 14, 2008 examination, Dr. Price performed a shortened version of an intelligence test on Petitioner, which showed an overall I.Q. of 81, Borderline Intellectual Functioning.[1]

Based on his limited examination and testing of Petitioner, Dr. Price evidently formed preliminary opinions which he communicated orally to trial counsel, who then instructed him not to follow-up with further testing or examinations.  Trial counsel's unreasonable decision to both stop Dr. Price's further investigation and/or to not retain another expert to follow-up on Dr. Price's abbreviated examination and testing, resulted in a failure of trial counsel to uncover crucial mitigation evidence.  Such evidence includes Petitioner's Borderline Intellectual Functioning (not low average); that Petitioner does not suffer from Anti-social Personality Disorder (he was not a sociopath as Dr. Price initially believed might be the case); and that Petitioner presented a low risk of future dangerousness (which, at least based

---

[1] It appears that for reasons neither clear in his report nor in his notes taken during his examination, Dr. Price mistakenly characterized Mr. Storey as "low average" rather than Borderline Intellectual Functioning. See Dr. Fallis's June 13, 2012 and May 20, 2010 reports attached to this memoranda as Exhibits 1 and 2 and incorporated herein for all purposes. Specifically, pp. 13-15 of Exhibit 1 and p. 13 of Exhibit 2.

11

on his initial evaluation, Dr. Price had been unwilling to say.) <u>See</u>, Attached Fallis 2012 and 2010 reports, Exhibit 1 at pp. 20-21 and Exhibit 2 at p. 16, respectively.

In other words, trial counsel's unreasonable decision to restrict and cut short Dr. Price's examination and testing of Petitioner or, in the alternative, to not retain another expert to further examine and test the Petitioner prevented them from discovering and presenting crucial mitigating evidence that would reasonably have caused at least one juror to have answered at least one of the three special issues differently resulting in a sentence of life without parole. (<u>See</u>, Exhibits 1 and 2).

In this case, Dr. Emily Fallis was retained, in the first instance, by Petitioner's state post-conviction writ attorney Robert Ford. Dr. Fallis's investigation as reflected in her 2010 report (Attached Exhibit 2) uncovered a number of mitigating factors which were not discovered by trial counsel and which, among other things, led to her profoundly important professional opinion that "with regard to future dangerousness, Mr. Storey overall presents a low risk of harm to others based on historical factors." (Exhibit 2 at 16). Her opinion and the basis of her opinion are summarized at the end of her 16 page 2010 report. The entire report was proffered to the court of conviction (the trial court) as a part of Petitioner's state post-conviction writ and includes facts and evidence that a reasonably competent investigation would have uncovered and which would have been powerful evidence at trial for a "no" answer as to special issue number 1 as well as a "yes" answer to special issue number 3.   As Dr. Fallis noted:

. . . [Petitioner] was involved in only a few minor fights as a child and teenager. Moreover, he does not have a history of perpetrating domestic violence, despite exposure to domestic violence in his youth. He was in only a few minor altercations in the county jail. Apart from the murder, he has not been convicted of an assault either inside or outside of a penal institution . . . Note that he has more often directed anger and disappointment toward himself in the form of depression, rather than acting out toward others. Other factors which suggest he is a low risk of future violence include his educational level (i.e., he has a high school degree) and the fact that he does not have a significant history of substance dependence. Furthermore, he has been able to maintain a job and never was a gang member.

(Exhibit 2 at 16).

Importantly, Dr. Fallis noted "that Mr. Storey does not fit the criteria for diagnosis of Antisocial Personality Disorder . . . This disorder has been linked to estimates of moderate to high risk of future violence. Thus, the absence of such a diagnosis is a significant predictor of low risk of future violence." (emphasis added). (Exhibit 2 at 16).

This undiscovered and therefore unused information was sufficiently powerful to move one of Mr. Storey's jurors to give an affidavit, also proffered to the court of conviction, in which he stated:

I read Dr. Fallis' psychological/mitigation evaluation and based on this new information I am certain I would not have voted for the death penalty. In particular, I would have voted that Mr. Storey was not a future danger.

(See, Attached Exhibit 3).

In fact, Dr. Fallis's 2010 report identifies numerous mitigating factors that were not presented at trial including Petitioner's apparent history of clinical depression (Exhibit 2 at pp. 11-12); his early exposure to substance abuse (Exhibit 2 at pp. 4,5, & 14), violence in the

13

home, and other criminal behavior by the adults in his life including his mother, her poor choices of men and their criminal activities. (Exhibit 2; pp. 3-6; 14-16).

In *Lewis v. Dretke*, 355 F.3d 364 (5th Cir. 2003), the Court stated:

> To prevail on his claim of ineffective assistance of counsel, [Petitioner] must show that his defense counsel's performance in the punishment phase of Lewis's trial was deficient, i.e., that it "fell below an objective standard of reasonableness." [citing *Strickland* at 688]. If successful, [Petitioner] then must prove that there is a reasonable probability that, but for defense counsel's deficient performance, the result of the proceedings would have been different. *Id.* at 694 . . .

In failing to effectively utilized Dr. Price or any mental health expert, and thereby unreasonably failing to discover and utilized crucial mitigating evidence including the evidence that Petitioner is Borderline Intelligence, is not a sociopath, has a history of depression, was exposed to violence, substance abuse, and other criminal activity in the home while growing-up, but that he was a low risk of future dangerousness. Petitioner's trial counsel "fell below an objective standard of reasonableness." There is also a reasonable probability that, but for defense counsel's deficient performance, the result of the proceedings would have been different. As the Fifth Circuit stated in *Lewis*, ". . . had this evidence been produced, it is quite likely that it would have affected the sentencing decision of at least one juror." *Id.* at 369. See, also juror affidavit (Exhibit 3).

The likelihood of at least one juror's favorable vote on at least one of the special issues is greatly enhanced by the State's complete lack of any punishment evidence.

Petitioner had no criminal history and the State's only two substantive punishment witnesses were so bad, it is baffling as to why they were seriously considered by the State as

14

witnesses, much less, actually called to testify.  In fact, it would be fair to say that the State's

punishment stage evidence in no way hurt the Petitioner and, in fact, was favorable. Of

course, the State was free to put on almost anything at punishment and this was their best

shot.

The following is the pertinent testimony of the State's first punishment witness,

Lavarone Edwards:

By Mr. Foran [Prosecutor]:

Q.     Mr. Edwards, will you tell the jury your name.

A.     Levarone Edwards.

Q.     How are you employed?

A.     I'm not.

Q.     How old a man are you?

A.     I am 17.

Q.     And are you presently in school?

A.     No, not at the current moment.

Q.     Are you planning to go back to school?

A.     Yes, sir.

Q.     Who are you living with?

A.     I'm living with my grandmother.

Q.     Mr. Edwards, are you currently on probation here in Tarrant County?

A.     Yes, sir.

Q.     What are you on probation for?

A.     Burglary of a building.

Q.     Burglary of a building?

A.     Yes, sir.

Q.     And were you placed on what is called deferred adjudication for burglary of a building?

A.     Yes, sir.

Q.     And I want to draw your attention back to August 16, 2008.  Were you incarcerated here in Tarrant County, Texas?

A.     Yes, sir.

Q.     That was while you were awaiting disposition in your case?

A.     Yes, sir.

Q.     Mr. St. John, your attorney, is here in court; is that right?

A.     Yes, sir.

Q.     And when you were incarcerated, were you in the same pod with a bunch of other prisoners?

A.     Yes, sir.

Q.     And these other prisoners, were they charged with a variety of different felonies?

A.     Yes, sir.

Q.     Were you incarcerated with a man named Paul Storey?

A.     I don't know the name.  I didn't know really nothing about his name.

Q.     You knew somebody named Paul, right?

A.     Yes.

Q.     And you see that guy named Paul in the courtroom?

A.     Yes, sir.

Q.     If I am No. 1 and Mr. Moore is No. 2, counting this way, what number is he? Where is he sitting in the courtroom, the man you know as Paul?

A.     4.

Q.     That's the man to your far right?

A.     Yes, sir.

MR. FORAN:        May the record reflect the witness has identified the defendant?

THE COURT:        The record will so reflect.

Q.     (By Mr. Foran) Mr. Edwards, while you were in the tank, there was quite a few other people in the tank; is that right?

A.     Yes, sir.

Q.     And were some of the guys in that tank trying to run the tank?

A.     Not that I know of.  I don't really recall.

Q.     Do you recall making a complaint that Paul and this –

A.     About a TV, yes.  It was a little misunderstanding about a TV.  And I said I would like to be moved, or could you move me.

Q.     Hold on.  Isn't it true that you said that –

MR. RAY:    Excuse me.  I'm going to object since Mr. Foran is impeaching this witness with an inconsistent statement.

In other words, the witness has said that there is not a problem, and Mr. Foran is impeaching him, asking about a prior inconsistent statement.

17

I would ask for an instruction to the jury that that testimony be only used for that purpose, not as evidence in this case.

THE COURT:    Ladies and Gentlemen of the Jury, you are instructed that the testimony to impeach the witness is to be used solely for that purpose.

Q.    (By Mr. Foran) Mr. Edwards, when someone acts like a tank boss, does that mean they are trying to run the tank, telling people what to do?

A.    That was my first time going to jail.  I really didn't know what a tank boss is. The definition of a tank boss is to do that.

Q.    Didn't you complain that this individual and others were going up and taking the remotes from other prisoners and trying to intimidate them?

A.    I said there was a dude doing that, but I did not say it was Paul.

Q.    Isn't it true that you made a complaint that this guy–you spoke to this detective just a short while ago when you were still incarcerated, and you said Paul was the worst one, didn't you?

A.    I don't recall.  I don't remember that.

Q.    You don't recall now?

A.    No.

Q.    And that you–yesterday, when you were here in court, outside the presence of the jury, said you had conflicts with this man; is that right?

A.    We had like issues, like spoken words over the television show.  Everybody has conflicts in jail.  It was solved really. I just said can I be moved before something happened.  That's all I said.

Q.    And you wanted to resolve that conflict by having him moved or you moved?

A.    One of the two.

Q.    That's because he was trying to control the TV?

A.    I don't know man.  You are confusing me.

18

Q.      You weren't confused when you made that complaint.

A.      No. I said can I be moved so there wouldn't be any problem.  That's all I said.

        They said, "Why would you want to be moved?"

        I said, "He is acting like a boss of somebody."

        I wasn't saying he was no tank boss.  I barely know Paul.

Q.      Let's back up just a minute.

        You said you wanted to be moved because he was like the boss of someone.
        Is that what you said?

A.      Like if somebody is trying to tell you what to do, you just say they're the boss.
        I'm not saying he was a tank boss.  I didn't say he was no type of boss.

        If Mr. De La Flor got that, then he mixed my words up. Just saying he thought
        he was the boss at that moment. I'm not saying he was no tank boss or nothing.

Q.      He thought he was the boss of you at that moment?

A.      It's not like–okay, like somebody is trying to tell you what to do, like your
        daddy or something. That's all. I did not say he was no tank boss at all.

Q.      Did you get into his face and tell him not to do that?

A.      I didn't get into his face. We just exchanged words in front of the TV. He was
        just playing around – you know what I'm saying–trying to edge stuff on me.
        It's not even–you know what I'm saying? Probably some stuff that they told
        me that he said that's probably some stuff that he didn't even say.

Q.      So did he tell you what he was charged with?

A.      I mean, he didn't tell me. When I came in, people was already walking around
        saying, okay, he's in for this, telling everybody he was charged with some
        serious charge.

        People who, I guess, knew him or seen him on TV, I don't know how they
        found out his charge. I don't know if he told them or what or what his problem

                                                                                    19

was. People was just walking around, kept saying his name like he was an important person in the tank or something. You know what I'm saying?

Q.    You don't remember telling Mr. De La Flor that he acted like a bully to everyone? You just did that a few weeks ago.

A.    I don't recall that, sir.

Q.    Or that Paul, the man you have identified in court, was the worst one of the bunch being a bully?

A.    Because there was two Pauls in there anyway. There was a dude named Paul–which one of the Pauls was, I think, a Hispanic dude and that Paul right there, every morning he was the dude who helped hold church and all this with the other dude in there.

Well, as far as I know, he used to pray for everybody in there, him and the two other dudes, so– yeah, y'all kind of mixing up my words, and I don't appreciate that.

Q.    Let's be very specific in who you said was running things. Paul Storey–

A.    No–

Q.    Let me finish my question. Quinton McAlister, Paul Storey, Nicholas Trammell, you know who they were.

A.    If you look at the exact paper, it just say – on the paper, it just say Paul. It do not say no last name or nothing like that. If you look on my exact paper, that's exactly what it say. So ya'll cannot put his last name on there because I did not say it.

Q.    The complaint you made, as a result of this complaint, you guys were moved, right?

A.    I was moved. I don't know if anybody else was moved. I was moved to Green Bay.

Q.    You were moved?

A.    Oh, yes, sir.

20

MR. FORAN:      Pass the witness.

THE COURT:     Mr. Moore?

MR. MOORE:     Thank you, Your Honor.

     CROSS-EXAMINATION

BY MR. MOORE:

Q.     Mr. Edwards, I think you said that at the time that all of this happened, you were in custody for the burglary charge?

A.     Yes, sir.

Q.     Did you – was there some kind of hold on you out of juvenile?

A.     Yeah, I had a TYC parole.

Q.     You actually got your probation prior to the TYC hold being released; is that right?

A.     Yes.

Q.     And Mr. St. John here, your lawyer, he is the lawyer that represented you in the burglary case. Is he the one that represented you in the TYC case?

A.     No. They just dropped it some way. I don't know.

Q.     You are out now; you are on probation on deferred adjudication, right?

A.     Yes, sir.

Q.     Now, you, apparently, wrote some kind of a kite, some kind of a piece of paper and gave it to the guard saying that you wanted to be moved or wanted some of y'all to be moved; is that right?

A.     Yes, sir.

Q.     And the complaint you made was against a guy named Quinton, a guy named Paul, and a guy named Nicholas; is that right?

21

A.      Yes.

Q.      It was an argument over the TV?

A.      Over the TV, yes, sir.

Q.      Okay. And you said that – are you saying that you had arguments with Paul Storey over the TV, or did you have arguments with some other Paul over the TV? Who was it?

A.      I had numerous arguments with a Mexican dude named Paul, but I really don't know what is going on and what I heard, to be honest.

Q.      As a result of whatever complaint that you made, you got moved out of that pod to another pod.

A.      Yes, sir.

Q.      What was that about, that Paul Storey was holding Bible classes, or he and some other guys were –

A.      It was him, and I don't know the other dude's name, but he had like a nickname. We called him Trey. He was a real old-school dude.

        And they hold – every morning like right after breakfast, you can go up to them and they will pray for you and all of that stuff – you know what I'm saying – just pray for you and all that.

        I mean, every morning all those young kids that was in there, everybody went to prayer every morning.

Q.      Thank you, Mr. Edwards.

MR. MOORE:      That's all, Judge.

THE COURT:      Redirect?

BY MR. FORAN:

Q.      That's the first time you mentioned that, even though you had every

22

opportunity to tell Mr. De La Flor about this.

A.   I did not ask him the question. Mr. De La Flor was trying to get out of me that – me making a statement saying that Paul was a bad person, if you really want to know. That's what he was trying to get out of me, and I didn't like that.

Q.   And the truth of the matter is, Mr. Edwards, that's exactly what you said. You said he was a bully.

A.   I would like you not to raise your voice at me.

THE COURT:   Let him finish his question.

Q.   (By Mr. Foran)   That you and others had to get into his face, that he wouldn't listen to anybody and that you wanted to move or have him moved as a result.

That's what you said, not only to Mr. De La Flor, that's the complaint you made to the Sheriff's Department. That's the truth, isn't it?

A.   That's not the truth, sir.

Q.   That's absolutely the truth. You made that complaint on August 16th of 2008.

A.   I made a complaint asking can I be moved from the pod because there was a conflict over the TV, sir.

And I put Paul on there, and I put Nicholas Trammell, and I put some other dude named Quinton, which I didn't have a problem with Quinton. It was just that somebody else had a problem with him, and they asked to put him on there, too, and I said okay.

THE WITNESS:   I don't know, man. Can I talk to my lawyer?

THE COURT:   Hold on for a question.

Q.   (By Mr. Foran)   But you are the one that wrote the kite; you are the one that signed it.

A.   Yes, sir. Everybody – a couple of other dudes signed it, too, sir, if you look at the original copy.

23

Q.   The reality was, when you were locked up on August 16, 2008, you wanted to move because this guy was intimidating you; isn't that right?

A.   Nobody intimidate me, sir.

MR. FORAN:      Pass the witness.

RECROSS-EXAMINATION

BY MR. MOORE:

Q.   Mr. Edwards, you've indicated that Paul Storey never intimidated you?

A.   He never intimidated me, not at all. No one ever intimidated me in the pod. I was kind of cool with everybody. But I did have people who I had conflicts with – you know what I am saying – fights with, but that was it.

Q.   It wasn't ever this guy?

A.   No, it was never Paul.

Q.   You and I have never talked before?

A.   No, sir.

Q.   And you have never talked to Mr. Ray, the other lawyer?

A.   No, sir.

Q.   You never talked to any investigator that was working for us; is that right?

A.   Sir?

Q.   You never talked to any investigator working for us; the only person you have ever talked to is Mike De La Flor, the DA's investigator.

A.   Mike, yes, sir.

Q.   And he came up and saw you in jail after you had written that kite asking to be moved.

24

A.    Yes, sir.

Q.    Did they bring a copy of the actual thing that you wrote and show it to you and ask you about who Paul was or anything else?

A.    He did bring a little thing, the little original kite, but I told him I didn't even know the last name. I didn't know Paul's last name. You know what I am saying?

Q.    Okay. Thank you, Mr. Edwards.

pp. 9-21

The States only other substantive punishment witness was Regina Davis who testified as follows:

BY MR. FORAN:

Q.    Would you tell the jury your name, please.

A.    Regina Davis.

Q.    Ms. Davis, do you have a sister named Geneva?

A.    Yes, sir, I do.

Q.    Is she here with you today?

A.    Yes, sir, she is.

Q.    What is your mother's name?

A.    Pamela Davis.

Q.    Do you know Mark Porter?

A.    Yes, sir, I do.

Q.    How is it that you know Mark Porter?

A.      That's my nephew's daddy.

Q.      Do you know Paul Storey?

A.      Yes, I do.

Q.      Do you know who he is?

A.      I know his name.

Q.      He has been to your house –

A.      Okay.

Q.      – right?

A.      When the mailman comes to your house, do you know him?

Q.      I will get to all of the other people you might know later, but it appears right now that you know Paul Storey, right?

A.      In a way. I know of him.

Q.      He has been to your house?

A.      I know of him.

Q.      My question was, has he been to your house?

A.      Yes.

Q.      You have ridden in his truck before, right?

A.      Yes.

Q.      In September of 2006, you were riding in his truck when he showed you a weapon, weren't you?

A.      No.

Q.      See, Ms. Davis, you understand you just swore an oath to tell the truth, right?

26

A.    Well, I know he took me to the store one time.

Q.    He took you to the store, and somebody cut you off in traffic, and he pulled a semi-automatic and waved it at them. That's what you told us a few months ago, a month and a half ago.

A.    No, sir. Actually, I didn't give you a statement or a date. I didn't sign a statement or a date, and I wasn't recorded on a statement or a date.

Q.    That's very clever, but you gave a spoken one, didn't you, in front of three witnesses, my intern and my investigator, in which you described exactly that event and that it happened in Tarrant County, Texas, didn't you?

A.    No.

MR. FORAN:    Your Honor, might I have a moment?

THE COURT:    Yes.

(Pause in proceedings.)

Q.    (By Mr. Foran) Well, Ms. Davis, in this conversation, isn't it true that you said that y'all were driving that he had a semi-automatic, you described it as a 9-millimeter; that someone cut him off in traffic; he pulled it out and waved it at them; he waved it like this (demonstrating). And nobody knew that but you until you said it.

A.    No, sir.

Q.    That it happened while he was driving you around?

A.    No, sir.

Q.    Do you understand that you are under oath?

A.    Yes, sir, I do. I swore.

Q.    Is there anything about your testimony you want to change or retract at this point?

A.    No, sir.

27

Q.     All right.

MR. FORAN:        Pass the witness.

CROSS-EXAMINATION

BY MR. RAY:

Q.     Did you – Ms. Davis, did you meet with Mr. De La Flor, the man who just got up and left the courtroom? He is not in here now.

A.     I don't know who.

Q.     Did you meet with somebody from the DA's Office, an investigator?

A.     Yes. There was a couple of people. I don't really know who you are talking about.

Q.     And what was the conversation about? First of all, tell me when you met them. When did you talk to them?

A.     Who is it again?

Q.     Well, let's do it this way. Have you ever met with anybody in the District Attorney's Office and talked to them about Paul Storey or this case or Mark's case?

A.     I've talked to a couple of people from – I don't know where they are from. They came to me. I was subpoenaed.

Q.     Let me ask you this: Do you know Detective Shelby, the man seated here on the front row, over on the far side of the courtroom? He is raising his hand. Have you ever met him before?

A.     No.

Q.     He is a Hurst police detective. You never talked to him?

A.     I don't remember.

Q.     In the last 30, 40 days, okay, since July of this year, have you ever talked to

28

anybody that works for the Hurst police or the DA's Office that was talking to you about this case?

A.   You said the last 30 days?

Q.   Last 60 days.

A.   No.

Q.   This conversation that Mr. Foran was asking you about, did you have a conversation with somebody at the DA's Office, and I've just got the times wrong?

A.   No.

Q.   Did you ever talk to them?

A.   No, huh-uh. I don't know where they came from. I just know a couple of people came to my house and asked me how I knew each person.

Q.   Okay. Were they from the DA's Office?

A.   I don't know.

Q.   Did they tell you they were the police? Did they show you a badge?

A.   They left me cards, but to be honest, this is not real important to me.

Q.   Well, did you ever ride in a car with Paul Storey?

A.   Yes, I have.

Q.   On few or on many occasions?

A.   Just like one time.

Q.   Where did y'all go?

A.   He took me to the store.

Q.   To get some groceries?

A.   I don't remember what I went to go get, but he gave me a ride to the store.

Q.   Do you own a car?

A.   My car was broken down at that time.

Q.   Okay. So your testimony is, you've never seen him pull a gun and point it at anyone?

A.   Yes, that is my testimony.

MR. RAY:   That's all. I would ask for a limiting instruction.

THE COURT:   Ladies and Gentlemen, the testimony of impeaching the witness is solely to be used for that purpose.

### REDIRECT EXAMINATION

BY MR. FORAN:

Q.   So, Ms. Davis, he took you to the store, this happened about a month and a half before the Putt-Putt murder?

A.   I don't recall the date.

Q.   Wasn't that long before the murder?

A.   I don't know when he took me to the store. I don't remember the date.

Q.   Do you recall coming down to our offices with your mother, Pamela Davis?

A.   Yes, sir.

Q.   That was within the last two months.

A.   Okay.

Q.   Another time Mr. De La Flor and I came to your home.

A.   I didn't talk to you guys.

Q.     We made arrangements to speak to you later; is that right?

A.     Yes, sir.

Q.     But now you've just conveniently forgotten what you said?

A.     Not conveniently; I just don't remember.

Q.     I'm sorry. Just to be honest, you just don't care, right?

A.     If you want to say that.

Q.     I think that's what you said.

A.     No. I said it wasn't of any importance to me, my family, my kids, my job.

       And I am here in court today, when I am supposed to be at work, to help you guys to do what you have to do. Because you are at work right now, right? And you are getting paid. So I am missing that time.

       So not, it's not of any importance to me.

Q.     That or the truth, right?

A.     Excuse me?

Q.     That or the truth, right?

A.     I don't understand what you are saying.

Q.     You got up here and you just told the jury something false, when you, in fact, had told them previously of seeing this man in a little road-rage incident, when somebody cut him off when you were on the way to the store, wave his gun at this unknown driver. And now you are going back on it because it's just not important enough for you to be here, right?

A.     (No response)

MR. FORAN:      Pass the witness.

       RECROSS-EXAMINATION

31

BY MR. RAY:

Q.      Ms. Davis, do you work anywhere outside the home?

A.      Yes, sir.

Q.      Where do you work?

A.      For John Peter Smith.

Q.      Is that a full-time job?

A.      Yes, sir.

Q.      And at your home, how many people live in your home?

A.      Me and my six children.

Q.      So do any of those children's fathers, do they support the kids?

A.      No, sir.

Q.      You are working a full-time job at JPS and supporting six kids?

A.      Yes, sir.

pp. 22-30

The State's third and final witness was a district attorney investigator through whom they made a lame effort to impeach their first two witnesses.

It is telling that in the states final argument to the jury for the death penalty, they did not make <u>one</u> mention of any of their three "punishment" witnesses.

Weakness in the state's punishment stage case, does not excuse trial counsel from adequately and competently investigating and presenting mitigating evidence including low risk of future dangerousness in a death penalty case. It does, however, establish how a

32

competent investigation and presentation of mitigating evidence would have reasonably changed the outcome of the trial. How it could have changed at least one juror's vote on at least one issue, thereby meeting *Strickland's* second prong. (See, Exhibit 3).

## STANDARD OF REVIEW AND REQUEST FOR
## AN EVIDENTIARY HEARING ON CLAIM NUMBER ONE

Petitioner has never had <u>any</u> kind of hearing on this issue, although the issue was fully raised in Petitioner's state habeas writ and through Dr. Fallis's 16 page, 2010 report which was presented to the court of conviction as a part of that writ.

In an order dated December 8, 2010, the court of conviction found that neither Petitioner's state writ nor Dr. Fallis's 16 page report raised a "contraverted, previously unresolved factual issue material to the legality of Appellant's confinement . . . Therefore, this court finds that the there [sic] is no necessity for a fact finding hearing . . ." (See Attached Exhibit 4). Likewise, because the court of conviction found that there were no material, previously unresolved factual issue, she did not order affidavits, depositions, or interrogatories, as provided for by the Texas Code of Criminal Procedure. In essence, she found that Petitioner had not stated a claim upon which relief could be granted.

Although trial counsel filed affidavits with the district clerk in support of the state's responsive writ, they were not filed pursuant to court order as required by the Texas Code of Criminal Procedure <u>after</u> a finding of unresolved material fact issues and, therefore, were never evidence in front of the court. In fact, they have no status at all under Texas law.

The Texas Code of Criminal Procedure specifically sets out the state post-conviction

writ procedure in death penalty cases. The state court completely ignored the procedure and made a completely unreasonable decision, ignored Supreme Court law, and violated due process.

Petitioner timely filed his state writ with the Fallis 2010 report (Exhibit 2). The State responded. At that point, after the State answers:

> the convicting court shall determine whether controverted, previously unresolved factual issues material to the legality of the applicant's confinement exist and shall issue a written order of determination.
>
> (b) If the convicting court determines the issues do not exist, the parties shall file proposed findings of fact and conclusions of law . . .

Tex. Code Crim. Pro. art. 11.071, sec. 9.

Here, the "convicting court" issued an order on December 8, 2010 finding that Petitioner's state writ raised no contraverted, previously unresolved material, factual issues and consequently there was no need to follow the fact finding process as set out in the next provision of the Code which reads as follows:

> (a) If the convicting court determines that contraverted previously unresolved factual issues material to the legality of the applicant's confinement exist, the court shall enter an order . . . designating the issues of fact to be resolved and the manner in which the issues shall be resolved. To resolve the issues, the court may require affidavits, depositions, interrogatories, and evidentiary hearings, and may use personal recollection.

Tex. Code Crim. Pro. Sec. 9(a).

The Court's Order of December 8, 2010 found that this second step was unnecessary. Therefore the convicting court unreasonably found, based on no evidence, as none was required by the court, that there was "no contraverted, previously unresolved factual issues

34

material to the legality of Appellant's confinement . . . Therefore, this court finds that there

[sic] is no necessity for a fact finding hearing . . ." Presumably, there was likewise no need

for affidavits, depositions, or interrogatories.

The court of conviction went on to order each side to file proposed findings of fact

and conclusions of law.

Petitioner's writ counsel filed proposed findings and conclusions which included the

following:

> The post conviction mitigation evaluation revealed that the applicant was a low
> risk for future dangerousness. The jury did not hear this type of evidence from
> the defense . . .
>
> The Applicant's trial attorneys have responded that Randy Price
> completed a report and could not offer any help for the applicant. There ain't
> no report. We have a credibility issue in full view at this point because Price
> turned over a few pages of handwritten notes and some test results . . . A report
> would contain an analysis of family history, social factors, risk of future
> dangerousness - in and out of prison . . . In fact, Dr. Price opined that the
> applicant's depression was probably situational. To the contrary, Dr. Fallis
> developed information regarding serious depression problems in the life of the
> applicant. Fallis analysis at 11-13. [Petitioner's trial attorney] also states that
> Price could not state that the applicant would not be a future danger. Where?
> In or out of the penitentiary? Again, having a talk with Price makes it
> exceedingly easy to reach conclusions that can never be impeached. On the
> other hand [the trial attorney] attacked Fallis' report but could only do so
> because Fallis wrote an actual report.

The State court's finding that there were no contraverted, previously unresolved

factual issues material to the legality of Applicant's confinement was clearly "a decision that

was based on an unreasonable determination of the facts in light of the evidence [or lack

thereof] presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

Trial counsel's affidavits were not "evidence", they were mere proffers. There is only "evidence" once there is a contraverted issue of material fact. The court never asked for evidence by affidavit or otherwise as required by the statute when there are contraverted material facts. Even if the unsolicited proffered report and affidavits were considered "evidence", they are in such dramatic disagreement on so many material facts that it was completely unreasonable to assert, as the court of conviction did, that a decision could be made on uncontraverted material factual issues therefore obviating the need for any fact-finding process. Dr. Fallis and Dr. Price did not even, agree on whether Petitioner's score of 81 on a standard I.Q. test administered by Dr. Price was considered "Low Average" or "Borderline Intellectual Functioning."

Other material fact issues raised by the state writ and Dr. Fallis's 2010 report which clearly raised fact issues not properly resolved by the court of conviction include the following found at pp. 12-13 of Dr. Fallis's 2010 report:

> Mr. Storey was assessed by a psychologist, Randy Price, Ph.D., during his pretrial period of incarceration. The results of this evaluation, primarily focused on neuropsychological issues, will be discussed in a later section. The records show Dr. Price asked very few questions about Mr. Storey's history, although Dr. Price likely was asked to focus on testing. Moreover, the information from Dr. Price's report shows Dr. Price mistakenly labeled Mr. Storey's intelligence as falling in the Low Average range, rather than in the Borderline range.

> Randy Price, Ph.D., performed a neuropsychological assessment of Mr. Storey on July 14, 2008. Records show Dr. Price administered the Reynolds Intellectual Assessment Scales (RIAS), the Repeatable Battery for Assessment of Neuropsychological Status (R-BANS), and the Reynolds 15-Item test. The

latter test is used to screen for malingering of cognitive problems and the results indicated Mr. Storey was not malingering such deficits. Evidently Dr. Price provided feedback to the defense attorneys that, based on the three tests administered, Mr. Storey had no cognitive or neuropsychological deficits.

The RIAS scores demonstrated a Composite IQ Score of 81, as well as a Verbal Score of 82 and a Nonverbal Score of 86. Note that Dr. Price characterized the overall score of 81 as "Low Average"; however, the Diagnostic and Statistical Manual-IV (DSM-IV) states that an IQ score that falls in the range from 71 to 84 is the basis for diagnosing Borderline Intellectual Functioning. This diagnosis does not appear to have been provided to the defense attorneys.

With regard to the tests chosen for the cognitive assessment, Mr. Storey was not given the most comprehensive, well-validated, and most reliable intelligence test available. This test would be the Wechsler Adult Intelligence Scale-IV (WAIS-IV). Given that Mr. Storey's life was at stake in a capital murder case, this examiner argues that the WAIS-IV should have been the choice for considering neuropsychological and general cognitive capacities. This test would yield more information that the RIAS regarding both functioning during the crime and development functioning pertinent to mitigation.

The State court of conviction could only have done one of three things: She completely ignored the assertions made in Petitioner's state writ and treated them as if they had not been made; she failed to recognized the diametrically opposed assertions of material fact between the two sides that needed to be resolved; or she ignored the law and simply resolved every controverted material fact in favor of the State, in her own way and without first designating the material facts to be resolved and the process by which she would resolve them; an abject violation of Texas law and due process. In fact, it appears that the court of conviction did all three.

The court of conviction's findings purportedly based on uncontraverted facts, and

37

which were essentially drafted by the state and rubber-stamped by the Court of Criminal

Appeals, make a number of completely unsupported and even irrational assertions. A few

examples include:

> Finding No. 24.    Neither Applicant's habeas counsel nor his post-conviction mitigation special cite any newly discovered evidence from any source or witness except from Applicant himself.

Simply not true. For example, Dr. Fallis, not Petitioner, "discovered" that "81" is

Borderline Intellectual Functioning, not low average. In addition, "new" evidence was

discovered from Petitioner's mother and the personality tests given to her. The information

Dr. Fallis reviewed for her 2010 report is attach as an appendix to her June 13, 2012 report.

Of course, the irony is, so what if all new information came from "Applicant

himself"?

> Finding No. 25.    Applicant's post-conviction mitigation expert has failed to corroborate any of Applicant's claims that form the basis of her assessment of Applicant. The expert lists her "collateral contacts" in conducting her assessment as a one and a half hour interview with Applicant's writ counsel and one telephone interview and one face-to-face interview with Applicant's mother totaling two-and-one-fourth hours. [Applicant's Application Appendix B, Psychological Evaluation (hereinafter Fallis Report), at 1].

Simple not true (See Finding 24, above).

> Finding 30:    Applicant has failed to establish how Dr. Price's assessment of Applicant's intellectual functioning could have affected Applicant's punishment defense, particularly as Applicant's counsels were made aware of the actual test results.

Nonsensical. Obviously, the difference between Borderline Intellectual Functioning

and Low Average is hugely significant in analyzing Petitioner's entire mitigation case.

Regardless, her decision "resulted in a decision that was contrary to or involved an unreasonable application of clearly established Federal law . . ." and "resulted in a decision that was based on an unreasonable determination of the facts in light the evidence presented in the state court proceeding," within the meaning of 28 U.S.C. § 2254(d). It also violated due process. She did not even follow state procedural law.

Additionally, Petitioner requests an evidentiary hearing because of Dr. Fallis's findings pursuant to a recent examination and testing she conducted on Petitioner as reflected in her report dated June 13, 2012. (Attached Exhibit 1).

First, she confirmed through additional, more accurate testing that Mr. Storey is "Borderline Intellectual Functioning" not low average, an issue that is mitigating in and of itself and perhaps, more importantly, changes the entire landscape as to all mitigating issues, including those presented to the jury by trial counsel. See, Exhibit 1 at pp. 13-17. These results confirm what was presented to the court of conviction as part of Petitioner's state writ but which were completely and unreasonably discounted by that court without any sort of hearing legally recognized fact finding process.

In addition, Dr. Fallis conducted additional personality tests that yielded information, undiscovered by trial counsel but which would have been hugely valuable at trial. On page 15 of Dr. Fallis's June 13, 2012 report, she states:

> The results of the Gudjonsson Suggestibility Scale indicate a significantly greater than average suggestibility for Mr. Storey . . . In other words, Mr. Storey is more likely than 75% of the population to acquiesce to stronger

personalities who urge him to think differently or act differently than he would if he were by himself. The results indicate Mr. Storey is a follower, not a leader, and will be vulnerable to those he perceives as having some authority. This finding is consistent with significantly below average intellectual testing results. In other words, individuals with scores in the range of Borderline Intellectual Functioning (or below) are, by definition, more likely to be socially vulnerable and gullible.

Petitioner is entitled to an evidentiary hearing under 28 U.S.C. § 2254(e).

## CLAIM FOR RELIEF NUMBER TWO

PETITIONER'S FOURTEENTH AMENDMENT RIGHT TO EQUAL PROTECTION UNDER THE LAW WAS VIOLATED WHEN THE STATE WAS ALLOWED TO USE A PEREMPTORY STRIKE ON AN AFRICAN AMERICAN JUROR BASED ON RACE. *SNYDER V. LOUISIANA*, 128 S.Ct. 1203 (2008) BATSON *V. KENTUCKY*, 476 U.S. 79 (1986); *MILLER-EL V. DRETKE*, 545 U.S. 231 (2005)

## ARGUMENT AND AUTHORITIES

Each potential juror was voir dired individually, with challenges for cause and strikes made immediately after each potential juror's voir dire. Petitioner is African American. Venireman number 50 was African American. Even one race based peremptory strike by the State requires reversal.

The trial court heard the *Batson* challenge after denying the State's challenge for cause regarding the same venireman number 50. [R.Vol.-18:111-112] This is a significant component in evaluating the State's purported race neutral reasons for their strike because the trial court did not believe, as the State asserted in their challenge for cause, that the juror would require the State to show that a person would kill again before he could answer yes to special issue number one. In fact, the juror clearly did <u>not</u> say that. In fact when directly

40

asked that very question, the juror said the opposite, that he absolutely would not require that.

So why did the state so obviously and inaccurately assert that he did? [R.Vol.-18:111-112 at

lines 9-4] That is the first red flag that the State is in fact trying to get rid of this juror not for

the reasons they say, but for reasons they do not wish to disclose. Note that the trial court

judge stated:

> THE COURT: I don't - I didn't get him saying all that, either. I'm going to
> deny the motion for cause. [R.Vol. -18:112]

The prosecutor then exercised a peremptory on Venireman 50 and the defense

raised the *Batson* challenge.

> *Batson* provides a three-step process for a trial court to use in adjudicating a
> claim that a peremptory challenge was based on race:

> > "First, a defendant must make a prima facie showing that a
> > peremptory challenge has been exercised on the basis of
> > race[;s]econd, if that showing has been made, the prosecution
> > must offer a race-neutral basis for striking the juror in
> > question [? and t], in light of the parties' submissions, the trial
> > court must determine whether the defendant has shown
> > purposeful discrimination.'" *Miller-El v. Dretke*, 545 U.S.
> > 231, 277 (2005).

The trial court heard the prosecutors explanation. [R.Vol.-18:112]

The following excerpts pinpoint the State's purported race neutral claims:

Reason One

MS. JACK: . . . Okay. Judge, first of all, our issues with regard to his voir dire, my -
my particular issues have to go with I believe that he would increase our burden of
proof with regard to question number one.

I think that the type of evidence that he's looking for in order to support an answer to
question number one has to do with the - the probability that the Defendant would

41

commit a future homicide against an employee of the prison system or someone else at the prison system. [R.Vol.-18:113]

What the Venireman actually answered

Q. Prosecutor: And so some people get to this point and they're like, as they sit in the chair - and we only get today to talk to you, okay-they just can't have that on their spirit.

*****

Q. All right. What we ask them-first, we want to know your feelings about it when you reach this point, just because you found somebody guilty of capital murder, whether or not that would make you inclined or - as you sit here today, to answer this question one way or the other, or can you follow this law and listen to all the evidence and not be predisposed to answer it either yes or no, just answer it based on the evidence?

A. I'll just have to answer it based on the evidence. [R.Vol.-18:66]

More Answers

Q. Prosecutor: Okay. Remember, I don't have to prove he's going to kill again. All right?

*****

Q. Okay. So are you saying that I would have to-well, I mean, you remember in the first question you would have answered that you felt that he was a future danger, that he'd continue to commit criminal acts.

A. Right.

Q. - of violence, okay?

A. I mean, you can always do that in the prison system, too.

*****

Q. But I want to make sure I understood your question - I mean, you already required me to prove - or I'm required to prove that first question should be yes. Okay?

42

\*\*\*\*\*

A.  I mean, if you're going to go into the prison system and take lives, I mean, that tells me that it doesn't make any difference where you are, inside or out. That would probably be - I would lean - lean more towards, you know . . . [R.Vol.-18:70-72]

\*\*\*\*\*

A. The -the death penalty.

\*\*\*\*\*

A. Give him a life sentence. Now if he's a real bad character to the point where he's rabid and he's going to hurt even the prison population, you know, there's no point-you already convicted him. All you can do is give him life, okay, sentence.

He gets in there, he decides, I'm already here, might as well kill a few people while I'm here, hey, just go ahead and give him the death penalty and be done with it.

Q. Okay. Just so I - I mean, are you saying that you want me to show you that he'd kill again? (R.Vol.-18:73-74]

A. <u>No, no, no</u> [emphasis added]

\*\*\*\*\*

A. - up to this point will tell you that, you know. That he's going to go and do his time and he's going to do whatever he has to do and-and act accordingly while he's there. Okay?

\*\*\*\*\*

A. And then, you know, he's not going to be a danger to anybody else in the prison system because you still got wardens, guards and everything else.

And if he's likely to hurt people outside for just a few dollars, and he has no, you know, conscience, no repentance over that, then you put him into a prison system and he's going to take out a guard, regardless. [R.Vol.-18:74-75]

43

The State ended this inquiry by limiting the venireman's definition of "hurt someone else". [R.Vol.-18:78]. In other words, the State elicited an answer that "hurt someone else" means taking a life, however, the venireman's answer has to be taken in the context of his prior answer where he emphatically answered that he would not have to be shown that a defendant was going to commit murder again, "no, no, no". [*See* R.Vol.-18: lines 2-4 @ 75] To paraphrase an old country song, what part of "no, no, no," did the State not understand? Clearly, the State had some other reason in mind when they moved to strike him for cause. There is no other reasonable explanation for arguing that "no, no, no" actually meant "yes, yes, yes". Why did the State have to be secretive as to their <u>real</u> reason? When the defense called "Batson", the State conjured up additional "race neutral" reasons.

After unsuccessfully convincing the trial court that "no, no, no" means "yes, yes, yes,", the prosecutors continued to dissemble.

### Additional Reasons

The State's additional proffered, purported race neutral reasons for the strike were based on the venireman's distrust of the criminal justice system and his requirement of "mass murder" for a finding of future dangerousness. [R.Vol.-18:114-115].

However, nowhere in his voir dire does the juror make <u>any</u> mention of either issue. The State declined to even question the venireman on his distrust of the criminal justice system or as to his requirement of "mass murder" as a prerequisite for a finding of future dangerousness. Although both reasons are "race neutral", they are both clearly pretextual.

In addition, the following exchange occurred:

44

THE PROSECUTOR: In addition to that, Judge, I've been a prosecutor almost 17 years - this September will be 17 years - and I have a personal rule that I will never place on a felony case a venireman who has ever found an individual not guilty of a felony case.

Mr. Patterson, my records indicate, one and the same Patterson that lived at 4820 Willie Street, with the exact same date of birth and the exact same name, has served as juror in Cause Number 0507514 out of Criminal District Court No. 4 in 1994 for the offense of aggravated robbery with a deadly weapon. And he not only served on a jury in that case, but he found the Defendant not guilty.

I don't know why he's not recalling this information, Judge. That kind of bothers me on two different levels. It-it bothers me - I don't want to think that he would intentionally hide this information.

But on the other hand, if it just - if it just simply doesn't stand out in his mind, then it tells me he really didn't - that the lack of seriousness that he gave to his jury service, that it would not cause him to recall it when we go over this same type of law today with regard to robbery and deadly weapons.

I have never placed someone on a jury that has found someone not guilty of a felony before. And for all of those reasons for me personally, it was recommendation that we strike this juror. [R.Vol.-18:116-117]

Other Reasons

The State also presented two other reasons for their strike. One, the venireperson indicated that having a good lawyer was important in terms of a favorable outcome. Second, the venireperson ranked punishment as the last goal in a four part ranking of the goals of the criminal justice system. [R.Vol.-18:115]

No Questions

The State did not ask the venireperson one question about his jury service on the alleged "not guilty" case. Not one. [R.Vol.-18:24-26] The State asked no questions regarding the ranking system or the goals of the criminal justice system.

45

## Snyder and the Requirement of Questioning

In *Snyder v. Louisiana*, 128 S.C. 1203 (2008), the Supreme Court addressed the issue

of *Batson* again deciding, in part, that the State's lack of questioning on a particular issue

established discriminatory intent. *Id*. at 1211-1212. The Court held:

> In other circumstances, we have held that, once it is shown that a
> discriminatory intent was a substantial or motivating factor in an action taken
> by a state actor, the burden shifts to the party defending the action to show this
> factor was not determinative. See *Hunter v. Underwood*, 471 U.S. 222,228
> (1985) . . . And in light of the circumstances here - including absence of
> anything in the record showing that the trial judge credited the claim that Mr.
> Brooks was nervous, the prosecution's description of both its proffered
> explanations as "main concerns]," and the adverse inference noted above-the
> record does not show that the prosecution would have pre-emptively
> challenged Mr. Brooks based on this nervousness alone. *Snyder* at 1212.

## Discussion

The State's intentional discrimination is apparent on the face of the record and

embodied in the concept of the venireman as a nonperson. First, the State questions the

African American juror ad nauseam on an issue in which to the definitive question, the juror

answers "no, no, no". The State continues with the questioning then challenges for cause

arguing that his answer was "yes, yes, yes". When the trial judge correctly disagrees with the

State's characterization of his answers, the State argues purported "race neutral" reasons for

its peremptory strike that the state never even questioned him, on even though it had every

opportunity to do so.  It is really as if Mr. Patterson (Juror number 50) did not exist. Yet we

know he sat there and the prosecutors had time to ask him about every problem area they

expressed concern over. This is best thought of as a *Batson* avoidance technique. A

46

prosecutor might broach a problem area; i.e., prior jury service but not fully explore the area and reach the penultimate question. In this case, that question would have addressed - directly - Mr. Patterson's prior not guilty vote if in fact it occurred. [R.Vol.-18:24-26]. If the State really had a problem with the burden of proof regarding future dangerousness then they could have asked Mr. Patterson a direct question. Mr. Patterson answered that hurting a guard or other prison employee was not acceptable and that criminal acts were not confined to murder, *supra*. As noted above the prosecutor offering the purported race neutral reasons just couldn't understand why Mr. Patterson could not recall his prior jury service, *supra*. He was suspect. The real explanation; however, is much simpler. The State fills in the blanks with every negative inference at hand. However, the real import of *Batson* and the cases that follow *Batson,* including *Snyder*, *supra*, lies in the importance of requiring either side to conduct questioning regarding problem areas they later assert were the "race neutral" reasons for the strike. If the "problem areas" are concerning enough to burn a peremptory strike, they are concerning enough to ask at least one question about in an hour of individual voir dire. Otherwise they are presumptively pretextual. This requirement ends the insidious practice of trial courts and lawyers agreeing on pretextual race neutral reasons to strike that never existed. Proving the negative is always difficult, but here, the only reasonable inference that can be drawn from the prosecutor's complete lack of questioning vis-a-vis his purported race-neutral reasons are that the reasons were unequivocally pretextual.

The State's peremptory strike was infected with racist intent and based on that fact a *Batson* violation occurred.

47

This issue was raised and rejected on direct appeal by the Texas Court of Criminal Appeals. The Court's reasoning basically bought off on the State's unreasonable position that "no, no, no", meant "yes, yes, yes". "Patterson's answers during voir dire conveyed the impression that he would not answer the future dangerousness issue affirmatively unless he was persuaded that the defendant was likely to kill someone in prison . . ." *Storey v. State*, Slip Op. at 27 (Tex.Crim.App. Oct 6, 2010). Even the trial court did not swallow that reason when she rejected the State's motion to strike for cause. Likewise, the Court of Criminal Appeals failed to conduct any analysis as to whether the State's other purported race neutral reasons were pretextual other than to defer generally to the trial court's judgment. There was no discussion anywhere of the State's complete and total lack of questioning in the other areas it asserted as problematic and "race neutral".[2]

The Texas Code of Criminal Appeals rendered a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. In addition, the decision was contrary to and involved an unreasonable application of clearly established federal law. Petitioner requests an evidentiary hearing on this issue.

---

[2]This issue was likewise raised in the state writ but was rejected without analysis because of the Court of Criminal Appeals decision.

48

## CLAIM FOR RELIEF NUMBER THREE

ARTICLE 37.071 OF THE TEXAS CODE OF CRIMINAL PROCEDURE (THE DEATH PENALTY SENTENCING STATUTE) IS UNCONSTITUTIONAL AS APPLIED TO PETITIONER AND ON ITS FACE, VIOLATING THE PETITIONER'S FIFTH, EIGHTH AND FOURTEENTH AMENDMENT RIGHTS

## ARGUMENT AND AUTHORITIES

The statutory "*Penry*" special issue in Tex.Code Crim.Proc. 37.071 is unconstitutional because it fails to place the burden of proof on the State regarding aggravating evidence. The Supreme Court has held that the Eighth Amendment requires the State to prove the existence of aggravating factors during the capital punishment phase. *Walton v. Arizona*, 497 U.S. 639; 110 S.C. 3047, 3055 (1990) (State's "method of allocating the burden of proof" burden . . . to prove the existence of aggravating factors"). In order to understand why *Walton* applies to the statutory "Penry" special issue (special issue number 3) this Court must recognize that this special issue is a conduit for aggravating as well as mitigating factors. By asking jurors to determine whether there are sufficient mitigating circumstances, Tex.Code Crim.Proc. Art. 37.071, Section 2(e), the statutory special issue in effect tells jurors to consider any possible aggravating factors that may outweigh the mitigating factors present in the case. Although the statute does not explicitly use the term "aggravating circumstances," clearly that is how a reasonable juror must interpret the statute. *Johnson v. Texas*, 509 U.S. 350; 113 S.C. 2568 (1993) (describing jurors' determination of answer to "future dangerousness" special issue to require balancing of aggravating and mitigating circumstances.). Because the statute is

49

silent about whether the State or the defense has the burden of proof on aggravating factors; and, moreover, because the language of the special issue implies that the burden to disprove aggravating circumstances is on the defense, the statute is unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution.

In addition, the *"Penry"* special issue is unconstitutional under the Eighth and Fourteenth Amendments because it permits the very type of open-ended discretion condemned by the Supreme Court in *Furman v. Georgia*, 408 U.S. 238 (1972), in which the Supreme Court struck down capital punishment as it then was administered. The Court's decision focused on the arbitrariness of the procedure. In particular, the Court condemned the open-ended, unstructured discretion that was given to capital sentencing juries. *Gregg v. Georgia*, 428 U.S. 153 (1976).

In the years following the Court's decision in *Penry v. Lynaugh*, 492 U.S. 302; 109 S.C. 2934 (1989), the Texas Legislature enacted a new capital sentencing scheme that sought to cure the constitutional defect found in the former capital sentencing scheme and identified by the United States Supreme Court in *Penry*. The new statutory *"Penry"* special issue contained in Tex.Code Crim.Proc. 37.071 and 37.0711, provides the following:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

Five members of the modern Supreme Court have, directly or indirectly condemned

an open-ended, unstructured capital sentencing instruction such as Texas' statutory "Penry" special issue as violative of the Eighth and Fourteenth Amendments to the United States Constitution. *Penry v. Lynaugh*, 109 S.C. 2934, 2969 (1989) (Scalia, J., dissenting, joined by Rehnquist, C.J., White, J. and Kennedy, J.)(In holding that the jury had to be free to deem Penry's mental retardation and sad childhood for whatever purpose it wished, the Court has come full circle, not only permitting but requiring what *Furman* once condemned.); *Graham v. Collins*, 506 U.S. 461; 113 S.C. 892, 903-915 (1993) (Thomas, J., concurring) (*Penry* reintroduces the very risks that we had sought to eliminate through the simple directive that States in all events provide rational standards for capital sentencing.)   In dicta, Justice Thomas has explicitly suggested that the type of sentencing scheme in operation at the Petitioner's trial violates *Furman. See Graham*, 113 S.C. at 913 n.9 (Discussing the present Texas capital sentencing statute).

Rather than submit such an open-ended, unstructured sentencing issue, the Eighth Amendment requires that a trial court, in the sentencing phase of a capital case, instead submit a charge that adequately structures the jury's sentencing discretion regarding mitigating and aggravating factors. *Gregg v. Georgia*, 428 U.S. 153 (1976)(discussing Georgia's pot-*Furman* capital sentencing statute). The Petitioner received no such instruction in this case resulting in Eighth and Fourteenth Amendment violations.

Texas' statutory capital sentencing scheme is unconstitutional under the Eighth and Fourteenth Amendments because it does not permit meaningful appellate review.  As discussed above, the pivotal sentencing issue in Texas capital cases - the statutory "Penry"

51

special issue does not specify the types of mitigating or aggravating factors relevant to a capital sentencing jury's deliberations during the punishment phases. Rather, the jury is simply asked whether there exists a sufficient mitigating circumstance or circumstances to warrant a life sentence rather than a death sentence. In a larger sense, however, the "Penry" special issue requires Texas juries to perform the same functions that other States' post-Furman capital sentencing juries already perform: (1) the threshold findings of particular aggravating and mitigating circumstances; and (2) the balancing process whereby jurors determine whether the mitigating factors outweigh the aggravating factors. *Gregg v. Georgia*, 428 U.S. 153 (1976) (discussing Georgia's post-Furman statute).

Petitioner contends that the Texas unstructured sentencing scheme is unconstitutional because it does not permit meaningful review, which is not only required by Texas statute, but also is a prerequisite to any constitutionally implemented capital sentencing scheme. Because the third statutory special issue is open-ended and unstructured (i.e., not enumerating a list of mitigating and aggravating factors and not requiring jurors to make specific findings in this regard), the Court of Criminal Appeals has no way to know which aggravating and mitigating factors the jurors considered. Thus, the appellate court has no way to know how, and indeed whether, the jury considered any of the constitutionally relevant mitigating evidence offered at trial. In this way, meaningful appellate review is impossible. The Supreme Court has recognized that an appellate court is in a virtually impossible position to review a jury's consideration of mitigating and aggravating evidence, without knowing which factors the jury in fact considered. *Sawyer v. Whitley*, 505 U.S. 333; 112 S.C. 2514,

2522-23 (1992) (noting how difficult a task a reviewing court faces in assessing how jurors reacted to mitigating and aggravating evidence, particularly considering the breadth of those factors that a jury must be allowed to consider without knowing how jurors actually considered the totality of the evidence).

Because the Constitution requires appellate review of the sufficiency of the evidence supporting a jury's negative answer to the statutory "Penry" special issue, the open-ended and unstructured nature of Arts. 37.071 & 37.0711, which prevents such meaningful appellate review, renders the Texas capital sentencing statute unconstitutional under the Eighth and Fourteenth Amendments to the United States Constitution.

Article 37.071's "parties" special issue violates the Eighth and Fourteenth Amendments to the United States Constitution.  The "parties" statutory special issue contained in Tex.Code Crim. Proc. Art. 37.071, Section 2(b)(2)(1994) reads as follows:

> "[I]n cases in which the jury charge at the guilt or innocence stage permitted the jury to find the Defendant guilty as a party under Section 7.01 and 7.02, Penal Code, whether the Defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken."

The Petitioner contends that this statutory special issue is facially unconstitutional because of the statute's use of the language "or anticipated that a human life would be taken." Such language - which permits a capital sentencing jury to impose a death sentence based upon a finding that a Defendant, found guilty under the "law of parties," simply "anticipated" that death might occur - violates the Eighth Amendment principle announced by the Supreme Court in *Tison v. Arizona*, 481 U.S. 137 (1987) and *Emmund v. Florida*, 458

53

U.S. 782 (1982).

This statute is unconstitutional because it fails to require that mitigation be considered. A juror is constitutionally required to consider all mitigation. After the juror has considered the mitigation, it is then up to the juror to determine what effect to give the mitigation. Failure to mandate consideration of _all_ mitigating evidence makes this statute unconstitutional, in violation of the Eighth Amendment. Capital murder statutes which have survived constitutional scrutiny all require that the jury be told that it _must_ consider _all_ mitigating evidence. *Johnson v. Texas*, 509 U.S. 350;113 S.C. 2658 (1993); *Boyde v. California*, 494 U.S. 370 (1990); *Blystone v. Pennsylvania*, 494 U.S. 299 (1990).

The present Texas capital sentencing statute defines "mitigating evidence" as "evidence that a juror might regard as reducing the Defendant's moral blameworthiness." Tex.Code Crim. Proc. Art. 37.071, Section 2(e)(4) & 37.0711, Section 3(f)(3)(994). This definition of "mitigating evidence" is unconstitutionally narrow. The Supreme Court has held that constitutionally relevant mitigating evidence is not simply that type of mitigating evidence that relates to a capital defendant's moral culpability or blameworthiness for the crime, but also includes any mitigating evidence relevant to a defendant's character, history, or circumstances of the crime that militates in favor of a life sentence. *Skipper v. South Carolina*, 476 U.S. 1 (1986). Numerous types of constitutionally relevant mitigating evidence thus have nothing to do with a capital defendant's moral culpability or blameworthiness - such as a history of positive character traits, kindness shown toward children, or animals, or artistic talent. Although the statutory "Penry" special issue speaks of "the circumstances of

54

the offense, the defendant's character and background, and the personal moral culpability of the defendant," Art. 37.071, Section 2(e), the statute's separate definition of "mitigating evidence," limits jurors' consideration of such evidence to those mitigating factors that specifically implicate the defendant's moral blameworthiness.

Therefore, the statute's limited definition of mitigating evidence violates the Eighth and Fourteenth Amendments to the United States Constitution.

The Texas death penalty scheme is unconstitutional and in violation of the Eighth and Fourteenth Amendments of the United States Constitution because it does not define the various terms and phrases used in the three special issues in ways that would permit the jury to give full mitigating significance to those terms.

The procedure by which the death penalty is imposed in Texas denies the Defendant protection from cruel and unusual punishment. A close analysis of the statute reveals that the system for imposition of the death penalty permits arbitrary and unchecked discrimination amounting to a denial of equal protection under the law. Pursuant to the provisions of the Texas statutes, two persons could commit capital offenses under similar circumstances, yet one could receive the death penalty and the other life imprisonment. The special issue submission pursuant to Article 37.071 provides no real standard for the guidance of juries in death penalty cases. Turning to the issues themselves, one can readily see that they are couched in nebulous terms that defy a realistic answer. Further, there is no properly defined policy for assisting jurors with the life and death question. The only guidance which the Court gives the jury under Article 37.071, concerning capital punishment, is simply to submit

55

these rather meaningless issues, affirmative answers to which result in a mandatory death sentence. Consequently, the defendant is not adequately protected from jurors acting arbitrarily, and with caprice, in arriving at the awesome decision between life and death.

The Defendant has a right to be free from punishment imposed arbitrarily and capriciously in violation of the Due Process Clauses of the Fifth and Fourteenth Amendments to the Constitution of the United States. The special issues procedures set out in Article 37.071 allow total discretion to a jury to make unfavorable findings against a defendant, and such findings may be based on prejudices the jury may have, individually or as a whole.

Article 37.071 is so vague and indefinite to be incapable of interpretation by reasonable men, and is therefore facially void as violating the Defendant's rights to due process and due course of law, and fundamental fairness as guaranteed by the Fifth and Fourteenth Amendments to the Constitution of the United States.

## CLAIM FOR RELIEF NUMBER FOUR

> THE TEXAS DEATH PENALTY SCHEME VIOLATES PETITIONER'S RIGHT TO DUE PROCESS UNDER THE UNITED STATES CONSTITUTION BECAUSE THE PUNISHMENT SPECIAL ISSUE RELATING TO MITIGATION FAILS TO REQUIRE THE STATE TO PROVE THE ABSENCE OF SUFFICIENT MITIGATING CIRCUMSTANCES BEYOND A REASONABLE DOUBT

## ARGUMENT AND AUTHORITIES

The Fifth Amendment to the United States Constitution guarantees that no person may be deprived of liberty without due process of law, while the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial,

by an impartial jury." U.S. CONST. Amends. V, VI. The right to trial by jury in serious criminal cases is "fundamental to the American scheme of justice, and therefore applicable in state proceedings." *Sullivan v. Louisiana,* 508 U.S. 275, 277-78, 113 S.C. 2078, 2080 (1993) (quoting *Duncan v. Louisiana*, 391 U.S. 145, 149, 88 S.C. 1444, 1447 (1968)).  The prosecution must prove all elements of the offense charged and must persuade the fact-finder beyond a reasonable doubt of the facts necessary to establish each of those elements. *Sullivan,* 508 U.S. at 277-78, 113 S.C. at 2081. The Fifth Amendment requirement of proof beyond a reasonable doubt and the Sixth Amendment requirement of a jury verdict are interrelated. *Id.*

The trial court effectively deprived the Petitioner of his right to a jury trial and his right to have all the elements of the offense proven beyond a reasonable doubt, as guaranteed under the Fifth and Sixth Amendments.  Although this Court and the other United States District Courts of Texas have previously declined to rule in favor of allegations similar to Petitioner's, the conclusion to be drawn from the Supreme Court's decisions in *Apprendi v. New Jersey, Ring v. Arizona,* and *Cunningham v. California*, when considered in tandem with the Texas death penalty statutory scheme, is inescapable: Because special issue No. 3 of Article 37.071, the mitigation issue, increases the maximum penalty for the crime of capital murder, the Texas statutory scheme is unconstitutional for not requiring this issue to be submitted, proved, and found by the jury beyond a reasonable doubt.

In *Apprendi*, the defendant was convicted of a firearms offense under New Jersey state law. *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.C. 2348 (2000). Apprendi's offense was

57

enhanced under an independent "hate crime" statute that authorized imposition of a longer sentence if the trial court found by a preponderance of the evidence that the crime was motivated by racial bias. *Id.* at 469-471, 120 S.C. At 2352-53. The Court noted that Apprendi's case squarely presented the issue of whether he had the right to have a jury, rather than the trial court, decide whether his crime was motivated by bias. In *Apprendi*, the Court held, "[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt. The Fourteenth Amendment commands the same answer in this case involving a state statute." *Id.* at 475-76, 120 S.C. at 2355. The Court reiterated that a criminal defendant's rights to due process, and its associated jury protections, extend not only to a defendant's trial on guilt or innocence, but also to determinations that affect the length of the defendant's sentence. *Apprendi v. New Jersey*, 530 U.S. at 484, 120 S.C. at 2359 (citing *Almandarez-Torres v. United States*, 523 U.S. 224, 251, 118 S.C. 1219, 1234 (1998) (Scalia, J., dissenting)).

In *Ring v. Arizona*, 536 U.S. 584 (2002), the Court relied on its decisions in *Apprendi* and *Jones v. United States*, 526 U.S. 227, 119 S.C. 1215 (1999), to review the constitutionality of a death sentence imposed under the Arizona state statutory sentencing scheme. The Court concluded that, because Arizona state law authorized the death penalty only if an aggravating factor was present, *Apprendi* required the existence of such a factor to be proven beyond a reasonable doubt to a jury rather than to the trial court. The Court also

58

specifically overruled its earlier decision in *Walton v. Arizona*, 497 U.S. 639, 110 S.C. 3047 (1990), which had upheld an Arizona death sentence against a similar challenge. Citing the irreconcilability of Walton's result with its reasoning in *Apprendi*, the Court held that "Capital defendants, no less than noncapital defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Ring v. Arizona*, 536 U.S. at 589, 122 S.C. at 2432.

When *Ring* was decided, Arizona's first degree murder statute provided that the offense was punishable by either death or life imprisonment. *Id.* at 592, 122 S.C. at 2435. The statute required the judge to hold a separate hearing and find all facts and circumstances to determine the appropriate sentence. *Id.* At the conclusion of the hearing, the judge was to determine the presence or absence of those aggravating or mitigating circumstances. As the court in *Ring* pointed out, "based solely on the jury's verdict finding Ring guilty of first-degree felony murder, the maximum punishment he could have received was life imprisonment." *Id.* The Court concluded that if the States makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact - no matter how the State labels it - must be found by a jury beyond a reasonable doubt. *Id.* at 602, 122 S.C. at 2439-40.

Thus, "[a] defendant may not be expose[d] . . . to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone." *Id.* Integral to the Court's holding was its review of Justice O'Connor's dissent in *Apprendi*, where she disagreed with the majority's interpretation of the Arizona death penalty statute, noting: "A defendant convicted of first degree murder in Arizona cannot receive a death

59

sentence unless a judge makes a factual determination that a statutory aggravating factor exists. Without that critical finding, the maximum sentence to which the defendant is exposed is life imprisonment, and not the death penalty." *Apprendi v. New Jersey*, 530 U.S. at 538, 120 S.C. 2388 (O'Connor, J., dissenting).

More recently, the United States Supreme Court has reaffirmed that the Constitution requires all facts relative to guilt and punishment be found by a jury beyond a reasonable doubt. *Cunningham v. California,* 549 U.S. 270; 127 S.C. 856 (2007). In *Cunningham*, the Court considered and rejected a California statutory scheme that required the judge, rather than the jury, to find certain "circumstances in aggravation" relative to punishment in order to justify the imposition of the upper prison term. *Id*. at 862. The relevant California rule required only that circumstances in aggravation "shall be established by a preponderance of the evidence. *Id*. In determining that the rule in question was constitutionally infirm, the Court explained:

> Because circumstances in aggravation are found by the judge and not the jury, and need only be established by a preponderance of the evidence, not beyond a reasonable doubt . . . the [rule] violates *Apprendi*'s bright-line rule: Except for a prior conviction, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and be proved beyond a reasonable doubt."

*Cunningham v. California*, 127 S.C. at 868 (quoting *Apprendi*, 530 U.S. at 490, 120 S.C. at 2348).

Section 19.03 of the Texas Penal Code defines the offense of capital murder, while Section 12.31 sets out the punishment for capital felonies. Tex. Penal Code § 19.03 (2005)

§§; Tex. Penal Code §12.31 (2005). §§ Under 12.31, an individual found guilty of a capital felony in a case in which the State seeks the death penalty shall be punished by life imprisonment, or by death. *Id.* at 12.31. The penal code does not distinguish which defendants found guilty of capital murder are eligible for death. For this, state law requires that the jury make additional findings pursuant to Article 37.071 of the Texas Code of Criminal Procedure. Tex. Code Crim. Proc. art. 37.071. Thus, like Arizona's statutory scheme in *Ring*, the Texas death penalty statute requires cross-referencing and additional fact -finding under another statutory provision before a defendant can be sentenced in a capital murder case. *Ring v. Arizona,* 536 U.S. at 586, 122 S.C. at 2431.

*A defendant convicted of capital murder in Texas may not be sentenced to death until the jury makes additional findings of fact under Subsections (b) and (e) of Article 37.071.*

Under Article 37.071, if a defendant is found guilty of a capital offense in which the State is seeking the death penalty, the court must conduct a separate sentencing proceeding, before the jury, to determine whether the defendant should be sentenced to death or life imprisonment. Tex. Code Crim.Proc. Art. 37.071§2(a)(1). At this proceeding, either side may present evidence on any matter that the court deems relevant to sentencing, including evidence of the defendant's background or character, or the circumstances of the offense that militates for or mitigates against the imposition of the death penalty. *Id.* §2(b)(1). If the jury returns a unanimous, affirmative finding on that issue, it must then decide whether, "taking into consideration all the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant,

61

there is a sufficient mitigating circumstance, or circumstances, to warrant that a sentence of life imprisonment rather than a death sentence be imposed." *Id.* §2(e)(1).

If the jury returns a negative finding on any issue submitted under Subsection (b), or cannot reach a unanimous affirmative finding, the court must sentence the defendant to life imprisonment. *Id.* §2 (g). Likewise, if the jury reaches an affirmative finding on the issue under Subsection (e), or is unable to reach a unanimous negative result, the defendant must receive a life sentence. *Id.* In other words, Texas law authorizes the trial court to sentence the defendant to death only if (1) the jury unanimously finds there is evidence to prove, beyond a reasonable doubt, that the defendant will probably commit future acts of violence that pose a continuing threat to society, and (2) the jury unanimously agrees that the evidence in mitigation of the offense is not sufficient to warrant a sentence of life imprisonment rather than death. Thus, Petitioner could not be punished with a greater sentence - in this case, the death penalty - until and unless the jury *unanimously* found (1) there was a probability that Petitioner would commit criminal acts of violence that would constitute a continuing threat to society, and (2) any mitigating evidence did not rise to a level to warrant a sentence of life imprisonment rather than a death sentence.

As the Court in *Ring* stated, "the right to a trial by jury guaranteed by the Sixth Amendment would be senselessly diminished if it encompassed the fact-finding necessary to increase a defendant's sentence to two years, but not the necessary fact-finding to put him to death." *Ring v. Arizona*, 536 U.S. at 609, 122 S.C. at 2443. Likewise, in this case, Petitioner's right to a jury trial will be undermined if this Court holds that his Sixth

62

Amendment right encompasses the right to have the jury find beyond a reasonable doubt that he was responsible for the death of the victim, but not to find all the facts beyond a reasonable doubt necessary before he is eligible for the death penalty to be imposed under Article 37.071.

Admittedly, the Fifth Circuit Court of Appeals has declined to shift the burden of proof from the defendant to the State on the issue of mitigation. In *Rowell v. Dretke*, that court addressed this issue in the context of whether the Respondent had established that he was entitled to a certificate of appealability under 28 U.S.C. §2253 ©) (2), 398 F.3d 370 (5th Cir. 2005). The court held that *Ring* did not apply to Rowell's case because the Supreme Court did not contemplate that the Sixth Amendment's "reasonable doubt" requirement would extend to a capital sentencing jury's findings regarding mitigating factors. Instead, *Ring* focused exclusively on certain judicial findings regarding aggravating factors. *Rowell*, 398 F.3d. at 377-78. The State argued, and the Court agreed, that Rowell was foreclosed from relying on *Ring* and *Apprendi* because, unlike the statutory schemes challenged in those cases, the Texas mitigation special issue does not operate as "the functional equivalent of an element of a greater offense." *Id.* at 377.

In *Rowell*, the court correctly noted that the jury is the "entity that determines death eligibility beyond a reasonable doubt." However, the court upheld the Texas death penalty scheme as constitutional by reasoning that "mitigating evidence" under the Texas statutory scheme is a "fact in mitigation" which no controlling authority required the State to prove beyond a reasonable doubt, rather than a "fact in aggravation of punishment." *Id.* at 376-78.

The court in *Rowell* stated:

> [N]o burden of proof exists for either the defendant of the State to prove or disprove mitigating evidence at the punishment phase. This is because the Supreme Court recognizes an important distinction between "facts in aggravation of punishment and facts in mitigation." Moreover, no Supreme Court or Fifth Circuit authority requires the State to prove the absence of mitigating circumstances beyond a reasonable doubt.

*Id.* at 378 (citing *Apprendi*, 530 U.S. at 490 n.16, 120 S.C. at 2363 n. 16).

As illustrated by the *Rowell* case, in rejecting the applicability of *Apprendi* to the Texas death penalty statute, courts have relief heavily on language from *Apprendi* that states, "[T]he Court has often recognized (the distinction) between facts in aggravation of punishment and facts in mitigation." *Apprendi v. New Jersey*, 530 U.S. at 490 n.16, 120 S.C. at 2363 n. 16. However, read in context, *Apprendi* and *Cunningham* make it clear that if a fact must be found by the jury before the defendant may be put to death, then that fact is an "element of the offense" that must be proved to the jury beyond a reasonable doubt. *Id.* at 490, 120 S.C. at 2363, *Cunningham v. California*, 549 U.S. 270; 127 S.C. at 858. As the Court in *Apprendi* stated, "[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be proved beyond a reasonable doubt." *Id.*

Under *Apprendi, Ring,* and *Cunningham,* Special Issue Number 3 is unconstitutional because it fails to place the burden on the State of proving a negative answer to the mitigation issue beyond a reasonable doubt. *United States v. Matthews*, 312 F.3d 652, 663

64

(5th Cir. 2002). In *Matthews*, the Court held that, consistent with *Apprendi*, any fact that increases the statutory maximum penalty must be found by a jury beyond a reasonable doubt, regardless of whether the legislature intended the fact to be a "sentencing factor" or an "element" of a separate offense. *Id.* The Texas statute cannot be saved simply because the required fact finding is labeled "mitigation." The Supreme Court has clarified that *Apprendi* repeatedly instructs that the characterization of a fact or circumstance as an "element" or a "sentencing factor" is not determinative. *Ring*, 536 U.S. at 602, 122 S.C. at 2439; *United States v. Matthews*, 312 F.3d at 662-63. The dispositive question, then, is not one of form but one of effect. *Ring v. Arizona*, 536 U.S. at 602, 122 S.C. at 2439. If a state makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact - no matter how the State labels it - must be found by a jury beyond a reasonable doubt. *Id.*

Article 37.071 of the Code of Criminal Procedure provides that a defendant convicted of capital murder is not eligible for the death penalty until and unless the jury finds that there is not mitigating evidence that would justify a life sentence rather than death. Thus, whether in this case the State of Texas calls Special Issue No. 3 "facts in mitigation" rather than "facts in aggravation" or "sentencing factors," does not change the "effect" of the dispositive issue: the defendant in a capital murder case cannot be put to death - i.e., his level of punishment cannot be raised beyond life imprisonment - unless the jury makes findings of fact under Special Issue No. 3. Under *Ring, Apprendi,* and *Cunningham*, then, the mitigation issue is an element of the offense that the State must prove beyond a reasonable doubt before a defendant can be sentenced to death.

65

A completely different outcome would result in this case if the Texas statutory scheme was drafted so that the defendant would be sentenced to death on conviction of capital murder (in cases where the State sought the death penalty) unless the jury found evidence in mitigation thereof. If the Texas statutory scheme provided that punishment for capital murder was automatically death, unless facts in mitigation were shown, then *Ring* would foreclose Petitioner's argument on this issue. But, "[a]ggravators operate as statutory 'elements' of capital murder under [Texas] law because in their absence, [the death] sentence is unavailable." *Ring v. Arizona*, 536 U.S. at 599, 122 S.C. at 2438 (citing *Walton v. Arizona*, 497 U.S. at 709 n. 1, 110 S.C. at 3087 n.1 (Stevens, dissenting)). Here, Petitioner could not have been assessed the death penalty unless there was a negative finding on Special Issue No. 3. As a result, the statute has made the "absence" of mitigating circumstances an element that must be proven beyond a reasonable doubt. By not requiring the beyond a reasonable doubt standard to prove that element, the statutory scheme violates *Apprendi, Ring, Cunningham,* and the Sixth and Fourteenth Amendments to the United States Constitution.

This claim was initially raised on direct appeal and dismissed summarily by the Texas Court of Criminal Appeals, without discussion, other than general reference to a string of Texas state cases. Likewise, the only discussion by the court in the state writ as to this claim is to point out that the Court of Criminal Appeals rejected it (albeit, without discussion and without reference to a single federal case). Such treatment in the state courts "resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States . . ." 28 U.S.C. §

2254(d) (I). This Court should review this issue de novo.

## VI. CONCLUSION

Petitioner is entitled to habeas corpus relief based upon the facts and legal arguments set forth in the individual claims in this Application.

WHEREFORE, PREMISES CONSIDERED, the Petitioner prays that this Court will issue the Writ of Habeas Corpus, and after a full and fair hearing grant relief to Petitioner and Order Petitioner discharged from the illegal restraint under which he is currently bound.

Respectfully submitted,

Michael Logan Ware
1407 Texas Street, Suite 102
Fort Worth, Texas 76102
Phone: (817) 338-4100
Fax: (817) 698-0000

BY: /s/ Michael Logan Ware

MICHAEL LOGAN WARE
State Bar No. 20864200
Attorney for Paul David Storey

67

## CERTIFICATE OF SERVICE

I certify that on the 14th day of June, 2012, I served a copy to Georgette Oden, Office of the Texas Attorney General, using the CM/ECF system for the Northern District of Texas. I received a "Notice of Electronic Filing" that this Writ was forwarded to all parties and to Paul David Storey via first class mail address listed below:

Georgette Patrice Oden
Office of the Texas Attorney General
P.O. Box 12548
Austin, TX 78711-2548
VIA CM/ECF system


Paul Storey
TDCJ# 999538
Polunsky Unit
3872 FM 350 South
Livingston, TX  77351
VIA U.S. Mail

/s/ Michael Logan Ware
MICHAEL LOGAN WARE

68

# VII. EXHIBITS