

# BALANCE
*Forensic & General Psychological Services, Inc.*

## PSYCHOLOGICAL EVALUATION

**NAME**: Paul Storey
**DATE OF BIRTH:** October 1, 1984
**DATES OF INTERVIEWS:** April 15 & 16, 2010; June 4, 2012
**DATE OF REPORT:** June 13, 2012
**EVALUATOR:** Emily Fallis, Ph.D.

### Identification and Reason for Referral

Mr. Paul Storey originally was referred by his attorney, Robert Ford, and, later, by his attorney, Michael Ware, for a psychological evaluation and review of documents related to an appeal of his conviction for Capital Murder and sentence of death. Mr. Storey is a 27-year-old, African-American male.

Mr. Storey was warned of the limits of confidentiality prior to the initiation of the evaluation. He was informed that the usual doctor-patient relationship would not exist. He was informed a report would be prepared for his appeal and given to his attorney. He was told the report likely would be provided to others reviewing his appeal. He was able to restate this warning in his own words and showed a good understanding.

### Evaluation Procedures[1]

Clinical Interviews by Emily Fallis, Ph.D. (5.25 hours in 2010; 1.5 in 2012)

Psychological Tests (administered June 2012):

> Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV)
> Wide Range Achievement Test-Fourth Edition (WRAT-IV)
> Validity Indicator Profile (VIP)
> Gudjonsson Suggestibility Scales-1 (GSS1)

Collateral Contacts:

> Bob Ford, Defense Attorney, March 22, April 22, May 6, 2010 (1.50 hours)
> Marilyn Shankle-Grant, Mother, April 13 (telephone interview) and April 16
>   (face-to-face interview and **testing**[2]), 2010 (2.25 hours)
> Michael Ware, Defense Attorney, February 17, 18, April 1, 13, May 7, 31, June 4,
>   5, 12, 2012 (4. 75 hours)

---

[1] See Appendix 1 for records reviewed in 2010 (with exception of handwritten notes from L. Moore).
[2] Ms. Shankle-Grant was administered the Minnesota Multiphasic Personality Inventory-2 (MMPI-2), as well as the Personality Assessment Inventory (PAI). These tests, as well as her interviews, were the basis of this examiner's conclusions about her personality.

910 Collier Street, Suite 202, Fort Worth, Texas 76102
Phone: 817.348.8682 or 8685   Fax: 817.348.8687   www.balanceforensic.com



EXHIBIT
1

Psychological Evaluation
STOREY, Paul
Date of Report:  June 7, 2012

## Background Information[3]

Mr. Storey was born in Fort Worth, Texas, in 1984 to Marilyn Shankle-Grant and David Van Storey.  The couple apparently met while David was working as a mechanic and Ms. Shankle-Grant was working as a caterer at a hotel.  Records suggest that Ms. Shankle-Grant pressured David about having a child together and, despite his stated desire not to have a child, she stopped taking her birth control pills.  Records indicate she became pregnant but lost this first baby at three months.  She apparently became pregnant with Mr. Storey very soon afterward, again against David's wishes.  She testified in court that she was involved with David for one and one-half to two years before Mr. Storey was born.  According to records, David was very controlling, tried to isolate Ms. Shankle-Grant, was very jealous, abused alcohol, and had a "violent temper."  Records indicate he once slapped her (after she apparently slapped him) and once choked her.  These two aggressive incidents may have occurred on the same date.  Reportedly Ms. Shankle-Grant left David after the second incident, taking the child and moving to her mother's home.

Records state that Mr. Storey's father saw his son for less than a year before he stopped visiting.  David reported that Ms. Shankle-Grant "intentionally turned Paul against" his father, teaching him to say things to his father like "you a crazy bastard."  The records state that Mr. Storey's father did not pay child support.  Records note that his father occasionally called about coming to visit but typically did not keep his word, leaving Paul very disappointed.

Mr. Storey weighed eight pounds, seven ounces at birth and, despite his mother's memory of a traumatic medical episode at birth, had an Apgar score of 9 just five minutes after his birth.  She reported she was toxemic during the final stages of her pregnancy and had to spend the last week in the hospital.  She also stated Mr. Storey was "almost lost" at birth because the umbilical cord was around his neck.  She has described him as a colicky, fussy baby.  His father described him as a very smart baby.  Mr. Storey's developmental milestones reportedly were reached on time, if not earlier.  He reportedly walked at 10 months and began talking at an early age.  Records state Mr. Storey accidentally ingested antidepressants (Amitriptyline) belonging to his maternal grandmother at age 27 months and was hospitalized at Cook Children's Medical Center. He reportedly was resuscitated after his heart stopped and was admitted to an intensive care unit.  **Note that this information about the ingestion of medication was reported by the father.  The mother could not recall the incident until repeatedly questioned by this examiner.**  Mr. Storey evidently was treated for asthma as a child but grew out of this problem.

---

[3] Information that documents indicate may be inconsistent or was not highlighted during Mr. Storey's trial and sentencing are in bold print.

Psychological Evaluation
STOREY, Paul
Date of Report: June 7, 2012

Mr. Storey told the examiner his mother is "loving, caring. Whup our butts when we did something wrong. She always provided for us, has a good heart. She had a bad temper. At one point she became real spiritual." He recalled he was around age 13 when she made this change. When asked about her temper, he responded, "More whuppings before. [She] never got along with my brother's father. [They'd] fight all the time. She'd go off on people real quick, verbally most of the time, not just violent." He remembered times when she hit his brother's father, as well as times she got in physical fights with women. He knew his mother was diagnosed with Lupus in 2003 but did not recall her seeming sick prior to that time or limiting her activities since that time. Mr. Storey's mother apparently frequently was involved with men younger than her. Records indicate she had a relationship with a man she met at the Tarrant County Jail after Mr. Storey was arrested for murder. This man, Mike Tristan, reportedly had many tattoos, including those under both eyes, and dressed in a fashion associated with gang members. She evidently let him stay in her home and partake in the mitigation specialist's interview of her, although she had known him for only a short time.

Ms. Shankle-Grant's assessment (using the MMPI and PAI) by this examiner indicates she is easily slighted by others and tends to hold grudges. She tends to blame external causes for her problems and failures, rather than looking at her contribution to her circumstances. She has an inflated sense of her abilities and achievements. She also has a strong need to be affiliated with others so that she can have attention for all these perceived excellent qualities. She will choose quantity in her relationships, rather than quality. Others will find her controlling and smothering, although she will perceive herself as protective.

Ms. Shankle-Grant's parenting style was one which focused on herself, rather than on her children. She wanted to control her son, Mr. Storey, but not for the purpose of guidance and providing structure. To her, Mr. Storey was a token of her achievements, another way to obtain the attention she desired. She was not concerned with the quality of her relationship with her son or his needs. As a result, she did not ensure he was properly supervised when she was at work. She was too focused on herself to notice his involvement in drugs, much less help him eat appropriately. Moreover, she entered and maintained relationships with men who were abusive and very poor role models. Finally, she continued to advise him to "be loyal," rather than discriminating in his choice of companions; and to "be a man," rather than responsible. Court transcripts indicate Ms. Shankle-Grant's friends testified that she provided "everything a parent should," referring to food, clothing, and education and was a "fine mother . . . a moral compass". This testimony apparently was not challenged by the defense.

Mr. Storey reported he never had a significant relationship with his biological father. He said he has not communicated with his father since 2006 when his father was in the hospital and had his legs amputated due to complications of diabetes. Records indicate the contact was in 2002. He noted that his mother persuaded him to have

Psychological Evaluation
STOREY, Paul
Date of Report:  June 7, 2012

contact with his father at that time, but apparently a relationship was not kindled. Note that his mother has told others that Mr. Storey's father asked to see his son. **He remarked that he questioned his father about not making contact for years, at which time his father gave a "lame" excuse: "He said he felt my mother told me to say [bad] things about him when he came to get me."** He has acknowledged great anger at his father for his abandonment. **The 2006 contact evidently made him feel worse as he learned his father had a daughter with whom he had maintained contact. He stated he could not describe his father because "I don't know him . . . . He never was a topic. I understood that I had a father, but not to where I could honestly tell you what kind of person he was." He indicated he has no memory of his father being physically abusive to Mr. Storey's mother;** however, she has reported this violence. Although both his mother and his father indicated Mr. Storey did not see his father after age four, **Mr. Storey recalls spending weekends with his father up to age 10. Mr. Storey remembers watching television with his father but no other activity. He denied his father was abusive in any fashion. He heard his mother say that his father abused alcohol, but Mr. Storey had no memory of his father using alcohol at all.** He did not know if his father had been in legal trouble. Records indicate his father was in many fights prior to the time he got involved with Ms. Shankle-Grant. **Mr. Storey told the examiner he did not know what sort of work his father did or if he worked at all. He said he occasionally saw one paternal aunt but saw no other paternal relatives until he attended a family reunion in Oklahoma as a teenager.**

**When asked with whom his mother was next involved, Mr. Storey recalled his mother had a brief long-distance relationship with Charles Holmes, a man in Oklahoma.** Court transcripts indicate Charles lived with the family for one and one-half years (1994 to 1995), although their relationship lasted five or six years. **Mr. Storey reported he was age six when his mother got involved with Larry, Sr.;** however, some records state he was only four. Court transcripts suggest he was significantly older than six and that Ms. Shankle-Grant still was involved with Charles when she got involved with Larry, Sr. **Mr. Storey was unsure how long they were together before Larry, Sr., moved into the home; however, he recalled Larry, Jr., was born before the co-habitation began. Mr. Storey stated he was "OK" with Larry, Sr., as his stepfather: "He was like a father to us. He didn't treat me like I wasn't his child."** Records indicate Larry, Sr., was characterized as a good father by Ms. Shankle-Grant as well. **Mr. Storey estimated Larry, Sr., lived with the family about 12 years, although Mr. Storey acknowledged his stepfather sometimes left when he and the mother would "get into it." Mr. Storey thought his mother might have "messed around" with other men when his stepfather was absent. Mr. Storey reported that his stepfather was not physically abusive to his mother; however, he added that "she hit him." Mr. Storey recalled the police were called three or four times, but neither party was arrested. When asked what he did when the adults fought, he answered, "A couple of times, I try to keep them apart. I call the police if they both act stupid. 'Ya'll stop yelling!'" Mr. Storey said his stepfather spanked only once, typically resorting to yelling when he attempted to discipline the boys.** Mr. Storey indicated his stepfather worked in construction. **He said Larry, Sr., abused**

4

Psychological Evaluation
STOREY, Paul
Date of Report:  June 7, 2012

alcohol but began to abuse crack cocaine after the relationship with Ms. Shankel-Grant ended.  On the other hand, Mr. Storey later indicated he heard his mother accuse Larry, Sr., of drug abuse before the relationship ended.  Mr. Storey reported his stepfather was jailed for Public Intoxication, traffic tickets, and Possession of Drugs.  Note that some of these offenses occurred <u>before</u> the relationship with Mr. Storey's mother ended.  Larry, Sr., continued to spend time with Mr. Storey and Larry, Jr., after the relationship with their mother ended.  **Mr. Storey stated his stepfather did not obviously use crack cocaine around Mr. Storey and Larry, Jr.; however, he remembers his stepfather buying crack cocaine while spending time with the boys.  Mr. Storey was well aware that his stepfather was using crack cocaine, in other words.  His mother told the examiner she left Mr. Storey and Larry, Jr., with Larry's paternal aunt, rather than Larry, Sr., as she knew he was abusing drugs; however, this report is at odds with Mr. Storey's memory and at odds with the impression she left with others in the courtroom regarding Larry, Sr.'s, positive influence.**

**Mr. Storey told the examiner his mother got involved with Jimmy after the relationship with Larry, Sr., ended.  Mr. Storey thought he was around age 16 when Jimmy moved into the home.  He indicated the relationship lasted a few years, although the last part of the relationship was off-and-on due to quarreling. Mr. Storey denied physical violence between his mother and Jimmy, as well as calls to the police.  He reported Jimmy did not abuse drugs but did sell drugs. Mr. Storey indicated Jimmy was arrested for possessing drugs, as well as traffic tickets.  Jimmy apparently had a legitimate job as a truck driver.**

Mr. Storey reported he was in his 20's when his mother married Uriel.  **Other sources indicate he was younger when this marriage began.**  In either case, Mr. Storey still lived at home.  He denied domestic violence in this relationship, as well as police being called for suspected violence.  Records also indicate a lot of conflict in the family overall because Uriel's nine-year-old son was a troublemaker and no one but his father was allowed to discipline the boy.

**Mr. Storey's brother, Larry, Jr., currently is in the Navy but Mr. Storey did not know his brother's rank.  Mr. Storey indicated his brother is stationed in Fort Worth and visits Mr. Storey about once per month.  Larry, Jr., recently married, according to Mr. Storey.  He described his brother as "like me because he enjoys dressing, women, some video games.  He's a game freak.  Differences?  The people he socialize with . . . . The term I use, nerdy, goofy . . . . He's smart.  He works well with computers."  Mr. Storey recalled that he and Larry, Jr., shared a room when young, sometimes having conflict because Larry, Jr., was not as neat as Mr. Storey. He said Larry, Jr., was a loner in high school, to some degree.  Mr. Storey denied his brother had problems with depression, although he recalled Larry, Jr., was hit hard by their Uncle Tony's death (see below).**

Psychological Evaluation
STOREY, Paul
Date of Report:  June 7, 2012

**Mr. Storey acknowledged he and his family have struggled with obesity.  He and his mother indicated he was overweight as a child and teenager.  He told the examiner that his peers picked on him about being fat.  He said the obesity is due to "poor eating habits, lack of exercise, culture."  He stated his grandmother, mother, maternal aunts and uncles, brother, and father have all struggled with weight.**

Mr. Storey's grandmother was a significant caretaker, keeping him and Larry, Jr., when their mother was working.  (This arrangement apparently changed when both boys were in elementary school and Mr. Storey was given the task of supervising his younger brother.)  **When asked about discipline, he indicated his grandmother would take privileges, give chores, make the boys take a nap, and spank.  His grandmother reportedly was diabetic and was "constantly in bed" beginning in 1999, when Mr. Storey was around age 15.  He indicated she lived in a separate residence and needed assistance with various daily living tasks by 1999.  She evidently later developed senility, was diagnosed with cancer, and deteriorated over a two-year period before she died in June 2004.**  Court transcripts indicate his mother testified that her mother died while Mr. Storey still was in high school, leading to some of his truancy.  **He told the examiner his grandmother had chemotherapy and several surgeries.  He stated she was in a nursing home and he visited as often as twice weekly.  At the same time, he admitted he "loved her so much, it hurt me to see her" and, therefore, he often avoided spending time with his grandmother.  He added that the senility made his grandmother increasingly irritable.  His mother indicated her mother got very depressed and took antidepressant medication during that time.  Mr. Storey recalled his grandmother's depression:  "She was tired of suffering, surgeries, medication, being in bed all the time."  He noted he felt increasingly irritable because of his grandmother's failing health, while his interest in school faded during his senior year.  He indicated he became depressed about his grandmother and this depression was accompanied by a significant increase in overeating and weight gain.**  His mother's court testimony confirmed that Mr. Storey became significantly depressed after his grandmother died.  **He noted he did not feel he was over the grief of her death until 2007.  He added that Ms. Shankle-Grant took the death of her mother very hard:  "It's where a lot of her depression and overeating came from."**

Mr. Storey indicated his maternal uncle, Tony, was in the Navy but, after being diagnosed with cancer, lived with Mr. Storey's family in the final five months before his death in late 2005.  **Mr. Storey noted he had had minimal contact with Uncle Tony prior to that time.**  Nevertheless, the death was difficult for the whole family.  Mr. Storey stated his maternal Aunt Carolyn died shortly afterward of sudden heart problems.  He apparently felt a good deal of stress because of the three deaths over a very short time.

**Both Mr. Storey and his mother indicated that Child Protective Services never was involved in their family.  The available records do not show whether or not this report was confirmed before or during Mr. Storey's trial.**

Psychological Evaluation
STOREY, Paul
Date of Report:  June 7, 2012

**Mr. Storey denied many signs of childhood maladjustment, including running away
from home, wetting the bed, cruelty to animals, and sexual abuse as either a victim
or a perpetrator.  When asked about fire-setting, he denied a pattern of such
behavior.  He denied getting involved in gambling.  He indicated he liked playing
sports in his neighborhood, including football and basketball, as well as riding his
bicycle.  He admitted staying out past curfew beginning in junior high school,
although he indicated his curfew was not well-established.  He said he began to
sneak out of the house at age 17.  He admitted he had difficulty managing his anger
in elementary school.  He indicated by high school he "understood I didn't want to
get in trouble all the time . . . . [and] understood I could hurt someone . . . . I would
take time to think more, weigh options."  He denied a pattern of property
destruction when angry.**

Mr. Storey reported he completed high school.  **He said he "loved learning" and did
not perceive teachers as picking on him.**  He said he never was in Special Education
classes but was held back in ninth grade.  Other sources indicate he had to attend summer
school to pass to eighth grade.  He apparently got tutoring in ninth grade as his grades
were falling, **which he blamed on working after school.**  He stated he made C's in
school until ninth grade, having the most trouble with math.  (**Mr. Storey's academic
difficulty in math throughout school could be reflecting attention deficits that were
resolved by the time he was tested by the defense expert, Dr. Price and, later, by this
examiner.**)  He indicated he was failing classes in 11th grade, so he decided to attend an
alternative school, Theresa B. Lee Academy, so that he could graduate on time.  Records
show his grades in academic subjects ranged from 57 to 80 in 9th grade the first time;
from 54 to 83 the second time he was in 9th grade; from 53 to 86 in tenth grade; from 45
to 88 in 11th grade; and from 70 to 99 in 12th grade.  Records show he enrolled in Theresa
B. Lee Academy in August 2003.  **He noted the teachers at the alternative school
were more helpful to him than teachers in previous schools, which is reflected in his
grades.  He nevertheless continued to have difficulty with math class.  He reported
he perceived his high school degree as important, despite the illegal activities in
which he had engaged:  "I knew I needed it.  It's required for jobs.  I knew I needed
it for a good job.  It would've made my mother happy [too]."**  He told the examiner he
played football during ninth grade (the first time).  **He indicated his grades were too
poor to play football thereafter,** although records indicate his mother claimed she made
him quit.  He stated he got into a few fights, **some prompted by peers who ridiculed his
weight.**  He estimated he was suspended about ten times, beginning in elementary school
and continuing through high school.  He thought he was in trouble for insubordination,
being tardy, skipping school, and fighting.  He indicated the number of fights was very
few.  Court transcripts indicate he was in only one fight while at Theresa B. Lee
Academy.  Teachers from this school testified in court that he was likeable, a model
student, great, and outstanding.  He said he did not skip school until seventh grade.
**When asked what he did while truant, he replied, "My mother left before we did, so
it was no problem to stay at home."  He indicated his schools were primarily
African-American, although some students were Caucasian and some were**

Psychological Evaluation
STOREY, Paul
Date of Report:  June 7, 2012

"Mexican." He recalled the racial groups segregated themselves. He also recalled a great deal of tension between the African-American and the Hispanic students.

Court transcripts note the prosecutor said Mr. Storey was sent to Amon Carter Riverside summer school for "violation of school policies" in 2000; and was suspended "at least five or six" times and given in-school suspension at Eastern Hills High School in 2001 and 2002. The transcripts also show the prosecutor stated Mr. Storey was suspended "many, many, wouldn't it be fair to say, several suspensions from school" for "challenging teachers, being disruptive to teachers, talking back to teachers . . . . to the point where he had to go to an alternative school to graduate." **These characterizations misrepresent the number and nature of Mr. Storey's misconduct in high school, as well as the situation leading Mr. Storey to attend an alternative school (which was by choice).** In actuality, records indicate Mr. Storey was suspended six times and received in-school suspension eight times for generally minor infractions. Records show that the school policy violation in 2000 involved bringing firecrackers to school; however, his mother denied he was the culprit. Records from Theresa B. Lee Academy state he "only got in trouble for minor things as far as tardiness or missing class" and was a "good student."

When he was a senior, Mr. Storey reported his best friend, O'Brien, talked to him about joining the Navy on the "buddy system" after high school graduation. **Mr. Storey thought the idea was good because he could get money for college, could travel, and would earn sufficient money to take care of his needs.** He evidently was totally unprepared for the Navy recruiter to tell him that he had to lose 50 pounds before he would be accepted. He said O'Brien went into the Navy without Mr. Storey, leaving him with no plan for the future, as well as leaving him without his best friend. **Mr. Storey stated he was able to lose 20 pounds but then became too depressed to overcome his food addiction.**

**Mr. Storey said he first worked at age 15: "My mom said I was an expensive teen. I needed to get a job to pay for the things I wanted to have." He recalled he worked as a bagger at a grocery store three days a week, after school, for several months. He stated he did not like the work because male customers were rude to him. He noted the job was not boring because he worked with several other teens. He told the examiner he began failing at school and quit in order to work on his grades. He added, "You can't work at a grocery store for the rest of your life, unless it's what you want to do." When prompted, he acknowledged his mother urged him to quit because his grades were slipping.**

Mr. Storey reported he next was hired by Putt-Putt, a miniature golf business. He said a **friend who was working for this business encouraged Mr. Storey to apply. He stated he heard that he could meet girls, as well as earn his spending money.** He estimated he held this job for eight months, working about 30 hours per week. He noted **most of the hours he worked were on weekends so his schoolwork did not suffer. He commented that he liked the job because he has "just always been into girls." He**

Psychological Evaluation
STOREY, Paul
Date of Report:  June 7, 2012

was unsure if some of the girls came simply because he worked there:  "Possibly.
None gave that impression, but it's possible."  Mr. Storey stated he left this job
because "something happened and I don't feel they handled it in a manner they
should have.  I didn't want to be at a job where they do me like that, so I quit."  He
explained that one of the children in a go-kart ran into him, injuring his leg.  When
he asked for a replacement to operate the ride so he could get some ice to put on his
leg, he said he was told he did not need ice.  He stated he then quit.

Mr. Storey told the examiner he then began to work jobs through a temporary job
placement service.  He recalled his longest job assignment was for four months at Nokia
where he refurbished telephones, as well as stocked and packed merchandise.  He said he
quit two jobs because of unreliable transportation.  **He stated he was fired from one job
because he could not master the cash register.**

Mr. Storey evidently was awarded a scholarship to attend a truck driving school in Waco,
Texas.  He was supposed to work with a trainer after completing the school but both
trainers with whom Mr. Storey attempted to work quit.  Apparently he was not allowed to
drive long distances unaccompanied.

Mr. Storey admitted resorting to illegal means of obtaining money, beginning in 11th
grade.  He acknowledged he broke into vehicles and houses; and also stole items from
stores.  He said that people engaged in theft who would ask him to join them.  He
indicated he only once attempted a theft by himself.  **He denied finding excitement in
stealing, noting he always felt scared.**  He said he and his companions would find
others to buy the stolen items.  **He noted he sometimes hid the stolen items in his
home.**  Other sources indicate Mr. Storey took his mother's car for a joy ride at age 13,
but the police were not involved.

Mr. Storey later noted that, at age 15, he and a friend planned to rob a home but were not
successful.  Apparently the friend had stolen a house key from another peer.  When
Mr. Storey's friend attempted to enter the house, they were observed by the owner and
ran away.  Mr. Storey indicated he was taken to juvenile detention by police but was not
prosecuted.  He said he admitted the plan to his mother and "got a whipping."

Mr. Storey acknowledged he continued a pattern of theft while he was in truck driving
school in Waco, Texas.  By all accounts, a high school peer, Mark Porter, went with
Mr. Storey to Waco.  The two men apparently robbed drug dealers **on two to four
occasions**, figuring the drug dealers could not report them to the police.  As a result of
choosing to rob criminals, Mr. Storey was never arrested prior to the murder case.
Mr. Storey apparently had a number of traffic violations for which his mother paid.

Mr. Storey reported he first used marijuana at age 14, using this drug about twice per
week for the next year.  **He remarked, "Really, when I get high, I have a paranoia
problem . . . . I got paranoid when I smoked."**  He stated he decreased his use of
marijuana to once per month **"when I went to a club" with someone older who**

Psychological Evaluation
STOREY, Paul
Date of Report: June 7, 2012

helped him enter. He indicated he continued this once monthly pattern until age 18 when he stopped using this drug. He denied ever using methamphetamines, cocaine, hallucinogenic drugs (LSD, PDPO), Ecstasy, and opioids. He also denied abusing prescription medication. Mr. Storey admitted he began to sell marijuana at age 17; however, other sources indicate this behavior began earlier. By all accounts, he got the marijuana from individuals he met at a recording studio

Mr. Storey reported he began to drink alcohol at age 16. He insisted he does not like the taste and never drank more often than once every two years. He acknowledged he has been drunk on about four occasions. He denied having blackouts or legal consequences for his use of alcohol.

Mr. Storey characterized himself as both someone who liked to "run the streets" and someone who was a "loner." He was not in a gang, although he spent time in the "Stop Six" area of Fort Worth, which is infamous for gang activity. He said he was not in a "clique" at school but was considered a "class clown." The clowning apparently was begun to help him cope with being teased about his obesity. He recalled he "hung out" with one close friend or a small group in his teens and early 20's. Other sources indicate Mr. Storey's mother's bought 100's of dollars of groceries to motivate his peers to spend time at their house, trying to create friends for her son. Other sources indicate he developed a relationship with Dewan, a boy who ran away from home and used illegal drugs. Apparently Mr. Storey and Dewan spent time around a recording studio and wanted to become rappers. When Dewan began to use "harder drugs," Mr. Storey evidently distanced himself from this friend. He did not recall having a best friend until high school when he and O'Brien became friends. He stated O'Brien skipped school with Mr. Storey but otherwise was not a bad influence. He indicated they remained friends until they tried to enlist in the Navy together. After Mr. Storey was refused for being overweight (apparently 360 pounds) and O'Brien was accepted, the friendship was not maintained. He revealed, "When O'Brien went into the Navy, he was my only real friend."

Mr. Storey told the examiner he became interested in the opposite sex when he was age 12. He said he dated several different girls before he was involved with Qualondra for several years, beginning when both were in high school. Qualondra apparently is younger than Mr. Storey. He indicated he met Qualondra through a friend, James Lewis, who was involved with Qualondra's friend. When asked if Qualondra was faithful to him, he said she was until 2006 when the couple had financial problems and the number of arguments increased. He remarked that he got tired of the conflict because "I'm not an argumentative person." He said he met Dorothy during this time and began to spend more time with her than with Qualondra. He stated he was intimately involved with Dorothy over the five-year period prior to the current incarceration. He noted that neither woman knew he was unfaithful, although Qualondra suspected. Mr. Storey indicated he has been sexually involved with six women, only one of which was a "one-night stand." He denied paying for sex with a prostitute or contracting a sexually transmitted disease.

Psychological Evaluation
STOREY, Paul
Date of Report: June 7, 2012

Mr. Storey denied fathering children, noting he did not want to be a father in the past. He related, "I couldn't sit still and then I was, was messing with several women. I wanted to make sure, if I had kids, that it was someone I wanted to have kids with." He noted that he needed to stop "running the streets" if he were going to have a child. He indicated he recognized the need to be with only one woman, to work regularly, and be at home as much as possible if he had a child.

Mr. Storey denied being physically violent with women: "I'm not into hitting women." He added that Qualondra sometimes would hit him and verbally abuse him, but he never returned the abuse. When asked how he would handle this abuse, he answered, "Most of the time, we were in my home. I'd tell her to get your stuff, go."

Mr. Storey reported he began taking medication for hypertension two days prior to the first interview, noting he had not been diagnosed with this problem previously. He was no longer taking this medication at the time of the second interview. He apparently had a head injury when he was child, as a passenger in a car that Larry, Sr., was driving.  By all accounts, a collision with anther car occurred while Mr. Storey was sleeping in the backseat.  Evidently Mr. Storey was not wearing a seatbelt and was thrown into the front of the car where his head hit the dashboard. Records indicate he was not observed to be unconscious when ambulance personnel arrived, although his mother (who was driving another car and witnessed the accident) recalled he was unconscious. Records indicate he was seen at a hospital and was diagnosed with a possible hematoma. Mr. Storey said he had trouble with his vision and attention after the accident. Other sources indicate his grades fell, he became easily irritated, and he became withdrawn. He indicated he had a head injury while playing football in ninth grade. He also hurt his knee in a football game. Mr. Storey apparently has been advised he is at risk for Peripheral Vascular Disorder given his father has had this condition.

As suggested previously, Mr. Storey told the examiner he has had periods of very depressed mood and accompanying symptoms which indicate severe, or clinical, levels of depression. The family history of depression supports the likelihood that he has had episodes of clinical depression, i.e., Major Depressive Disorder. He reported periods of two weeks or more during which he has "not want[ed] to do anything, [not wanted to] get out of bed, [and] became distant." He continued, "I didn't want to go to school, I'd fight more often, I'd eat a lot, I became distant." He recalled he sometimes found himself not wanting to sleep. He reported having suicidal thoughts in the past, both after his grandmother died and immediately after his arrest for murder. He acknowledged his depression related to his grandmother's death lasted about two years. He noted that, after her death, "I was really eating to suppress my depression." He indicated that, when depressed, he typically sleeps more often than normal: "I'm using [sleep] to nullify the depression, too." He stated he tried to hide his depression from others, commenting, "I'm always good at hiding my feelings. And, I got a thing about—other people

11

Psychological Evaluation
STOREY, Paul
Date of Report:  June 7, 2012

have their own problems.  No use to give them mine."  By all accounts he was very depressed after he was refused entry into the Navy and cut off from his "only real friend."  His difficulty finding a mentor after truck driving school also triggered significant feelings of depression.  He told the examiner he experienced a period of serious depression for about three months prior to his arrest for murder.  He indicated he was overeating, was sleeping more than normal, and had lost interest in "hanging out, going places, being around people."  He apparently never had mental health treatment.

Mr. Storey was assessed by a psychologist, Randy Price, Ph.D., during his pretrial period of incarceration.  The results of this evaluation, primarily focused on neuropsychological issues, will be discussed in a later section.  The records show Dr. Price asked very few questions about Mr. Storey's history, although Dr. Price likely was asked to focus on testing.  Moreover, the information from Dr. Price's report shows Dr. Price labeled Mr. Storey's intelligence as falling in the Low Average range, rather than in the Borderline range., although the IQ score was 81.

## Recent Mental Status and Behavioral Observation

Mr. Storey is a 26-year-old, African-American man who appeared his stated age.  He had a large build and was of average height.  He demonstrated fair eye contact.  His grooming and hygiene were fair.  He was dressed in jail-issue clothing; and was in leg irons both times he was seen and in handcuffs on the first occasion.  He used neither corrective lenses nor hearing devices.  His seated posture and walking gait were within normal limits.  His rate, rhythm, and tone of speech were all within normal limits.  He demonstrated neither psychomotor retardation nor agitation.  He was respectful and cooperative during the evaluations.  He initially was interviewed in a room adjacent to his housing unit and in the booking area in the Tarrant County Jail.  More recently he was interviewed in the Polunski Unit, outside Livingston, Texas.  He denied taking any sort of psychotropic medication at the time of the evaluation.

In 2010, Mr. Storey indicated he was involved in more activities in the Polunski Unit in TDCJ than at the Tarrant County Jail.  On both occasions he was queried, he indicated he listens to the radio, writes, reads, socializes, and exercises in TDCJ.  He noted he has a few pen pals with whom he exchanges letters.  He noted he gets visits in TDCJ and has had visits in the jail.  He denied having behavioral problems at the jail in 2010.

Mr. Storey demonstrated a normal range of emotional expression and appeared calm.  He reported sleeping off and on.  He made no complaints about his appetite.  He denied current suicidal thoughts or behaviors in 2010 and in 2012.  He provided no evidence of a manic episode or an anxiety disorder.

Mr. Storey exhibited coherent, sequential, goal-directed, logical thought processes with no evidence of psychosis.  He neither reported nor demonstrated evidence of hallucinations or delusions.

Psychological Evaluation
STOREY, Paul
Date of Report:  June 7, 2012

In both 2010 and 2012, Mr. Storey was oriented to person, place, day of the month, month, year, and situation.  He seemed to have intact immediate, short-term, and long-term memory capacities.  He seemed to have adequate attention and concentration.

## Prior Assessment of Cognitive Functioning and Neuropsychological Dysfunction

Randy Price, Ph.D., performed a neuropsychological assessment of Mr. Storey on July 14, 2008.  Records show Dr. Price administered the Reynolds Intellectual Assessment Scales (RIAS), the Repeatable Battery for Assessment of Neuropsychological Status (R-BANS), and the Reynolds 15-Item test.  The latter test is used to screen for malingering of cognitive problems and the results indicated Mr. Storey was not malingering such deficits.  Evidently Dr. Price provided feedback to the defense attorneys that, based on the tests administered, Mr. Storey had no cognitive or neuropsychological deficits; and did not make a good effort on testing.  The latter opinion was not based on a test of effort and contradicts a handwritten note that Mr. Storey was providing reliable information.

The RIAS scores demonstrated a Composite IQ Score of 81, as well as a Verbal Score of 82 and a Nonverbal Score of 86.  Note that Dr. Price characterized the overall score of 81 as "Low Average"; however, the Diagnostic and Statistical Manual-IV (DSM-IV) states that an IQ score that falls in the range from 71 to 84 is the basis for diagnosing Borderline Intellectual Functioning.  This diagnosis does not appear to have been provided to the defense attorneys.  Indeed, handwritten notes by one defense attorney notes an IQ of "85-86," rather than 81.

Mr. Storey was administered the R-BANS as well, a battery of short tests which, with one exception, yielded scores classified as Average.  Mr. Storey earned one score of "Low Average" range on Language, a score which falls in only the 12th percentile.  The two subtests which are factored into the Language score involve expressive language.  Mr. Storey performed particularly poorly on Picture Naming which, in conjunction with his verbal test scores on the RIAS, indicates deficits in expressive language.  This information does not appear to have been explained to the defense attorneys.  Note that getting average scores on all parts of the R-BANS except one test contradicts Dr. Price's feedback to attorneys that Mr. Storey was not giving his best effort.

With regard to the tests chosen for the cognitive assessment, Mr. Storey was not given the most comprehensive, well-validated, and most reliable intelligence test available.  This test would be the Wechsler Adult Intelligence Scale-IV (WAIS-IV).  Given that Mr. Storey's life was at stake in a capital murder case, this examiner argues that the WAIS-IV should have been the choice for considering neuropsychological and general cognitive capacities.  This test would yield more information than the RIAS regarding both functioning during the crime and developmental functioning pertinent to mitigation.

Moreover, Mr. Storey was not given an achievement test to discover what he had learned with the intelligence he has.  Although achievement testing is not necessarily part of a

**Psychological Evaluation**
**STOREY, Paul**
**Date of Report:  June 7, 2012**

neuropsychological assessment, with school records showing Mr. Storey had academic difficulties in math, the issue of his achievement should have been addressed.

Finally, Mr. Story was not administered a test of effort, such as the Validity Indicator Profile.  Dr. Price did not assess Mr. Storey's effort in a reliable, valid fashion which could be repeated by another examiner, although Dr. Price did give the defense attorneys feedback on his impression that Mr. Storey was not giving his best effort.

Note that Dr. Price's feedback regarding assessment of Mr. Storey apparently was provided shortly before the trial began, leaving little time for follow-up with neurological tests (e.g., a CAT-scan) if needed, much less further psychological assessment.

On a related matter, Dr. Price evidently provided feedback to the attorneys that further assessment likely would yield confirmation of Dr. Price's impression that Mr. Storey has the diagnosis of Antisocial Personality Disorder.  The attorneys apparently did not further investigate the presence of Antisocial Personality Disorder through Dr. Price or another psychological expert.

<u>**Recent Test Results**</u>

Note first that Mr. Storey demonstrated he put good effort into the testing which this examiner administered on June 4, 2012, according to the results of the Validity Indicator Profile (VIP).  Both the Verbal and Nonverbal subtests of the VIP score as Valid, Compliant, demonstrating accompanying cognitive testing may be considered valid and reliable.

Mr. Storey scored a Full Scale IQ of 83 on the WAIS-IV[4], a score which puts him in the Borderline range of intellectual functioning, more than one standard deviation below the mean (100).  With 95% certainty, his "true" Full Scale IQ Score falls in the range from 79 to 87.  His Verbal Comprehension Index (VCI) of 83 puts him in the more than one standard deviation from the mean ("true" score 78-89, 95% certainty).  His Perceptual Reasoning Index (PRI) of 82 puts him more than one standard deviation below the mean ("true" score 77-89, 95% certainty).  His Working Memory Index (WMI) of 100 puts him in the average range ("true" score 93-107, 95% certainty).  His Processing Speed Index (PSI) of 84 puts him more than one standard deviation below the mean ("true" score 77-94, 95% certainty).  With the exception of WMI, which measures immediate memory for verbal data, the other indices (VCI, PRI, PSI) are consistent with the overall IQ of 83.  This overall IQ is also consistent with Mr. Story's prior IQ of 81 on the RIAS

---

[4] Note one scoring question on the subtest, Coding.  Mr. Storey used a mark that appeared as a "plus," rather than a horizontal line and vertical line which meet but do not cross as shown in the testing material. This examiner chose to score his answers as correct given that he consistently used the "plus" symbol as the symbol associated with the number "6."  If this answer were scored as incorrect, the Full Scale IQ would be 82 (true score 78-86).

Psychological Evaluation
STOREY, Paul
Date of Report:  June 7, 2012

as administered by Dr. Price in 2008.  These consistencies, as well as the average score on WMI, are further evidence that Mr. Storey put forth good effort on testing on both occasions.

The difference between WMI and the other three indices (VCI, PRI, PSI) are statistically different (at the .05 level).  Moreover, the base rates for such differences are low:  7.0 for VCI<WMI by 17 points; 7.9 for PRI<WMI by 18 points; and 10.3 for PSI<WMI by 16 points.  In other words, these sorts of differences between cognitive abilities do not occur often in the general population.  This finding suggests limited abilities in verbal comprehension, perceptual reasoning, and processing speed despite his average immediate memory for verbal data.

As noted, these results are consistent with Mr. Storey's test results when previously tested by Dr. Price.  One conclusion this examiner draws from this consistency is that Mr. Storey previously made a good effort to do his best on testing when meeting with Dr. Price.  This conclusion highlights the prior error in both perceiving Mr. Storey as not giving his best effort and presuming Mr. Storey's intelligence was in the Low Average range, rather than the Borderline range.

The WRAT-IV, a test which assesses an individual's academic achievement, indicates Mr. Storey is able to read words at the 11.7 grade level (Standard Score = 95; 37th percentile), while his reading comprehension of sentences is at the 9.7 grade level (Standard Score = 86;18th percentile).  The results of this test also show he is spelling at >12.9 grade level (Standard Score = 105:63rd percentile) but computing arithmetic problems at an 8.8 grade level (Standard Score = 93; 32nd percentile).  These results indicate Mr. Storey: 1) was able to make use of his limited intellectual abilities to learn some material through high school; and 2) has limitations in his academic achievement commensurate with his limited intellectual abilities.

The results of the Gudjonsson Suggestibility Scale indicate a significantly greater than average suggestibility for Mr. Storey.  His scores on Yield 1 (7; more than one standard deviation above the mean of 4.6) and Yield 2 (10; more than one standard deviation above the mean of 5.6) are above the 75th percentile.  His score on Shift (overall suggestibility) is at the 90th percentile In other words, Mr. Storey is more likely than 75% of the population to acquiesce to stronger personalities who urge him to think differently or act differently than he would if he were by himself.  The results indicate Mr. Storey is a follower, not a leader, and will be vulnerable to those he perceives as having some authority.  This finding is consistent with significantly below average intellectual testing results.  In other words, individuals with scores in the range of Borderline Intellectual Functioning (or below) are, by definition, more likely to be socially vulnerable and gullible.

Psychological Evaluation
STOREY, Paul
Date of Report:  June 7, 2012

## Personality Functioning

Mr. Storey's personality functioning is tied to the lack of parental guidance in his early life, as well as his limited intellectual abilities.  The lack of guidance resulted in him imitating others' inappropriate behavior such as eating indiscriminately and using illegal drugs.  His father emotionally abandoned him, while his mother spent much of her time working, leaving him hurt and angry.  His early experiences taught him to hide his feelings, rather than share them with others.  In order to have some sense of relatedness, he became a clown to fit in.  This persona was also a way to guard himself against further hurt, such as when he was ridiculed for his obesity.  He was left with underlying anger which he did not know how to express or manage.  While he has been involved in a few incidences of violence prior to the murder, these incidences were mild.  Instead, he turned this anger on himself and became depressed.   He is a follower, rather than a leader, and is likely to be a target for those who can manipulate others easily.  He has limited coping resources and, when met with failure, will have difficulty regrouping and developing a new strategy.

## Diagnosis

| | |
|---|---|
| Axis I: | Major Depressive Disorder, Recurrent, in Remission, 296.36 |
| | Cannabis Abuse, In Remission, 305.20 |
| | Adult Antisocial Behavior, V71.01 |
| | |
| Axis II: | Borderline Intellectual Functioning, V62.89 |
| | |
| Axis III: | Closed head injuries, hypertension, pain in left knee (by history) |
| | |
| Axis IV: | Stressors:  Legal, relational |
| | |
| Axis V: | Current General Assessment of Functioning = 75 |

The most critical diagnosis in Mr. Storey's situation is that of Borderline Intellectual Functioning. This diagnosis is made when an IQ in the 71-84 range is determined with the administration of an intelligence test.  Mr. Storey's Full Scale IQ of 83 on the WAIS-IV, as well as his Composite Index of 82 on the RIAS in 2008, places him in this category of Borderline Intellectual Functioning.  This level of intellectual functioning is distinguished from that of Mild Mental Retardation which ranges from 50 or 55 to 70 or 75 (taking the error of measurement into consideration).  Just as limitations in adaptive functioning (in at least 2 skill areas) are associated with Mild Mental Retardation, limitations in adaptive functioning are associated with Borderline Intellectual Functioning.

The key to determining limitations in life skills is "an inability to protect oneself, without supports, against potential catastrophic failure in academic, daily living, and social roles. Particular emphasis is placed on gullibility and other forms of social vulnerability as a

Psychological Evaluation
STOREY, Paul
Date of Report:  June 7, 2012

Concepts in Mental Retardation: Finding the Natural Essence of an Artificial Category,"
Exceptionality:  A Special Education Journal, Vol. 14 (4), 2006, pages 205-224).
Mr. Storey has demonstrated this gullibility and social vulnerability in his behavior as a
follower of antisocial associates.  His testing with the Gudjonsson Suggestibility Scales
supports this conceptualization of him as suggestible and vulnerable.  Some other
examples of limitations in adaptive functioning in Mr. Storey's life include his academic
difficulties, his difficulty making friends, his difficulty operating a cash register, his
difficulty coping with his injury at work, and his difficulty finding reliable transportation.

Mr. Storey's limited adaptive functioning also played a role in his attempts to establish
himself in terms of his occupational functioning.  He planned to be in the Navy with his
friend; however, his obesity did not factor into his planning, which is illogical to those
with a normal intelligence.  Moreover, when told he must lose weight to be acceptable, he
could not demonstrate flexibility in his problem-solving.  Mr. Storey experienced this
same difficulty in planning and problem-solving when facing another obstacle, i.e., when
his truck driving mentors failed to complete their obligation twice.  Rather than
considering how to complete his training or asking others for assistance with this turn of
events, he became depressed and gave up.

Mr. Storey does not fit the diagnosis of Antisocial Personality Disorder which is
diagnosed upon evidence of "a *pervasive* pattern of disregard for, and violation of, the
rights of others that begins in *childhood or early* adolescence and continues into
adulthood."[5]  According to the DSM-IV-TR, "Antisocial Personality Disorder must be
distinguished from criminal behavior undertaken for gain that is *not* accompanied by the
*personality features* characteristic of this disorder . . . . Only when antisocial personality
traits are inflexible, maladaptive, and persistent and cause significant impairment or
subjective distress do they constitute Antisocial Personality Disorder."  The seven traits
associated with Antisocial Personality Disorder, at least three of which must be verified,
were not in evidence in Mr. Storey's history at the time of his trial.[6]  Furthermore, the
diagnosis of Antisocial Personality Disorder is not made unless the person has a history
of "*some* symptoms of Conduct Disorder *before age 15 years*."  As will be explained
more fully in the next paragraph, Mr. Story demonstrated only *one* possible behavior
associated with Conduct Disorder prior to age 15 (i.e., limited truancy); and this one
behavior was not "repetitive and persistent" as the criteria for Conduct Disorder requires.

Conduct Disorder refers to a "repetitive and persistent pattern of behavior in which the
basic rights of others or major age-appropriate societal norms or rules are violated, as

---

[5] In this section discussing diagnoses, the quoted portions are from the Diagnostic and Statistical Manual of
Mental Disorders, Fourth Edition, Text Revision (DSM-IV-TR).  The italics are added by this examiner for
emphasis.
[6] The seven criteria for Antisocial Personality Disorder are: 1) inability to follow rules and laws as shown
by repeatedly committing behavior that are grounds for arrest; 2) lying and manipulating others;
3) impulsivity or failure to plan ahead; 4) irritability and aggressiveness, as evidenced by repeated fights or
assaults; 5) reckless disregard for the safety of self and others; 6) consistent irresponsibility; and 7) lack of
remorse.

Psychological Evaluation
STOREY, Paul
Date of Report:  June 7, 2012

manifested by" at least three specific behaviors (noted in a 12 month period) prior to age 18 (from the DSM-IV-TR).  These behaviors are *not* considered "persistent" if only a few examples are noted; or if one example occurs years after another example.  Moreover, the "disturbance in behavior" results in a diagnosis of Conduct Disorder "*only if* the conduct problems represent a . . . pattern that is associated with impairment in social, academic, or occupational functioning" (from the DSM-IV-TR).  These behaviors are categorized generally as aggression to people and animals, destruction of property, deceitfulness or theft, and serious violations of rules.  Although Mr. Storey engaged in fights in his youth, he does not fit the criteria of "*often* initiates physical fights," one of seven indicators of aggression.  Moreover, he did not engage in other aggressive behavior prior to age 18.  He did not engage in destruction of property.  Apart from some truancy which he admitted occurring around age 13, school records do not show he was "*often* truant from school," one of three indicators of serious rule violations.  He did not engage in the other two indicators of serious rule violations.  He admitted he began to engage in theft at age 17.  He acknowledged he broke into vehicles and houses; and also stole items from stores.  He said that he joined others engaged in theft and attempted to steal only once by himself because he was too afraid.  Breaking into someone else's house, a building, or a car is one of three behaviors in the category of deceitfulness or theft.  Shoplifting is another of these three behaviors.  Thus, Mr. Storey evidenced only 2 of 15 possible behaviors indicative of Conduct Disorder; and these 2 behaviors did not emerge until age 17.  Note that the DSM-IV-TR states "onset is rare after age 16 years."  Furthermore, the DSM-IV-TR urges clinicians "to consider the social and economic context in which the undesirable behaviors have occurred."  Mr. Storey's academic difficulty in school, his desire to "fit in" as an obese teenager, his difficulty coping with family deaths, and his failure to qualify for the Navy suggest the context had a great impact on his decision to accompany others as they engaged in theft beginning at age 17.  Mr. Storey's pattern does not meet the diagnostic criteria for Conduct Disorder, either in terms of the breadth of conduct problems or the longevity of conduct problems.

## Summary

The data from this evaluation show many mitigating factors which should have been presented to a jury as these individuals determined whether or not to sentence Mr. Storey to death.  Many of these mitigating factors were provided to neither the defense attorneys nor the jury.  In fact, problems with the first mitigation specialist leading to the hiring of a second mitigation specialist hampered research into Mr. Storey's life and presentation of a full report to the defense attorneys.  In particular, the mitigation specialist (as well as the psychologist; see below) apparently did not get enough detail about family life (e.g., exposure to substance abuse, violence in the home, and other criminal behavior) or about the family history of clinical depression.  Moreover, the data from this evaluation show the defense attorneys allowed Mr. Storey's mother to misrepresent his upbringing and, thus, the jury did not hear critical information about his development.  Finally, complete psychological testing data was not pursued by the attorneys and, thus, was not provided to the jury.

**Psychological Evaluation**
**STOREY, Paul**
**Date of Report: June 7, 2012**

With regard to the defense psychologist, evidence indicates Dr. Price did not obtain a full life history from Mr. Storey. In all fairness, Dr. Price may not have been asked to obtain this information but, rather, may have been designated to focus on neuropsychological testing, as the title of his report suggests. Nevertheless, this limited focus hindered presentation of mitigating factors to the jury. In criticism of Dr. Price, his report to the attorneys that Mr. Storey demonstrated "Low Average" intellectual functioning according to his testing ignored the fact that Mr. Storey fits the *diagnosis* of Borderline Intellectual Functioning according to the Diagnostic and Statistical Manual-IV. Dr. Price's verbal feedback that Mr. Storey did not give his best effort on testing is borne out by neither the malingering testing Dr. Price administered nor his "impression." Current testing, which includes effort testing on the VIP, resulted in an almost identical overall IQ, as well as strong evidence Mr. Storey has not malingered limited intelligence but, indeed, has limited intelligence.

Mr. Storey should have been administered further testing by another psychologist, if not by Dr. Price. Such testing could have demonstrated his effort was good and he has Borderline Intellectual Functioning, as well as pursued the question of Antisocial Personality Disorder. The attorneys made a decision to have no further psychological assessment so that Dr. Price would not find evidence for his hunch that Mr. Storey has Antisocial Personality Disorder. Nevertheless, further assessment could have uncovered the absence of such evidence, as well as more evidence of Mr. Storey's Borderline Intellectual Functioning and his high level of suggestibility. At worst, the defense attorneys could have decided against using in court any additional data Dr. Price or another psychologist discovered.

With regard to the mother, Ms. Shankle-Grant was allowed to misrepresent the role of Mr. Storey's father, apparently to take the focus off her choices. Nevertheless, the father did abandon Mr. Storey emotionally, financially, and, later, physically. The mother made poor choices about coping with stress, about men, and about participation in her children's rearing. Her choices of men exposed Mr. Storey to domestic violence, substance abuse, and other criminal behavior, about which the jury heard nothing. The mother's poorly controlled temper and use of violence were not presented to the jury. The mother also was allowed to misrepresent the effect of the grandmother's illness and subsequent death on Mr. Storey. Note that Mr. Storey's withdrawal and other symptoms, even before his grandmother died, indicate the presence of both serious mental health problems (i.e., depression) and poor coping resources.

With regard to other information that was not brought to the jury, the family history of mental illness was not presented. Mr. Storey's mother, his maternal aunt, and his maternal grandmother all suffered from serious depression. Moreover, Mr. Storey's personal history of mental illness was not presented. The family history of obesity was not addressed, as well as the developmental impact on Mr. Storey to be a "fat boy". As

**Psychological Evaluation**
**STOREY, Paul**
**Date of Report:  June 7, 2012**

noted, the history of substance abuse and violence in the home was not presented.  The lack of supervision in the home was not presented.  While Ms. Shankle-Grant apparently acted responsibly in terms of providing for her children materially, she did not provide structure and discipline; and this information was not brought to the attention of the jury.  This examiner found no evidence that Child Protective Services records were sought to rule out neglect and abuse.  Mr. Storey's academic difficulty in math throughout school could be reflecting attention deficits that were resolved by the time Dr. Price tested him; however, this possibility was neither investigated nor presented to the jury.  Rather, Mr. Storey's school behavior problems were exaggerated or misrepresented to the jury.  His choice to attend an alternative school was misrepresented as a disciplinary punishment, while little to no attention was given to his effort to finish high school.  The jury was not informed that, while Mr. Storey had some indicators of behavior problems in his youth, the onset was late in his youth and, thus, predictive of less dysfunction in adulthood.

Mr. Storey's many life stressors, as well as his mental state, prior to the death of the victim was not presented to the jury.  His 15th year was a watershed year when his grandmother began to fail physically, he got his first job, academic pressures built, and Larry, Sr., left the family.  Neither the development of serious depression during this period, nor ongoing depression when later crises hit, was addressed.

Presenting data to the jury after his conviction about Mr. Storey's intellectual limitations, his suggestibility, his tendency to be a follower, and his poor coping resources (due to multiple factors) could have been persuasive in terms of mitigation.  The jury could have been informed about the impact of these factors on his choice of associates and his choice to commit a crime.  This individual has difficulty making friends, choosing appropriate associates, being assertive with dominant individuals, perceiving alternatives when goals are blocked, knowing where to seek wise counsel when faced with problems, considering consequences, and developing ways to cope.

With regard to future dangerousness, the data available at the time of sentencing indicated Mr. Storey overall presented a low risk of harm to others.  This opinion would have been based on historical factors.  He was involved in only a few minor fights as a child and teenager.  Moreover, he had no history of perpetrating domestic violence, despite exposure to domestic violence in his youth.  He was in only a few minor altercations in the county jail.  Apart from the murder, he had not been convicted of an assault either inside or outside of a penal institution.  Note that he more often had directed anger and disappointment toward himself in the form of depression and over-eating, rather than acting out toward others.  Other factors which suggest he was a low risk of future violence include his educational level (i.e., he has a high school degree) and the fact that he did not have a significant history of substance dependence.  Furthermore, he had been able to maintain a job and never was a gang member.  Note also that Mr. Storey did not and does not fit the criteria for diagnosis of Antisocial Personality

**Psychological Evaluation**
**STOREY, Paul**
**Date of Report: June 7, 2012**

Disorder. This disorder has been linked to estimates of moderate to high risk of future violence. Thus, the absence of such a diagnosis is a significant predictor of low risk of future violence.

**Emily Fallis, Ph.D.**
**Licensed Psychologist**

Psychological Evaluation
STOREY, Paul
Date of Report:  June 7, 2012

## Appendix 1

Records Reviewed:

Handwritten Witness List Notes, undated (2 pages)
Handwritten Notes regarding T. Taylor, August 24, 2008 (2 pages)
Handwritten Notes regarding Q. Burton, August 24, 2008 (1 page)
Witness list for PDS, undated (5 pages)
Paul's Lifeline, undated (3 pages)
Handwritten Notes on R. Price, Ph.D. interview, August 23, 2008 (1 page)
Handwritten Notes on meeting, September 6, 2008 (2 pages)
Larry Fitzgerald, dated August 23, 2008 (1 page)
Charles Holmes Mentoring, undated (4 pages)
Charles Holmes, August 24, 2008 (4 pages)
Character witnesses, dated March 15, 2008 (2 pages)
Mitigation Themes, undated (2 pages)
Psychosocial History, undated (10 pages)
Mitigation Interviews, dated April 5, June 30, July 29, November 11, November 29,
2007; January 19, and March 2, 2008 (31 pages)
School Records and Release of Information, July 2003 and March 2008 (26 pages)
Myelination Research, undated (19 pages)
Peer Pressure Research, undated (19 pages)
Brain Injury Research, undated (15 pages)
Amanda Letter, May 2008 (1 page)
Amanda's Bill, April 2008 (3 pages)
Mapquest, undated (17 pages)
Table of Contents for Mitigation Report, undated (3 pages)
Motion to Approve Additional Funds, April 2008 (1 page)
AP Meillot Handwritten Notes, posts, and article, various dates (16 pages)
AP Meillot Expert Testimony Except, July 2008 (16 pages)
Email from G. Byington to L. Fitzgerald, July 2008 (3 pages)
AP Meillot Testimony from March 2007 (68 pages)
Letter from L. Moore to M. Courtney, May 2008 (1 page)
Sealed Ex Parte Request for Expert Assistance and Curriculum Vitae from L. Fitzgerald,
February 2008 (8 pages)
Designation of Defendant's Expert Witness, June 2008 (2 pages)
Order to Appoint Expert for Psychological Purposes, November 2006 (1 page)
Motion to Appoint Expert, November 2006 (3 pages)
Letter from R. Price, Ph.D., to L. Moore, September 2008 (1 page)
Scores of testing by R. Price, PH.D., undated (1 page)
Expert invoices, September 2008 (4 pages)
Letter from J. Fazio to B. Ray, December 2007 (1 page)
Letter from B. Ray to J. Fazio, December 2007 (1 page)
Letter from B. Ray to Paul Storey, December 2007 (1 page)
Motion to Appoint Investigator, November 2006 (1 page)

**Psychological Evaluation**
**STOREY, Paul**
**Date of Report:  June 7, 2012**

Motion for Additional Funds, dated April, July, August, September, and November, 2008 (7 pages)
Letter to M. Courtney from B. Ray, July 2008 (2 pages)
Motion for Production and Release of Evidence, July 2008 (1 page)
Order to Appoint Expert, Dated November 2006 (2 pages)
Motion to Appoint Expert, dated November 2006 (2 pages
Motion for Expert Assistance and Order for This, dated March 2008 (4 pages)
Motion for Appointment of Mitigation Specialist, dated May 2008
Letter to M. Courtney from L. Moore, dated May 2008 (1 page)
Letter to R. Price from L. Moore, dated May 2008 (1 page)
Prison Classification Document, undated (16 pages)
Letter to B. Ross from L. Moore, dated May 2008 (1 page)
Credit Card Authorization, dated September 2008 (1 page)
Trial Transcripts
Offense Reports
R. Price, Ph.D., notes on structured interview with Paul Storey

## PSYCHOLOGICAL EVALUATION

**NAME:** Paul Storey
**DATE OF BIRTH:** October 1, 1984
**DATES OF INTERVIEWS:** April 15 & 16, 2010
**DATE OF REPORT:** May 20, 2010
**EVALUATOR:** Emily Fallis, Ph.D.

### Identification and Reason for Referral

Mr. Paul Storey was referred by his attorney, Robert Ford, for a psychological evaluation and review of documents related to an appeal of his conviction for Capital Murder and sentence of death. Mr. Storey is a 26-year-old, African-American male.

Mr. Storey was warned of the limits of confidentiality prior to the initiation of the evaluation. He was informed that the usual doctor-patient relationship would not exist. He was informed a report would be prepared for his appeal and given to his attorney. He was able to restate this warning in his own words and showed a good understanding.

### Evaluation Procedures

Clinical Interviews by Emily Fallis, Ph.D. (5.25 hours)

Collateral Contacts:

> Bob Ford, Defense Attorney, March 22, April 22, May 6, 2010 (1.50 hours)
> Marilyn Shankle-Grant, Mother, April 13 (telephone interview) and April 16
> (face-to-face interview/testing), 2010 (2.25 hours)

Review of Records included various legal, medical, and mental health documents

### Background Information[1]

Mr. Storey was born in Fort Worth, Texas, in 1984 to Marilyn Shankle-Grant and Paul David Storey. The couple apparently met while David was working as a mechanic and Ms. Shankle-Grant was working as a caterer at a hotel. Records suggest that Ms. Shankle-Grant pressured David about having a child together and, despite his stated desire not to have a child, she stopped taking her birth control pills. Records indicate she became pregnant but lost this first baby at three months. She apparently became pregnant with Mr. Storey very soon afterward, again against David's wishes. She testified in court that she was involved with David for one and one-half to two years before Mr. Storey

---

[1] Information that documents indicate was inconsistent or was not highlighted during Mr. Storey's trial and sentencing will be in bold print.

103


EXHIBIT
2
Blumberg No. 5119

Psychological Evaluation
STOREY, Paul
Date of Report: May 20, 2010

was born. According to records, David was very controlling, tried to isolate Ms. Shankle-Grant, was very jealous, abused alcohol, and had a "violent temper." Records indicate he once slapped her (after she apparently slapped him) and once choked her. Reportedly Ms. Shankle-Grant left David after the second incident, taking the child and moving to her mother's home.

Records state that Mr. Storey's father saw his son for less than a year before he stopped visiting. David reported that Ms. Shankle-Grant "intentionally turned Paul against" his father, teaching him to say things to his father like "you a crazy bastard." The records state that Mr. Storey's father did not pay child support. Records note that his father occasionally called about coming to visit but typically did not keep his word, leaving Paul very disappointed.

Mr. Storey weighed eight pounds, seven ounces at birth and, despite his mother's memory of a traumatic medical episode at birth, had an Apgar score of nine five minutes after his birth. She reported she was toxemic during the final stages of her pregnancy and had to spend the last week in the hospital. She also stated Mr. Storey was "almost lost" at birth because the umbilical cord was around his neck. She has described him as a colicky, fussy baby. His father described him as a very smart baby. Mr. Storey's developmental milestones were reached on time, if not earlier. He reportedly walked at 10 months and began talking at an early age. Records state Mr. Storey accidentally ingested antidepressants (Amitriptyline) belonging to his maternal grandmother at age 27 months and was hospitalized at Cook Children's Medical Center. He reportedly was resuscitated after his heart stopped and was admitted to an intensive care unit. **Note that this information was reported by the father and the mother could not recall the incident until repeatedly questioned.** He was treated for asthma as a child but apparently grew out of this problem.

**Mr. Storey told the examiner his mother is "loving, caring. Whup our butts when we did something wrong. She always provided for us, has a good heart. She had a bad temper. At one point she became real spiritual." He recalled he was around age 13 when she made this change. When asked about her temper, he responded, "More whuppings before. [She] never got along with my brother's father. [They'd] fight all the time. She'd go off on people real quick, verbally most of the time, not just violent." He remembered times when she hit his brother's father, as well as times she got in physical fights with women. He knew his mother was diagnosed with Lupus in 2003 but did not recall her seeming sick prior to that time or limiting her activities since that time. Mr. Storey's mother apparently frequently was involved with men younger than her. Records indicate she had a relationship with a man she met at the Tarrant County Jail after Mr. Storey was arrested for murder. This man, Mike Tristan, reportedly had many tattoos, including those under both eyes, and dressed in fashion associated with gang members. She evidently let him stay in her home and partake in the mitigation specialist's interview of her, although she had known him for only a short time.**

104

Psychological Evaluation
STOREY, Paul
Date of Report: May 20, 2010

Ms. Shankle-Grant's assessment by this examiner indicates she is easily slighted by others and tends to hold grudges. She tends to blame external causes for her problems and failures, rather than looking at her contribution to her circumstances. She has an inflated sense of her abilities and achievements. She also has a strong need to be affiliated with others so that she can have attention for all these perceived excellent qualities. She will choose quantity in her relationships, rather than quality. Others will find her controlling and smothering, although she will perceive herself as protective.

Ms. Shankle-Grant's parenting style was one which focused on herself, rather than on her children. She wanted to control her son, Mr. Storey, but not for the purpose of guidance and providing structure. To her, Mr. Storey was a token of her achievements, another way to obtain the attention she desired. She was not concerned with the quality of her relationship with her son or his needs. As a result, she did not ensure he was properly supervised when she was at work. She was too focused on herself to notice his involvement in drugs, much less help him eat appropriately. Moreover, she entered and maintained relationships with men who were abusive and very poor role models. Moreover, she continued to advise him to "be loyal," rather than discriminating in his choice companions; and to "be a man," rather than responsible. Court transcripts indicate Ms. Shankle-Grant's friends testified that she provided "everything a parent should," referring to food, clothing, and education and was a "fine mother . . . a moral compass". This testimony apparently was not challenged by the defense.

Mr. Storey reported he never had a significant relationship with his biological father. He said he has not communicated with his father since 2006 when his father was in the hospital and had his legs amputated. Records indicate the contact was in 2002. He noted that his mother persuaded him to have contact with his father at that time but apparently a relationship was not kindled. Note that his mother has told others that Mr. Storey's father asked to see his son. He remarked that he questioned his father about not making contact for years, at which time his father gave a "lame" excuse: "He said he felt my mother told me to say [bad] things about him when he came to get me." He acknowledged great anger at his father for his abandonment. The 2006 contact evidently made him feel worse as he learned his father had a daughter with whom he had maintained contact. He stated he could not describe his father because "I don't know him . . . . He never was a topic. I understood that I had a father, but not to where I could honestly tell you what kind of person he was." He indicated he has no memory of his father being physically abusive to Mr. Storey's mother; however, she has reported this violence. Although both his mother and his father indicated Mr. Storey did not see his father after age four, Mr. Storey recalls spending weekends with his father up to age 10. Mr. Storey remembers watching television with his father but no other activity. He denied his father was abusive in any fashion. He heard his mother say that his father abused alcohol but had no memory of his father using alcohol at all. He did not know if his father had been in legal trouble. Records indicate his father was in many fights prior to the time he got

105

Psychological Evaluation
STOREY, Paul
Date of Report:  May 20, 2010

involved with Ms. Shankle-Grant.  **Mr. Storey told the examiner he did not know
what sort of work his father did or if he worked at all.  He said he occasionally saw
one paternal aunt but saw no other paternal relatives until he attended a family
reunion in Oklahoma as a teenager.**

When asked with whom his mother was next involved, **Mr. Storey recalled his
mother had a long-distance relationship with Charles Holmes, a man in Oklahoma,
for a short time.**  Court transcripts indicate Charles lived with the family for one and
one-half years (1994 to 1995), although their relationship lasted five or six years.
**Mr. Storey reported he was age six when his mother got involved with Larry, Sr.;**
however, some records state he was only four.  Court transcripts suggest he was
significantly older than six and that Ms. Shankle-Grant still was involved with Charles
when she got involved with Larry, Sr.  **Mr. Storey was unsure how long they were
together before Larry, Sr., moved into the home; however, he recalled Larry, Jr.,
was born before the co-habitation began.  Mr. Storey stated he was "OK" with
Larry, Sr., as his stepfather: "He was like a father to us.  He didn't treat me like I
wasn't his child."**  Records indicate Larry, Sr., was characterized as a good father Ms.
Shankle-Grant as well.  **He estimated Larry, Sr., lived with the family about 12 years,**
although Mr. Storey acknowledged his stepfather sometimes left when he and his
mother would **"get into it."  Mr. Storey thought his mother might have "messed
around" with other men when his stepfather was absent.  Mr. Storey reported that
his stepfather was not physically abusive to his mother; however, he added that "she
hit him."  Mr. Storey recalled the police were called three or four times, but neither
party was arrested.**  When asked what he did when the adults fought, he answered,
**"A couple of times, I try to keep them apart.  I call the police if they both act stupid.
'Ya'll stop yelling!'"  Mr. Storey said his stepfather spanked only once,** typically
yelling when he attempted to discipline the boys.  **Mr. Storey indicated his stepfather
worked in construction.  He said Larry, Sr., abused alcohol but began to abuse crack
cocaine after the relationship with Ms. Shankel-Grant ended.**  On the other hand,
**Mr. Storey later indicated he heard his mother accuse Larry, Sr., of drug abuse
before the relationship ended.  Mr. Storey reported his stepfather was jailed for
Public Intoxication, traffic tickets, and Possession of Drugs.**  Note that some of these
offenses occurred <u>before</u> the relationship with Mr. Storey's mother ended.  Larry,
Sr., continued to spend time with Mr. Storey and Larry, Jr., after the relationship with
their mother ended.  **Mr. Storey stated his stepfather did not obviously use crack
cocaine around Mr. Storey and Larry, Jr.; however, he remembers his stepfather
buying crack cocaine while spending time with the boys.  Mr. Storey was well aware
that his stepfather was using crack cocaine, in other words.  His mother told the
examiner she left Mr. Storey and Larry, Jr., with Larry's paternal aunt, rather than
Larry, Sr., as she knew he was abusing drugs;** however, this report is at odds with
Mr. Storey's memory and at odds with the impression she left with others in the
courtroom of Larry, Sr.'s, positive influence.

Mr. Storey told the examiner his mother got involved with Jimmy after she and
Larry, Sr., ended their relationship.  He thought he was around age 16 when Jimmy

Psychological Evaluation
STOREY, Paul
Date of Report: May 20, 2010

moved into the home. He indicated the relationship lasted a few years, although the last part of the relationship was off-and-on due to quarreling. Mr. Storey denied physical violence in this relationship. He denied physical violence between his mother and Jimmy, as well as calls to the police. He reported Jimmy did not abuse drugs but did sell drugs. Mr. Storey indicated Jimmy was arrested for possessing drugs, as well as traffic tickets. Jimmy apparently had a legitimate job as a truck driver.

Mr. Storey reported he was in his 20's when his mother married Uriel. Other sources indicate he was younger when this marriage began. In either case, Mr. Storey still lived at home. He denied domestic violence in this relationship, as well as police being called for suspected violence. Records also indicate a lot of conflict in the family overall because Uriel's nine-year-old son was a troublemaker and no one but his father was allowed to discipline the boy.

Mr. Storey's brother, Larry, Jr., currently is in the Navy but Mr. Storey did not know his brother's rank. Mr. Storey indicated his brother is stationed in Japan and seldom writes; however, he has talked to his brother on the telephone. He described his brother as "like me because he enjoys dressing, women, some video games. He's a game freak. Differences? The people he socialize with . . . . The term I use, nerdy, goofy . . . . He's smart. He works well with computers." Mr. Storey recalled that he and Larry, Jr., shared a room when young, sometimes having conflict because Larry, Jr., was not as neat as Mr. Storey. He said Larry, Jr., was a loner in high school, to some degree. Mr. Storey denied his brother had problems with depression, although he recalled Larry, Jr., was hit hard by their Uncle Tony's death (see below).

Mr. Storey acknowledged he and his family have struggled with obesity. He and his mother indicated he was overweight as a child and teenager. He told the examiner that his peers picked on him about being fat. He said the obesity is due to "poor eating habits, lack of exercise, culture." He stated his grandmother, mother, maternal aunts and uncles, brother, and father have all struggled with weight.

Mr. Storey's grandmother was a significant caretaker, keeping him and Larry, Jr., when their mother was working. (This arrangement apparently changed when both boys were in elementary school and Mr. Storey was given the task of supervising his younger brother.) When asked about discipline, he indicated his grandmother would take privileges, give chores, make the boys take a nap, and spank. His grandmother reportedly was diabetic and was "constantly in bed" beginning in 1999, when Mr. Storey was around age 15. He indicated she lived in a separate residence and needed assistance with various daily living tasks by 1999. She evidently later developed senility, was diagnosed with cancer, and deteriorated over a two-year period before she died in June 2004. Court transcripts indicate his mother testified that her mother died while Mr. Storey still was in high school, leading to some of his truancy. He told the examiner his grandmother had chemotherapy and several surgeries. He

5

107

Psychological Evaluation
STOREY, Paul
Date of Report: May 20, 2010

stated she was in a nursing home and he visited as often as twice weekly. At the same time, he admitted he "loved her so much, it hurt me to see her" and, therefore, he often avoided spending time with his grandmother. He added that the senility made his grandmother increasingly irritable. His mother indicated her mother got very depressed and took antidepressant medication during that time. Mr. Storey recalled his grandmother's depression: "She was tired of suffering, surgeries, medication, being in bed all the time." He noted he felt increasingly irritable because of his grandmother's failing health, while his interest in school faded during his senior year. He indicated he became depressed about his grandmother and this depression was accompanied by a significant increase in overeating and weight gain. His mother's court testimony confirmed that Mr. Storey became significantly depressed after his grandmother died. He noted he did not feel he was over the grief of her death until 2007. He added that Ms. Shankle-Grant took the death of her mother very hard: "It's where a lot of her depression and overeating came from."

Mr. Storey indicated his maternal uncle, Tony, was in the Navy but, after being diagnosed with cancer, lived with Mr. Storey's family in the final five months before his death in late 2005. Mr. Storey noted he had had minimal contact with Uncle Tony prior to that time. Nevertheless, the death was difficult for the whole family. Mr. Storey stated his maternal Aunt Carolyn died shortly afterward of sudden heart problems. He apparently felt a good deal of stress because of the three deaths over a very short time.

Both Mr. Storey and his mother indicated that Child Protective Services never was involved in their family. The available records do not show whether or not this report was confirmed before or during Mr. Storey's trial.

Mr. Storey denied many signs of childhood maladjustment, including running away from home, wetting the bed, cruelty to animals, and sexual abuse as either a victim or a perpetrator. When asked about fire-setting, he denied a pattern of such behavior. He denied getting involved in gambling. He indicated he liked playing sports in his neighborhood, including football and basketball, as well as riding his bicycle. He admitted staying out past curfew beginning in junior high school, although he indicated his curfew was not well-established. He said he began to sneak out of the house at age 17. He admitted he had difficulty managing his anger in elementary school. He indicated by high school he "understood I didn't want to get in trouble all the time . . . . [and] understood I could hurt someone . . . . I would take time to think more, weigh options." He denied a pattern of property destruction when angry.

Mr. Storey reported he completed high school. He said he "loved learning" and did not perceive teachers as picking on him. He said he never was in Special Education classes but was held back in ninth grade. Other sources indicate he had to attend summer school to pass to eighth grade. He apparently got tutoring in ninth grade as his grades were falling, which he blamed on working after school. He stated he made C's in school until ninth grade, having the most trouble with math. (Mr. Storey's academic

Psychological Evaluation
STOREY, Paul
Date of Report: May 20, 2010

difficulty in math throughout school could be reflecting attention deficits that were resolved by the time he was tested by the defense expert, Dr. Price.) He indicated he was failing classes in 11th grade, so he decided to attend an alternative school, Theresa B. Lee Academy, so that he could graduate on time. Records show his grades in academic subjects ranged from 57 to 80 in 9th grade the first time; from 54 to 83 the second time he was in 9th grade; from 53 to 86 in tenth grade; from 45 to 88 in 11th grade; and from 70 to 99 in 12th grade. Records show he enrolled in Theresa B. Lee Academy in August 2003. **He noted the teachers at the alternative school were more helpful to him than teachers in previous schools, which is reflected in his grades. He nevertheless continued to have difficulty with math class. He reported he perceived his high school degree as important, despite the illegal activities in which he had engaged: "I knew I needed it. It's required for jobs. I knew I needed it for a good job. It would've made my mother happy [too]." He told the examiner he played football during ninth grade (the first time). He indicated his grades were too poor to play football thereafter,** although records indicate his mother claimed she made him quit. He stated he got into a few fights, **some prompted by peers who ridiculed his weight.** He estimated he was suspended about ten times, beginning in elementary school and continuing through high school. He thought he was in trouble for insubordination, being tardy, skipping school, and fighting. He indicated the number of fights was very few. Court transcripts indicate he was in only one fight while at Theresa B. Lee Academy. Teachers from this school testified in court that he was likeable, a model student, great, and outstanding. He said he did not skip school until seventh grade. **When asked what he did while truant, he replied, "My mother left before we did, so it was no problem to stay at home." He indicated his schools were primarily African-American, although some students were Caucasian and some were "Mexican." He recalled the racial groups segregated themselves. He also recalled a great deal of tension between the African-American and the Hispanic students.**

Court transcripts note the prosecutor said Mr. Storey was sent to Aaron Carter Riverside summer school for "violation of school policies" in 2000 and was suspended "at least five or six" times and given in-school suspension at Eastern Hills High School in 2001 and 2002. The transcripts also show the prosecutor stated Mr. Storey was suspended "many, many, wouldn't it be fair to say, several suspensions from school" for "challenging teachers, being disruptive to teachers, talking back to teachers . . . . to the point where he had to go to an alternative school to graduate." **These characterizations misrepresent the number and nature of Mr. Storey's misconduct in high school, as well as the situation leading Mr. Storey to attend an alternative school (which was by choice).** In actuality, records indicate Mr. Storey was suspended six times and received in-school suspension eight times for generally minor infractions. Records show that the school policy violation in 2000 involved bringing firecrackers to school; however, his mother denied he was the culprit. Records from Theresa B. Lee Academy state he "only got in trouble for minor things as far as tardiness or missing class" and was a "good student."

When he was a senior, Mr. Storey reported his best friend, O'Brien, talked to him about joining the Navy on the "buddy system" after high school graduation. **Mr. Storey**

7

Psychological Evaluation
STOREY, Paul
Date of Report:  May 20, 2010

thought the idea was a good because he could get money for college, could travel, and would earn sufficient money to take care of his needs. He evidently was totally unprepared for the Navy recruiter to tell him that he had to lose 50 pounds before he would be accepted. He said O'Brien went into the Navy without Mr. Storey, leaving him with no plan for the future, as well as leaving him without his best friend. **Mr. Storey stated he was able to lose 20 pounds but then became too depressed to overcome his food addiction.**

**Mr. Storey said he first worked at age 15: "My mom said I was an expensive teen. I needed to get a job to pay for the things I wanted to have." He recalled he worked as a bagger at a grocery store three days a week, after school, for several months. He stated he did not like the work because male customers were rude to him. He noted the job was not boring because he worked with several other teens. He told the examiner he began failing at school and quit in order to work on his grades. He added, "You can't work at a grocery store for the rest of your life, unless it's what you want to do." When prompted, he acknowledged his mother urged him to quit because his grades were slipping.**

Mr. Storey reported he next was hired by Putt-Putt, a miniature golf business. He said a friend who was working for this business encouraged Mr. Storey to **apply. He stated he heard that he could meet girls, as well as earn his spending money.** He estimated he held this job for eight months, working about 30 hours per week. He noted **most of the hours he worked were on weekends so his schoolwork did not suffer. He commented that he liked the job because he has "just always been into girls." He was unsure if some of the girls came simply because he worked there: "Possibly. None gave that impression, but it's possible." Mr. Storey stated he left this job because "something happened and I don't feel they handled it in a manner they should have. I didn't want to be at a job where they do me like that, so I quit."** He explained that one of the children in a go-kart ran into him, injuring his leg. When he asked for a replacement to operate the ride so he could get some ice to put on his leg, he said he was told he did not need ice. He stated he then quit.

Mr. Storey told the examiner he then began to work jobs through a temporary job placement service. He recalled his longest job assignment was for four months at Nokia where he refurbished telephones, as well as stocked and packed merchandise. He said he quit two jobs because of unreliable transportation. **He stated he was fired from one job because he could not master the cash register.**

Mr. Storey evidently was awarded a scholarship to attend a truck driving school in Waco, Texas. He was supposed to work with a trainer after completing the school but both trainers with whom Mr. Storey attempted to work quit. Apparently he was not allowed to drive long distances unaccompanied.

Mr. Storey admitted resorting to illegal means of obtaining money, beginning in 11th grade. He acknowledged he broke into vehicles and houses; and also stole items from

8

110

Psychological Evaluation
STOREY, Paul
Date of Report: May 20, 2010

stores. He said that people engaged in theft who would ask him to join them. He indicated he only once attempted a theft by himself. **He denied finding excitement in stealing, noting he always felt scared.** He said he and his companions would find others to buy the stolen items. **He noted he sometimes hid the stolen items in his home.** Other sources indicate Mr. Storey took his mother's car for a joy ride at age 13, but the police were not involved.

Mr. Storey later noted that, at age 15, he and a friend planned to rob a home but were not successful. Apparently the friend had stolen a house key from another peer. When Mr. Storey's friend attempted to enter the house, they were observed by the owner and ran away. Mr. Storey indicated he was taken to juvenile detention by police but was not prosecuted. He said he admitted the plan to his mother and "got a whipping."

Mr. Storey acknowledged he continued a pattern of theft while he was in truck driving school in Waco, Texas. By all accounts, a high school peer, Mark Porter, went with Mr. Storey to Waco. The two men apparently robbed drug dealers **on two to four occasions**, figuring the drug dealers could not report them to the police. As a result of choosing to rob criminals, Mr. Storey was never arrested prior to the murder case. Mr. Storey apparently had a number of traffic violations for which his mother paid.

Mr. Storey reported he first used marijuana at age 14, using this drug about twice per week for the next year. **He remarked, "Really, when I get high, I have a paranoia problem .... I got paranoid when I smoked." He stated he decreased his use of marijuana to once per month "when I went to a club" with someone older who helped him enter. He indicated he continued this once monthly pattern until age 18 when he stopped using this drug. He denied ever using methamphetamines, cocaine, hallucinogenic drugs (LSD, PDPO), Ecstasy, and opioids. He also denied abusing prescription medication. Mr. Storey admitted he began to sell marijuana at age 17;** however, other sources indicate this behavior began earlier. By all accounts, he got the marijuana from individuals he met at a recording studio

Mr. Storey reported he began to drink alcohol at age 16. He insisted he does not like the taste and never drank more often than once every two years. He acknowledged he has been drunk on about four occasions. He denied having blackouts or legal consequences for his use of alcohol.

**Mr. Storey characterized himself as both someone who liked to "run the streets" and someone who was a "loner."** He was not in a gang, although he spent time in the "Stop Six" area of Fort Worth, which is infamous for gang activity. **He said he was not in a "clique" at school but was considered a "class clown."** The clowning apparently was begun to help him cope with being teased about his obesity. **He recalled he "hung out" with one close friend or a small group in his teens and early 20s.** Other sources indicate Mr. Storey's mother's bought 100's of dollars of groceries to motivate his peers to spend time at their house, trying to create friends for her son. Other sources indicate he developed a relationship with Dewan, a boy who ran away from home and used illegal

9

111

Psychological Evaluation
STOREY, Paul
Date of Report:  May 20, 2010

drugs.  Apparently Mr. Storey and Dewan spent time around a recording studio and wanted to become rappers.  When Dewan began to use "harder drugs," Mr. Storey evidently distanced himself from this friend.  He did not recall having a best friend until high school when he and O'Brien became friends.  He stated O'Brien skipped school with Mr. Storey but otherwise was not a bad influence.  He indicated they remained friends until they tried to enlist in the Navy together.  After Mr. Storey was refused for being overweight (apparently 360 pounds) and O'Brien was accepted, the friendship was not maintained.  He revealed, "When O'Brien went into the Navy, he was my only real friend."

Mr. Storey told the examiner he became interested in the opposite sex when he was age 12.  He said he dated several different girls before he was involved with Qualondra for several years, beginning when both were in high school.  Qualondra apparently is younger than Mr. Storey.  He indicated he met Qualondra through a friend, James Lewis, who was involved with Qualondra's friend.  When asked if Qualondra was faithful to him, he said she was until 2006 when the couple had financial problems and the number of arguments increased.  He remarked that he got tired of the conflict because "I'm not an argumentative person."  He said he met Dorothy during this time and began to spend more time with her than with Qualondra.  He stated he was intimately involved with Dorothy over the five-year period prior to the current incarceration.  He noted that neither woman knew he was unfaithful, although Qualondra suspected.  Mr. Storey indicated he has been sexually involved with six women, only one of which was a "one-night stand."
He denied paying for sex with a prostitute or contracting a sexually transmitted disease.

Mr. Storey denied fathering children, noting he did not want to be a father in the past.  He related, "I couldn't sit still and then I was, was messing with several women.  I wanted to make sure, if I had kids, that it was someone I wanted to have kids with."  He noted that he needed to stop "running the streets" if he were going to have a child.  He indicated he recognized the need to be with only one woman, to work regularly, and be at home as much as possible if he had a child.

Mr. Storey denied being physically violent with women: "I'm not into hitting women."  He added that Qualondra sometimes would hit him and verbally abuse him, but he never returned the abuse.  When asked how he would handle this abuse, he answered, "Most of the time, we were in my home.  I'd tell her to get your stuff, go."

Mr. Storey reported he has been in only two fights during his incarceration, both of which occurred in the very volatile atmosphere of the county jail during the stressful pretrial period.  He said the other person was injured in one fight, sustaining only a bloody nose.  Records show he was in trouble for a "minor assault on a correctional officer" in July 2007.  Records show he had an altercation with his co-defendant in November 2007.  Records show he had an altercation with a prisoner (Christopher

112

Psychological Evaluation
STOREY, Paul
Date of Report: May 20, 2010

Moore) in March 2008. Records show he received a disciplinary report for "a disturbance of a correctional officer" in March 2008. **He admitted he also was in trouble twice for insubordination while in the jail during that same time period. He denied being in trouble or receiving disciplinary reports since his placement in TDCJ. He said the last time he lost his temper was 13 months ago when he was refused recreation. He indicated his response was to put his arm in the food slot and refuse to move until he had a chance to talk to the sergeant.**

**Mr. Storey reported he began taking medication for hypertension two days prior to the first interview, noting he had not been diagnosed with this problem previously.** He apparently had a head injury when he was child, as a passenger in a car that Larry, Sr., was driving. By all accounts, a collision with anther car occurred while Mr. Storey was sleeping in the backseat. Evidently Mr. Storey was not wearing a seatbelt and was thrown into the front of the car where his head hit the dashboard. **Records indicate he was not observed to be unconscious when ambulance personnel arrived, although his mother (who was driving another car and witnessed the accident) recalled he was unconscious.** Records indicate he was seen at a hospital and was diagnosed with a possible hematoma. **Mr. Storey said he had trouble with his vision and attention after the accident.** Other sources indicate his grades fell, he became easily irritated, and he became withdrawn. He indicated he had a head injury while playing football in ninth grade. He also hurt his knee in a football game. Mr. Storey apparently has been advised he is at risk for Peripheral Vascular Disorder given his father has had this condition.

As suggested previously, **Mr. Storey told the examiner he has had periods of very depressed mood and accompanying symptoms which indicate severe, or clinical, levels of depression. The family history of depression supports the likelihood that he has had episodes of clinical depression, i.e., Major Depressive Disorder.** He reported periods of two weeks or more during which he has "not want[ed] to do anything, [not wanted to] get out of bed, [and] became distant." He continued, "I didn't want to go to school, I'd fight more often, I'd eat a lot, I became distant." He recalled he sometimes found himself not wanting to sleep. He reported having suicidal thoughts in the past, both after his grandmother died and immediately after his arrest for murder. He acknowledged his depression related to his grandmother's death lasted about two years. He noted that, after her death, "I was really eating to suppress my depression." He indicated that, when depressed, he typically sleeps more often than normal: "I'm using [sleep] to nullify the depression, too." He stated he tried to hide his depression from others, commenting, "I'm always good at hiding my feelings. And, I got a thing about—other people have their own problems. No use to give them mine." By all accounts he was very depressed after he was refused entry into the Navy and cut off from his "only real friend." His difficulty finding a mentor after truck driving school also triggered significant feelings of depression. He told the examiner he experienced a period of serious depression for about three months prior to his arrest for murder. He

113

Psychological Evaluation
STOREY, Paul
Date of Report: May 20, 2010

indicated he was overeating, was sleeping more than normal, and had lost interest in "hanging out, going places, being around people." He apparently never had mental health treatment.

Mr. Storey was assessed by a psychologist, Randy Price, Ph.D., during his pretrial period of incarceration. The results of this evaluation, primarily focused on neuropsychological issues, will be discussed in a later section. The records show Dr. Price asked very few questions about Mr. Storey's history, although Dr. Price likely was asked to focus on testing. Moreover, the information from Dr. Price's report shows Dr. Price mistakenly labeled Mr. Storey's intelligence as falling in the Low Average range, rather than in the Borderline range.

### Recent Mental Status and Behavioral Observation

Mr. Storey is a 26-year-old, African-American man who appeared his stated age. He had a large build and was of average height. He demonstrated fair eye contact. His grooming and hygiene were fair. He was dressed in jail-issue clothing and was in handcuffs both times he was seen. He used neither corrective lenses nor hearing devices. His seated posture and walking gait were within normal limits. His rate, rhythm, and tone of speech were all within normal limits. He demonstrated neither psychomotor retardation nor agitation. He was respectful and cooperative during the evaluation. He was interviewed in a room adjacent to his housing unit and in the booking area in the Tarrant County Jail. He denied taking any sort of psychotropic medication at the time of the evaluation.

Mr. Storey indicated he was involved in more activities in the Polanski Unit in TDCJ than at the Tarrant County Jail. He indicated in TDCJ he listens to the radio, writes, reads, socializes, and exercises. He noted he has several pen pals with whom he exchanges letters. He noted he gets visits in TDCJ and has had visits in the jail. He denied having behavioral problems at the jail. He denied being troubled by staff or other prisoners.

Mr. Storey demonstrated a normal range of emotional expression and appeared calm. He reported sleeping off and on. He made no complaints about his appetite. He did not indicate suicidal thoughts or behaviors at any time in his life. He provided no evidence of a manic episode or an anxiety disorder.

Mr. Storey exhibited coherent, sequential, goal-directed, logical thought processes with no evidence of psychosis. He neither reported nor demonstrated evidence of hallucinations or delusions.

Mr. Storey was oriented to person, place, day of the month, month, year, and situation. He seemed to have intact immediate, short-term, and long-term memory capacities. He seemed to have adequate attention and concentration.

114

Psychological Evaluation
STOREY, Paul
Date of Report: May 20, 2010

## Cognitive Functioning and Evidence of Neuropsychological Dysfunction

Randy Price, Ph.D., performed a neuropsychological assessment of Mr. Storey on
July 14, 2008. Records show Dr. Price administered the Reynolds Intellectual
Assessment Scales (RIAS), the Repeatable Battery for Assessment of
Neuropsychological Status (R-BANS), and the Reynolds 15-Item test. The latter test is
used to screen for malingering of cognitive problems and the results indicated Mr. Storey
was not malingering such deficits. Evidently Dr. Price provided feedback to the defense
attorneys that, based on the three tests administered, Mr. Storey had no cognitive or
neuropsychological deficits.

The RIAS scores demonstrated a Composite IQ Score of 81, as well as a Verbal Score of
82 and a Nonverbal Score of 86. Note that Dr. Price characterized the overall score of 81
as "Low Average"; however, the Diagnostic and Statistical Manual-IV (DSM-IV) states
that an IQ score that falls in the range from 71 to 84 is the basis for diagnosing Borderline
Intellectual Functioning. This diagnosis does not appear to have been provided to the
defense attorneys.

Mr. Storey was administered the R-BANS as well, a battery of short tests which, with one
exception, yielded scores classified as Average. Mr. Storey earned one score of "Low
Average" range on Language, a score which falls in only the 12th percentile. The two
subtests which are factored into the Language score involve expressive language.
Mr. Storey performed particularly poorly on Picture Naming which, in conjunction with
his verbal test scores on the RIAS, suggests deficits in expressive language. This
information does not appear to have been explained to the defense attorneys.

With regard to the tests chosen for the cognitive assessment, Mr. Storey was not given
the most comprehensive, well-validated, and most reliable intelligence test available.
This test would be the Wechsler Adult Intelligence Scale-IV (WAIS-IV). Given that
Mr. Storey's life was at stake in a capital murder case, this examiner argues that the
WAIS-IV should have been the choice for considering neuropsychological and general
cognitive capacities. This test would yield more information than the RIAS regarding
both functioning during the crime and developmental functioning pertinent to mitigation.

Moreover, Mr. Storey was not given an achievement test to discover what he had learned
with the intelligence he has. Although achievement testing is not necessarily part of a
neuropsychological assessment, with school records showing Mr. Storey had academic
difficulties in math, the issue of his achievement should have been addressed.

115

Psychological Evaluation
STOREY, Paul
Date of Report: May 20, 2010

## Personality Functioning

Mr. Storey's personality functioning is tied to the lack of parental guidance in his early life. This lack of guidance resulted in him modeling such inappropriate behavior as eating indiscriminately and using illegal drugs. His father emotionally abandoned him, while his mother spent much of her time working, leaving him hurt and angry. His early experiences taught him to hide his feelings, rather than share them with others. In order to have some sense of relatedness, he became a clown to fit in. This persona was also a way to guard himself against further hurt, such as when he was ridiculed for his obesity. He was left with underlying anger which he did not know how to express or manage. While he has been involved in a few incidences of violence prior to the murder, these incidences were mild. Instead, he turned this anger on himself and became depressed. Note that despite the deficits of his childhood, he developed the capacity to act in a responsible fashion, as well as some empathy for others.

## Diagnosis

Axis I:        Major Depressive Disorder, Recurrent, in Remission, 296.36
               Cannabis Abuse, In Remission, 305.20
               Adult Antisocial Behavior, V71.01
               Rule out Cognitive Disorder, Not Otherwise Specified, 294.9
               Rule out Learning Disorder, Not Otherwise Specified, 315.9

Axis II:       Borderline Intellectual Functioning, V62.89

Axis III:      Closed head injuries, hypertension, pain in left knee (by history)

Axis IV:       Stressors: Legal, relational

Axis V:        Current General Assessment of Functioning = 75

## Summary

The data from this evaluation show many mitigating factors which should have been presented to a jury as these individuals determined whether or not to sentence Mr. Storey to death. Many of these mitigating factors were provided to neither the defense attorneys nor the jury. In fact, problems with the first mitigation specialist leading to the hiring of a second mitigation specialist hampered research into Mr. Storey's life and presentation of a full report to the defense attorneys. In particular, the mitigation specialist (as well as the psychologist; see below) did not get enough detail about family life (e.g., exposure to substance abuse, violence in the home, and other criminal behavior) or about the family history of clinical depression. Moreover, the data from this evaluation also show the defense attorneys allowed Mr. Storey's mother to misrepresent his upbringing and, thus, the jury did not hear critical information.

116

Psychological Evaluation
STOREY, Paul
Date of Report:  May 20, 2010

With regard to the defense psychologist, evidence indicates Dr. Price did not obtain a full
life history from Mr. Storey.  In all fairness, Dr. Price may not have been asked to obtain
this information but, rather, may have been designated to focus on neuropsychological
testing, as the title of his report suggests.  Nevertheless, this limited focus hindered
presentation of mitigating factors to the jury.  In criticism of Dr. Price, his report to the
attorneys that Mr. Storey demonstrated "Low Average" intellectual functioning according
to his testing ignored the fact that Mr. Storey fits the *diagnosis* of Borderline Intellectual
Functioning (with limited verbal reasoning) according to the Diagnostic and Statistical
Manual-IV.  Moreover, further testing should have been completed by another
psychologist, if not by Dr. Price.

With regard to the mother, Ms. Shankle-Grant was allowed to misrepresent the role of
Mr. Storey's father, apparently to take the focus off her choices.  Nevertheless, the father
did abandon Mr. Storey emotionally, financially, and, later, physically.  The mother made
poor choices about coping with stress, about men, and about participation in her
children's rearing.  Her choices of men exposed Mr. Storey to domestic violence,
substance abuse, and other criminal behavior, about which the jury heard nothing.  The
mother's poorly controlled temper and use of violence were not presented to the jury.
The mother also was allowed to misrepresent the effect of the grandmother's illness and
subsequent death on Mr. Storey.  Note that Mr. Storey's withdrawal and other symptoms,
even before his grandmother died, indicate the presence of both serious mental health
problems (i.e., depression) and poor coping resources.

With regard to other information that was not brought to the jury, the family history of
mental illness was not presented.  Mr. Storey's mother, his maternal aunt, and his
maternal grandmother all suffered from serious depression.  Moreover, Mr. Storey's
personal history of mental illness was not presented.  The family history of obesity was
not addressed, as well as the developmental impact on Mr. Storey to be a "fat boy".  As
noted, the history of substance abuse and violence in the home was not presented.  The
lack of supervision in the home was not presented.  While Ms. Shankle-Grant acted
responsibly in terms of providing for her children materially, she did not provide
structure and discipline; and this information was not brought to the attention of the jury.
This examiner found no evidence that Child Protective Services records were sought to
rule out neglect and abuse.  Mr. Storey's academic difficulty in math throughout school
could be reflecting attention deficits that were resolved by the time Dr. Price tested him;
however, this possibility was neither investigated nor presented to the jury.  Rather, Mr.
Storey's school behavior problems were exaggerated or misrepresented to the jury.  His
choice to attend an alternative school was misrepresented as a disciplinary punishment,
while no attention was given to his effort to finish high school.  The jury was not
informed that, while Mr. Storey had some indicators of behavior problems in his youth,
the onset was late in his youth and, thus, predictive of less dysfunction in adulthood.

Mr. Storey's many life stressors, as well as his mental state, prior to the death of the
victim was not presented to the jury.  His 15th year was a watershed year when his
grandmother began to fail physically, he got his first job, academic pressures built, and

117

Psychological Evaluation
STOREY, Paul
Date of Report:  May 20, 2010

Larry, Sr., left the family.  Neither the development of serious depression during this period, nor ongoing depression when later crises hit, was addressed.

With regard to future dangerousness, Mr. Storey overall presents a low risk of harm to others based on historical factors.  He was involved in only a few minor fights as a child and teenager.  Moreover, he does not have history of perpetrating domestic violence, despite exposure to domestic violence in his youth.  He was in only a few minor altercations in the county jail.  Apart from the murder, he has not been convicted of an assault either inside or outside of a penal institution.  Importantly, he has not been in trouble for assaultive behavior since he was sent to TDCJ.  Note that he more often has directed anger and disappointment toward himself in the form of depression, rather than acting out toward others.  Other factors which suggest he is a low risk of future violence include his educational level (i.e., he has a high school degree) and the fact that he does not have a significant history of substance dependence.  Furthermore, he has been able to maintain a job and never was a gang member.  Note also that Mr. Storey does not fit the criteria for diagnosis of Antisocial Personality Disorder which is diagnosed when three of seven features of a "pervasive pattern of disregard for and violation of the rights of others" are noted.  This disorder has been linked to estimates of moderate to high risk of future violence.  Thus, the absence of such a diagnosis is a significant predictor of low risk of future violence.

Emily Fallis, Ph.D.
Licensed Psychologist

16

118

## Affidavit of Sven Berger

My name is Sven Berger and I served on the Paul David Storey jury.  I am not addressing the guilt of Paul David Storey.  I believe the evidence established beyond a reasonable doubt that Paul David Storey was guilty of capital murder.

I read Dr. Fallis' psychological/mitigation evaluation and based on this new information I am certain I would not have voted for the death penalty.  In particular, I would have voted that Mr. Storey was not a future danger.

A copy of the Dr. Emily Fallis' report is attached to my affidavit.

THE STATE OF TEXAS        §
COUNTY OF TARRANT         §

   BEFORE ME, the undersigned authority, on this day personally appeared Sven Berger,

who being duly sworn, upon his oath stated as follows:

   "My name is Sven Berger. I have read the foregoing and know the contents thereof and that the same are true and correct."

SUBSCRIBED AND SWORN TO BEFORE ME, this the 25 day of May, 2010.



Notary Public in and for
the State of Texas

GARY B. COOPER
MY COMMISSION EXPIRES
December 2° 2010

102

EXHIBIT
3

NO. C-3-009076-1042204-A

| | | |
|---|---|---|
| EX PARTE | § | IN CRIMINAL DISTRICT |
| | § | |
| | § | COURT NUMBER THREE OF |
| | § | |
| PAUL DAVID STOREY | § | TARRANT COUNTY, TEXAS |

## ORDER

Having considered Applicant's application for writ of habeas corpus in the above-entitled and numbered cause, the State's answer, the record of the trial, the exhibits submitted by the parties, and the law applicable to the case, this court finds that there are no controverted, previously unresolved factual issues material to the legality of Applicant's confinement. The court further concludes that Applicant's complaints may be resolved on the basis of the present record in the cause.

THEREFORE, this court finds that the there is no necessity for a fact finding hearing. See TEX. CODE CRIM. PROC. ANN. art. 11.071, § 8(a)(Vernon Supp. 2010). The parties will file their proposed findings of fact and conclusions of within thirty (30) days of this order. See TEX. CODE CRIM. PROC. ANN. art. 11.071, § 8(b)(Vernon Supp. 2010).

SIGNED AND ENTERED this the ____8__ day of DECEMBER 2010.

_____
JUDGE PRESIDING

12-13-10
cc: Storey
Staff Atty
12-17-10
Atty came unit
I gave him a copy

270


EXHIBIT
4