IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

PAUL DAVID STOREY,               §
    Petitioner, §
       §
v.       §  NO.4:11-cv-433-Y
       §  Hon. Terry R. Means
RICK THALER, Director §  (Death Penalty Case)
Texas Department of Criminal Justice, §
Correctional Institutions Division, §
    Respondent. §

## RESPONDENT'S MOTION FOR SUMMARY JUDGMENT
## WITH BRIEF IN SUPPORT

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

DON CLEMMER
Deputy Attorney General
For Criminal Justice

*Counsel of Record
_____

EDWARD L. MARSHALL
Chief, Postconviction Litigation Division

*GEORGETTE P. ODEN
Assistant Attorney General
Postconviction Litigation Division

P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1400

ATTORNEYS FOR RESPONDENT

## MOTION FOR SUMMARY JUDGMENT
## WITH BRIEF IN SUPPORT

Petitioner Paul David Storey (Storey) was properly convicted of the capital murder of Jonas Cherry during the course of a robbery and was sentenced to death. He now challenges his presumptively valid death sentence in this Court pursuant to 28 U.S.C. §§ 2241 & 2254. For the reasons discussed below, Storey fails to demonstrate he is entitled to federal habeas relief.

## STOREY'S ALLEGATIONS

In this federal habeas proceeding, Storey raises the following allegations:

1. His attorneys provided ineffective assistance of counsel during the penalty phase because they failed to investigate and present adequate mitigation and lack-of-future dangerousness evidence;

2. The State used a peremptory challenge on Veniremember 50, Curtis Patterson, based on his race, in violation of *Batson v. Kentucky*.[1]

3. Texas's death-penalty statute is unconstitutional because
   (a) the allocation of the burden of proof for the special issues violates *Walton v. Arizona*,[2] *Ring v. Arizona*[3] and *Apprendi v. New Jersey*,[4]

---

[1] 476 U.S. 79 (1986).
[2] 497 U.S. 639 (1990).
[3] 536 U.S. 584 (2002).
[4] 530 U.S. 466 (2000).

(b)   it does not protect defendants from jurors acting arbitrarily
       and is too open-ended, in violation of *Gregg v. Georgia,*[5]
(c)   it does not permit meaningful appellate review,
(d)   the parties special issue permits a death sentence for actors
       who merely anticipated that death would occur, in violation
       of *Tison v. Arizona*[6] and *Enmund v. Florida.*[7]
(e)   it does not require the jury to consider all mitigating
       evidence,
(f)   the definition of mitigating evidence is too narrow,
(g)   it does not define the terms used in the special issues,
       and
(h)   it is vague and facially void.

These requests for relief must fail.  Storey cannot show that the state court
unreasonably applied clearly established federal law or unreasonably
determined the facts.  He attempts to present unexhausted evidence to this
Court which has never been seen by a state court.  He fails to present clear
and convincing evidence to overcome the presumption of correctness due to
the state court's factual findings.  Therefore, the requested relief should be
denied.

## STATEMENT OF THE CASE

Having been indicted in 2007 on charges of capital murder, Storey
was convicted and sentenced to death for the robbery-murder of Jonas
Cherry. 1 CR 1A (indictment); 2 CR 426 (judgment); 2 CR 430 (sentence).

---

[5]      428 U.S. 153 (1976).
[6]      481 U.S. 137 (1987).

The Court of Criminal Appeals upheld Storey's conviction and death sentence. *Storey v. State*, No. AP-76,018, 2010 WL 3901416 at *1 (Tex. Crim. App. 2010)(not designated for publication). The Supreme Court denied his petition for writ of certiorari. *Storey v. Texas*, 131 S.Ct. 1816 (2011). While his direct appeal was pending, Thomas filed an application for state habeas relief. SHCR[8] 2. The trial court considered exhibits presented by both parties, including the affidavits of trial counsel and documentation from defense experts. SHCR 279. The trial court denied relief and filed its own findings of fact and conclusions of law. SHCR 348-383. The Court of Criminal Appeals adopted the trial court's findings of fact and conclusions of law in their denial of Storey's application for writ of habeas corpus on June 15, 2011. *Ex parte Storey*, 2011 WL 2420707 (Tex. Crim. App.)(not designated for publication).

Storey timely filed his federal petition for writ of habeas corpus. Pet., ECF No. 14. This response is timely filed.

---

[7]      458 U.S. 782 (1982).

[8]      "SHCR" stands for State Habeas Clerk's Record, containing the papers

# STATEMENT OF FACTS

## I.      Facts of the Crime

The Texas Court of Criminal Appeals summarized the evidence of

Storey's guilt as follows on direct appeal:

> The record reflects that around 8:15 a.m. on October 16, 2006,
> Cherry left his house and went to work at the Putt–Putt Golf and
> Games in Hurst, Texas ("the Putt–Putt"). When Cherry arrived
> for work, he passed through the east door, which was the
> employees' entrance, and at 8:43 a.m., he disarmed the security
> alarm system. When a co-worker, Timothy Flow, arrived about
> ten minutes later, he found Cherry lying in a pool of blood in the
> office area. Flow noticed that Cherry was holding a key to the
> door of the manager's office, which was locked. Concerned that
> the perpetrator might still be present, Flow retreated outside.
> Once he saw that only his and Cherry's cars were in the parking
> lot, he went back inside to check on Cherry. Based on his
> observations, he believed that Cherry was dead. Flow then
> walked back outside while calling 9–1–1 on his cell phone, and he
> waited in his truck until the police arrived. Officer Samantha
> Wilburn and Corporal Lonnie Brazell responded first. After
> speaking with Flow and observing Cherry's body, they called for
> the assistance of additional officers.
>
> With the help of the manager, Patrick Arenare, police officers
> gained entry to the manager's office, where the business's
> surveillance equipment was kept. Four separate videocassette
> recorders ("VCRs") should have been set up for surveillance.
> However, one VCR had been stolen, and videotapes had been
> stolen from two other VCRs. The fourth VCR still contained a
> surveillance videotape and was functioning. It was connected to a
> video camera that monitored a section of the business's driveway
> that led from the road and into the parking areas. When officers
> played the videotape, they observed a red two-door Ford Explorer

filed during Storey's state writ, followed by page number(s).

with its hood up and its lights flashing, rolling from the direction of the road into the public parking area, and then moving out of view as it continued through the parking lot. A few minutes later, the Explorer came back into view, and then it passed out of view again as it rolled toward the employees' parking area. This videotape was released to the media and aired on the local news.

One of [Storey]'s friends reported that [Storey] had told her he was present during the offense and saw who committed it. She provided the police with [Storey]'s telephone number. Detective Rick Shelby, a Hurst police officer, contacted [Storey] by telephone. [Storey] acknowledged that he was a former employee of the Putt–Putt, and he admitted that the Explorer that was being shown on the news was his. He stated that he was willing to meet with Shelby at the police station but that he did not have transportation because his Explorer was not working. He accepted Shelby's offer of a ride and provided Shelby with directions to his house. Shelby and Sergeant Craig Teague then drove to [Storey]'s house, where they met [Storey], [Storey]'s brother, and a friend. [Storey] and his brother showed them the Explorer. [Storey] explained that the license plates on the Explorer did not match the ones in the video that was being shown on the news because he had switched the plates in order to do a "gas run." [Storey] explained that this was his term for pumping gas into a vehicle and then driving away without paying. [Storey] then accompanied Shelby and Teague to the police station to make a statement.

Over the next few days, [Storey] made three oral statements to police. In his first statement, he denied participating in any offense but admitted that he was a witness. In his second statement, he admitted to participating in the offense, but only as a lookout and by helping others gain entry to the Putt–Putt and by warning them to collect the surveillance tapes. In his third statement, he admitted that he had planned and participated in the robbery and that he had shot Cherry.

All three of [Storey]'s statements were presented to the jury. The medical examiner testified that Cherry suffered two gunshots to

his head. One shot entered from the back, where there was a
contact wound. Another shot entered from the front, where the
entry wound indicated a shot fired at close range. Either shot
would have been fatal. Cherry also suffered additional gunshot
wounds to both legs and one hand.

*Storey v. State,* 2010 WL 3901416 at *1-2.

## II.      Punishment Evidence

The State presented evidence that Storey may have behaved in an

intimidating fashion while in county jail awaiting trial.  38 RR[9] 11-15, 36-38.

He may have waved a pistol at another driver during a road-rage incident.

38 RR 24-30.

The defense presented evidence about the inmate classification

process for death-row entry, the security precautions in Texas prisons, and

the execution procedure.  38 RR 72-96.  Family friends, family, and his

girlfriend testified that they trusted Storey to do tasks for them including

taking care of their children, that Storey's father left him at a young age, and

that he was a good person who could contribute value to others' lives if given

life in prison. 38 RR 131-134, 148-150, 161-165, 169-172, 182, 190-196, 208.

Storey's brother explained that Storey tried to be a good role model and

encouraged him to work hard and respect their mother, and opined that

---

[9]      "RR" stands for the Reporter's Record of events during the trial,
preceded by volume number and followed by page number(s).

Storey could still be a help to him if given a life sentence.  38 RR 254. Storey's mother explained some of his past misdeeds, testified that his father was abusive, left Storey at an early age, and described how Storey struggled with a weight problem and was deeply depressed after his grandmother's death just before he graduated from high school. 38 RR 260-276. Teachers testified that Storey was not a discipline problem and was a good student.  38 RR 216-217, 221-222, 231, 239-242.

The state habeas court entered findings of fact summarizing some of the evidence admitted during the sentencing proceeding:

35.     [Storey]'s trial counsel introduced evidence that [Storey] (1) was involved in only a few minor fights as a child and teenager, (2) was in only a few minor altercations in the county jail, and (3) had not been previously convicted of a crime. 38 RR 17-18, 20-21, 222, 277.

36.     [Storey]'s trial counsel highlighted to the jury the very evidence which [Storey] complains was never introduced before the jury: in closing argument, counsel repeatedly stressed that the State had failed to prove that [Storey] had a history of violence and reasoned that the State had therefore failed to prove that [Storey] posed a future danger. 39 RR 20-21, 29-30.  Counsel also repeatedly pointed out that the State had failed to prove that [Storey] had been disruptive or violent while in jail awaiting trial, and stressed that the State's only witness to any altercation testified that there had simply been a "little misunderstanding about a TV." 39 RR 22-23, 37-38.  As counsel reminded the jury, the same witness testified that [Storey] had led a prayer group while incarcerated. 39 RR 28-29.

37.     [Storey]'s attorneys introduced evidence that [Storey] was not violent; offered testimony that apparently explained away some violent episodes; and adduced evidence that [Storey] was a good guy who was family-oriented, protective, kind, caring, trustworthy and helpful. 38 RR 132-135, 148-149, 171, 182, 205, 224, 251-253, 263-265, 268-269, 272-275.

38.     [Storey]'s trial counsel was aware at the time of trial that there was quite a bit of evidence on the issue of [Storey]'s violent tendencies and prior criminal history–some known to the prosecution and some not.  Counsel therefore made the strategic decision not to press hard, lest the defense "open the door" to the prosecution's introduction of such evidence. [SHCR 255-260, State's Habeas Ex. 2, at 14]. . . .

40.     [Storey]'s attorneys introduced evidence that [Storey] had not only graduated from high school, but was an exemplary student at the alternative school he attended, and graduated from truck driving school as well. 38 RR 193-194, 219-221, 239, 242.

41.     [Storey]'s trial counsel introduced testimony that [Storey] was not a gang member.  38 RR 196.

SHCR 359-60.

## STANDARD OF REVIEW

## I.     Anti-terrorism and Effective Death Penalty Act (AEDPA)

As an initial matter, habeas relief is inappropriate if a claim is not cognizable on federal review.  Storey, confined pursuant to a state court judgment, is entitled to relief "only on the ground that he is in custody in

violation of the Constitution or laws or treaties of the United States."   28 U.S.C. § 2254(a); *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991).

Under 28 U.S.C. § 2254(d), a federal court may not issue a writ of habeas corpus for a defendant convicted under a state judgment unless the adjudication of the relevant constitutional claim by the state court, (1) "'was contrary to' federal law then clearly established in the holdings of" the Supreme Court; or (2) "'involved an unreasonable application of'" clearly established Supreme Court precedent; or (3) "'was based on an unreasonable determination of the facts' in light of the record before the state court." *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011) (quoting *(Terry) Williams v. Taylor,* 529 U.S. 362, 412 (2000)); 28 U.S.C. § 2254(d).  The Supreme Court has explained that a state court decision is "contrary" to established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or confronts facts that are "materially indistinguishable" from a relevant Supreme Court precedent, yet reaches an opposite result. *Id.* at 405–06.

A "run-of-the-mill" state court decision applying the correct Supreme Court rule to the facts of a particular case is to be reviewed under the "unreasonable application" clause. *(Terry) Williams*, 529 U.S. at 406.  To this end, a state court unreasonably applies Supreme Court precedent only if it

correctly identifies the governing precedent but unreasonably applies it to the facts of a particular case. *Id.* at 407-09. And as the Supreme Court recently described this deferential standard, in order to determine if the state court made an unreasonable application, a federal court "must determine what arguments or theories supported or . . . *could have supported*, the state court's decision; and then it must ask *whether it is possible fairminded jurists could disagree that those arguments* or theories are inconsistent with the holding in a prior decision of this Court." *Richter*, 131 S. Ct. at 786 (emphasis added). Indeed, this is the "only question that matters under § 2254(d)(1)." *Id.*

Thus, "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'" on the correctness of the state court's decision. *Richter,* 131 S. Ct. at 786 (quoting *Yarborough v. Alvarado,* 541 U.S. 652, 664 (2004)); *see also Woodford v. Visciotti,* 537 U.S. 19, 27 (2002) (federal habeas relief is only merited where the state-court decision is both incorrect and objectively unreasonable, "whether or not [this Court] would reach the same conclusion"). Moreover, "evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case

determinations." *Alvarado,* 541 U.S. at 664.  This is particularly true when reviewing a state court's application of *Strickland v. Washington,* 466 U.S. 668 (1984), which when analyzed in conjunction with § 2254(d), creates a difficult to surmount, "doubly" deferential assumption in favor of the state court denial.  *Richter,* 131 S. Ct. at 786.

"It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable."  *Richter,* 131 S. Ct. at 786.

> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  It preserves authority to issue the writ in cases where there is *no possibility fairminded jurists could disagree* that the state court's decision conflicts with this Court's precedents. It goes no farther.  Section 2254(d) reflects the view that habeas corpus is a "guard against *extreme malfunctions* in the state criminal justice systems," *not a substitute for ordinary error correction through appeal.*

*Id.* (emphasis added) (internal citations omitted).

Moreover, it is the state court's "ultimate decision" that is to be tested for unreasonableness, and "not every jot of its reasoning."  *Santellan v. Cockrell,* 271 F.3d 190, 193 (5th Cir. 2001); *see also Neal v. Puckett,* 286 F.3d 230, 246 (5th Cir. 2002) (en banc); *Catalan v. Cockrell,* 315 F.3d 491, 493 (5th Cir.  2002) ("[W]e review only the state court's decision, not its reasoning

or written opinion[.]").  Indeed, state courts are presumed to "know and follow the law." *Visciotti*, 537 U.S. at 24.  And, even where the state court fails to cite to applicable Supreme Court precedent or is unaware of such precedent, AEDPA's deferential standard of review nevertheless applies "so long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]." *Early v. Packer*, 537 U.S. 3, 8 (2002); *Richter*, 131 S. Ct. at 786.

If the Supreme Court has not "broken sufficient legal ground to establish [a] . . . constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar" under either the contrary to or unreasonable application standard. *(Terry) Williams*, 529 U.S. at 381.  Stated differently:

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there *was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement*.

*Richter*, 131 S. Ct. at 786-87 (emphasis added).  And a federal court must be wary of circumstances in which it must "extend a [legal] rationale" of the Supreme Court "before it can apply to the facts at hand . . ." because such a

process suggests the proposed rule is not clearly established.  *Alvarado,* 541 U.S. at 666.

AEDPA also provides that the state court's factual findings "shall be presumed to be correct" unless the petitioner carries "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  "The presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact."  *Valdez v. Cockrell,* 274 F.3d 941, 948 n.11 (5th Cir. 2001).

And except for the narrow exceptions contained in § 2254(e)(2), the evidence upon which a petitioner would challenge a state court fact finding must have been presented to the state court.  Because a federal habeas court is prohibited from granting relief unless a decision was based on "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding," it follows that demonstrating the incorrectness of a state court fact finding based upon evidence not presented to the state court would be of no avail to a habeas petitioner.  28 U.S.C. § 2254(d)(2); *Cullen v. Pinholster*, 131 S.Ct. 1388, 1400 (2011).

Finally, where a habeas petitioner has failed to fully develop the factual bases of his claims in state court, he is precluded from further factual

development in federal court unless (1) his claims rely on a new rule of constitutional law or a factual predicate previously undiscoverable through the exercise of due diligence; and (2) he establishes by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty.   28 U.S.C. § 2254(e)(2).   A failure to meet this standard of "diligence" will bar a federal evidentiary hearing in the absence of a convincing claim of actual innocence that can only be established by newly discovered evidence.   *(Michael) Williams v. Taylor,* 529 U.S. 420, 436 (2000).   For example, a petitioner's failure to present controverted, previously unresolved factual issues to the state court is sufficient to constitute "failure" under the plain meaning of § 2254(e)(2).   *Id.* at 433.   But even if the petitioner can meet the foregoing standard, it is within this Court's discretion to deny a hearing if sufficient facts exist to make an informed decision on the merits.   *Clark v. Johnson,* 227 F.3d 273, 284-85 (5th Cir. 2000).

## II.   Summary Judgment Standard in Habeas Corpus Cases

"As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases."   *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000) (citing Rule 11, Rules Governing § 2254 Cases; Fed. R. Civ. P. 81(a)(2)).   Summary judgment is proper if the record shows that "there is no genuine

issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Martinez v. Johnson*, 255 F.3d 229, 237 (5th Cir. 2001) (citing *Turner v. Houma Mun. Fire & Police Civil Serv. Bd.*, 229 F.3d 478, 482 (5th Cir. 2000)); Fed. R. Civ. P. 56 (c).

In ruling on a motion for summary judgment, a court views the evidence through "the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby*, 477 U.S. 242, 254 (1986). Thus, the application of the summary judgment standard to a habeas corpus case differs from its application in other civil cases to the extent that habeas' substantive evidentiary rules or burdens differ. In the ordinary civil context, courts must construe the facts of the case in favor of the non-moving party. *Id.* at 255. In the habeas context, however, where factual allegations have been adversely resolved by express or implied findings of the state courts and the petitioner fails to demonstrate, by clear and convincing evidence, that § 2254(e)(1)'s presumption of correctness should not apply, it is inappropriate for the court to resolve the facts of the case in petitioner's favor. *Marshall v. Lonberger*, 459 U.S. 422, 432 (1983).

## ANSWER

### I.   Storey's Attorneys Adequately Investigated and Presented Punishment Evidence and Effectively Assisted Their Client During the Trial.

Storey's *Wiggins v. Smith* claim, initially raised in his state writ, was denied by the state court after a reasonable determination of the facts and an appropriate application of clearly established federal law.  His postconviction expert, Dr. Fallis, conducted additional investigation and wrote an additional report dated June 13, 2012, which is wholly unexhausted and procedurally barred.  Storey's first claim before this Court is unpersuasive.

## A.    Standard of review.

The burden of proof in a habeas proceeding attacking the effectiveness of trial counsel is on the petitioner, and Storey must demonstrate both ineffectiveness and resultant prejudice. *Carson v. Collins*, 993 F.2d 461, 466 (5th Cir. 1993).   The familiar standard by which a claim of ineffective assistance of counsel is weighed is set forth in *Strickland*.  466 U.S. at 687. In order to establish that his counsel's performance was constitutionally deficient, Storey must show that counsel's representation "fell below an objective standard of reasonableness."  *Id.* at 687-88.  In so doing, he must overcome a strong presumption that the conduct of his trial counsel fell within a wide range of reasonable professional assistance.  *Id.* at 687-91; *Loyd v. Whitley*, 977 F.2d 149, 156 (5th Cir. 1992).   Any deficiencies in counsel's performance must be prejudicial to the defense in order to constitute ineffective assistance under the constitution. *Strickland*, 466 U.S.

at 692.  In order to establish that he has sustained prejudice, Storey must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome.  *Id.* at 694; *Loyd*, 977 F.2d at 159.  This showing of prejudice must be rather appreciable; a mere allegation of prejudice is not sufficient to satisfy the prejudice prong of Strickland.  *Armstead v. Scott*, 37 F.3d 202, 206 (5th Cir. 1994).  Because a convicted defendant must satisfy both prongs of the Strickland test, a failure to establish either deficient performance or prejudice makes it unnecessary to examine the other prong. *Strickland*, 466 U.S. at 697; *Black v. Collins*, 962 F.2d 394, 401 (5th Cir. 1992).

The Supreme Court recently explained that, where the merits of an ineffectiveness claim have been rejected by the state—as in this case—the pivotal question in a § 2254 proceeding is whether the state court's application of the *Strickland* standard was unreasonable and that this inquiry is different from asking whether defense counsel's performance fell below *Strickland*'s standard. *Richter*, 131 S.Ct at 785 (citations omitted). Stated differently, a state court must be granted a deference and latitude that are not in operation when the case involves review under the Strickland

standard itself since the standards created by *Strickland* and § 2254(d) are both highly deferential. *Id.; Premo v. Moore*, 131 S.Ct. 733, 744-45 (2011). The Court has referred to this as a "doubly deferential" process. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Federal courts are thus tasked with taking "a 'highly deferential' look at counsel's performance [under *Strickland*] . . . through the 'deferential lens of § 2254(d)[.]" *Pinholster*, 131 S.Ct. at 1403 (citing *Mirzayance*, 556 U.S. at 121, n. 2).

Accordingly, the question to be asked "is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 131 S.Ct at 1426. Storey "must demonstrate that it was necessarily unreasonable for the [state court]" to rule as it did. *Pinholster*, 131 S.Ct. at 1403. The burden is on Storey to overcome any reasonable argument supporting the state court decision whether articulated by the state courts or not. *Richter*, 131 S.Ct at 784-85. This is so because § 2254 actions are not intended as "a substitute for ordinary error correction through appeal" but as a "guard against extreme malfunctions in the state criminal justice systems[.]" *Richter*, 131 S.Ct at 786.

Lastly, while unexhausted claims may be denied on the merits, the converse does not hold true—relief may not be granted on unexhausted claims.  28 U.S.C. § 2254(d)(2); *Pinholster*, 131 S.Ct. at 1400; *Mercadel v.*

*Cain*, 179 F.3d 271, 276-78 (5th Cir. 1999); *Alexander v. Johnson*, 163 F.3d 906, 908 (5th Cir. 1998).

**B.     Storey fails to show that the state court misapplied Strickland.**

Storey's argument before this Court predominantly focuses on counsel's actions at trial, which fails to establish that the state courts unreasonably applied *Strickland*.   His ineffective assistance of counsel claim should be denied.

**1.  Trial counsel used their mental health professionals well.**

Storey argues that trial counsel "failed to effectively utilize a mental health professional [and] failed to discover or utilize crucial evidence as to all three [special] issues."  Petition, ECF No. 14, at 10.  Specifically, he contends that counsel should have pursued a different expert once their first expert returned an unfavorable opinion on Storey's intellect, his antisociality, and his risk of future dangerousness.   *Id.* at 11-12.   Storey's story to his postconviction mitigation specialist, Dr. Fallis, was much more detailed, and she concluded that Storey was not a future danger.  *Id.* at 12.

The state court found that after hours of neuropsychological testing and detailed clinical interviews, Dr. Price told counsel he believed Storey did not take the testing "seriously."  SHCR 353 (citing SHCR 257).   This is ironically confirmed by the additional, unexhausted testing Dr. Fallis conducted in

June 2012 which revealed an even higher IQ score.  Petition, ECF No. 14, Exhibit 1.  Price queried Storey about his family, his mental health issues, and his education.  *Id.* at 354.  Price also examined Storey's hospital, juvenile, employment and jail records.  *Id.*  The state court also found that trial counsel hired two mitigation specialists to aid in the investigation.  SHCR 357.  In total, the state court found, Storey's trial defense team developed testimony during the punishment phase from Storey's parents, brother, girlfriend, high school principal and two teachers, and five close family friends; nine other witnesses were not called either for strategic reasons or because they could not be contacted.  SHCR 356-57.

The court found that during several meetings with Price, trial counsel discussed "at some length" the possible benefit of additional psychological testing and examination.  SHCR 357.  Dr. Price informed counsel that Storey was exaggerating his depression, and that the combination of Storey's IQ score and poor effort during the testing indicated his intelligence was likely "low average."  SHCR 357-359.  As a result of those conversations, in which Price also indicated Storey was probably an antisocial personality, counsel decided further evaluation would be unhelpful.  *Id.* at 354-355.  Price prepared several letters, reports and summaries which, along with oral communications on several occasions, constituted the report of his opinion to

Storey's trial counsel. *Id.* at 355-356.   The state court reasonably applied Strickland when it held that trial counsel was not deficient, and that it was a matter of sound trial strategy by defense counsel not to get a more formalized written report, nor to get Dr. Price to testify about Storey's alleged depression or antisociality.  SHCR 356, 364.

Specifically, the state court did not agree that the label borderline would have helped Storey's defense; it found Storey had "failed to establish how Dr. Price's assessment of [Storey]'s intellectual functioning could have affected [Storey]'s punishment defense, particularly as [Storey]'s counsels were made aware of the actual test results."  SHCR 357.   The state court found "In light of evidence such as [Storey]'s high adaptive functioning and his interviews with police, as well as Dr. Price's assessment that [Storey] did not take the intelligence tests seriously, an argument that [Storey]'s low intelligence somehow mitigates his offense is not credible.   Emphasis on [Storey]'s arguably low intelligence had the potential to undercut trial counsel's chosen trial strategy."  SHCR 358.   Additionally, the state court found that counsel could not have used Dr. Price to introduce evidence that Storey was not a sociopath, since Price believed he was.  SHCR 361.  And worse, any suggestion along those lines would have opened the door to a State's expert evaluating Storey.  SHCR 362.

Although Dr. Price formed an opinion unfavorable to the defense, Storey's trial counsel did not need to canvass for a more favorable expert. *Dowthitt v. Johnson*, 230 F.3d. 733, 748 (5th Cir. 2000); *see also Colburn v. Cockrell*, 37 F. App'x 90, 2002 WL 1021891, at *10 (5th Cir. 2002); *Wilson v. Green,* 1556 F.3d 396, 403–04 (4th Cir. 1998) (stating that where counsel had report from expert pronouncing defendant sane, counsel's decision not to seek another evaluation sooner was reasonable); *Poyner v. Murray*, 963 F.2d 1404, 1419 (4th Cir. 1992) (stating that reasonable counsel need not shop for more favorable opinion).

The state habeas court considered Storey's claim and reasonably applied *Strickland* when it held that:

> As reflected in closing argument, counsel sought to present [Storey] in as positive light as possible, then argue [Storey] should be spared the death penalty because he would not be violent in prison and might exert a positive influence on fellow prisoners. [39 RR 20-23, 28-30, 41]. In light of Dr. Price's test results, counsel's emphasis on [Storey]'s intellectual functioning might have suggested to the jury that [Storey] was incapable of being a positive influence on fellow prisoners and might be unable to learn from his mistakes, and hence, be a future danger. Trial counsel therefore had a sound strategic reason for down-playing [Storey]'s level of intellectual functioning.

SHCR 359. Storey does not dispute these presumptively correct fact findings. As a result, the state court reasonably concluded that Storey failed to show deficiency and prejudice. SHCR 382.

### 2.   Trial counsel presented a sound mitigation case to the jury.

Storey asserts that counsel "fail[ed] to effectively utilize Dr. Price or any mental health expert . . . thereby unreasonably failing to discover and utilized [sic] crucial mitigating evidence including the evidence that [Storey] is Borderline Intelligence [sic], is not a sociopath, has a history of depression, was exposed to violence, substance abuse, and other criminal activity in the home while growing up, but that he was a low risk of future dangerousness." Petition, ECF No. 14, at 14. However, the only evidence of these contentions comes from Storey, and he did not provide this information to his defense team before trial.  The state court implicitly found counsel's account of the defense investigation to be credible.  SHCR 356-57.  Because the state court's denial of this claim was predicated on a reasonable determination of the facts and a correct application of federal law, Storey has failed to show he merits habeas relief.

The new, unexhausted evidence produced by Dr. Fallis's June 2012 IQ/achievement/effort testing cannot be considered in this proceeding. AEDPA declares that relief "shall not be granted" under any circumstances unless it appears "the applicant has exhausted the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1).  Storey may not obtain federal habeas relief absent a showing of cause for the default and actual prejudice

attributable to the default or that the federal court's failure to consider the claim will result in a miscarriage of justice. *Coleman*, 501 U.S. at 730; *Murray v. Carrier*, 477 U.S. 478, 485 (1986). Storey does not attempt to distinguish his case from *Nobles* and *Muniz*; nor does he attempt to demonstrate cause and prejudice for his failure to raise the claims in his initial state habeas application. *Nobles v. Johnson*, 127 F.3d 409, 422 (5th Cir. 1997); *Muniz v. Johnson*, 132 F.3d 214, 221 (5th Cir. 1998). Because claims stemming from the June 2012 intelligence, achievement, and effort testing do not implicate the actual innocence exception to the procedural default doctrine, they are barred from merits review by this Court. Further, they cannot be used to test the reasonableness of the state court's rejection. *Pinholster*, 131 S.Ct. at 1400.

As mentioned above, trial counsel interviewed and developed evidence from twelve witnesses. SHCR 356-57. Nine additional individuals were either unreachable or unwise choices and did not testify. *Id.* at 357. The state court found that trial counsel personally interviewed between twenty and twenty-five potential defense punishment phase witnesses, in addition to those State's witnesses who were willing to talk with the defense. *Id.* at 357. The state court found that trial counsel introduced evidence that Storey was involved in only a few fights and had not previously been convicted of a

crime.  *Id.* at 359.   And the state court acknowledged that many of trial counsel's decisions were wise tactical choices.  *Id.* at 357-360.

> [Storey]'s trial counsel highlighted to the jury the very evidence which [Storey] complains was never introduced before the jury: in closing argument, counsel repeatedly stressed that the State had failed to prove that [Storey] had a history of violence and reasoned that the State had therefore failed to prove that [Storey] posed a future danger. Counsel also repeatedly pointed out that the State had failed to prove that [Storey] had been disruptive or violent while in jail awaiting trial, and . . . that [Storey] had led a prayer group while incarcerated. . . .  [Storey]'s trial counsel was aware at the time of trial that there was quite a bit of evidence on the issue of [Storey]'s violent tendencies and prior criminal history—some known to the prosecution and some not.  Counsel therefore made the strategic decision not to press hard, lest the defense "open the door" to the prosecution's introduction of such evidence.

*Id.* at 359-60.

Further, Storey's uncorroborated claim of exposure to domestic violence was found incredible by the state court.  *Id.* at 361.  Likewise, his claims to low intelligence, family history of obesity or substance abuse, depression, good employment history, non-violence, and lack of substance abuse history as mitigation were all found meritless, unpersuasive and unstrategic by the state court.  *Id.* at 358-364.  Dr. Fallis's report available to the state court in 2010 revealed that Storey was functioning well, in a range "above even mild symptoms," and did not exhibit childhood maladjustment or severe mental impairment.  *Id.* at 365-66.  By comparison, the State presented quantities of

aggravating evidence during the guilt-innocence portion of the proceedings which alleviated any need for followup during punishment. *Id.* at 366-372. This included a history of problems with authority, including forty-four infractions in school and thirty-four days of in-school suspension, fifteen days of out-of-school suspension, and at least two of which related to his threats against others. *Id.* at 372. The state court commented on Storey's history of violent behavior including three or four armed robberies of drug dealers. *Id.* at 372.

In conclusion, the state court held that "trial counsel's conduct fell within an objective standard of reasonableness under prevailing professional norms and was within the wide range of reasonable professional assistance." *Id.* at 362. Further, "[Storey] has failed to establish that the investigation supporting his trial counsels' decision not to introduce mitigating evidence was unreasonable. . . trial counsel had good reason to believe that they had thoroughly and appropriately investigated [Storey]'s case and that further investigation would have been a waste of time and resources." *Id.* at 366.

In order to establish that counsel were ineffective due to a failure to investigate the case, Storey must do more than merely allege a failure to investigate—he must state with specificity what the investigation would have revealed, what specific evidence would have been disclosed, and how the

evidence would have altered the outcome of the trial. *Anderson v. Collins*, 18 F.3d 1208, 1221 (5th Cir 1994); *Rose v. Johnson*, 141 F.Supp.2d 661, 691 (S.D. Tex. 2001). Here, Storey points at a difference of degree. The state court found that Storey failed to present any "newly discovered" evidence except for new tales by Storey. SHCR 356.

Storey's claim of undiscovered, unpresented evidence relevant to the special issues should be dismissed as a conclusory allegation. *Ross v. Estelle*, 694 F.2d 1008, 1011 (5th Cir. 1983). First, Storey has not supplied the state courts or this court with affidavits regarding the substance of the uncalled witnesses' testimony. "Where the only evidence of a missing witness' testimony is from the defendant, this Court views claims of ineffective assistance with great caution." *See Lockhart v. McCotter*, 782 F.2d 1275, 1282 (5th Cir. 1986) (citing *Schwander v. Blackburn*, 750 F.2d 494, 500 (5th Cir. 1985)); *see also United States v. Cockrell*, 720 F.2d 1423, 1427 (5th Cir. 1983).

Second, Storey has not proved that any of the uncalled witnesses would have appeared at trial and testified. "In order for the appellant to demonstrate the requisite *Strickland* prejudice, the appellant must show not only that this testimony would have been favorable, but also that the witness would have testified at trial." *See Alexander v. McCotter*, 775 F.2d 595, 602

(5th Cir. 1985) (citing *Boyd v. Estelle*, 661 F.2d 388, 390 (5th Cir. 1981));
*Gomez v. McKaskle*, 734 F.2d 1107, 1109-10 (5th Cir. 1984).  But the state
court found that Storey's "postconviction mitigation expert has failed to
corroborate any of [Storey]'s claims that form the basis of her assessment of
[Storey].   The expert lists her 'collateral contacts' in conducting her
assessment as a one and a half hour interview with [Storey]'s writ counsel
and one telephone interview and one face-to-face interview with [Storey]'s
mother totaling two-and-one-fourth hours."  SHCR 356 (citing SHCR 103).

Finally, "complaints of uncalled witnesses are not favored, because the
presentation of testimonial evidence is a matter of trial strategy and because
allegations of what a witness would have testified are largely speculative."
*See Boyd*, 661 F.2d at 390 (quoting *Buckelew v. United States*, 575 F.2d 515,
521 (5th Cir. 1978)).  Further, the Fifth Circuit has held that  "[H]ypothetical
or theoretical testimony will not justify the issuance of a writ[.]"  *See Martin
v. McCotter*, 796 F.2d 813, 819 (5th Cir. 1986) (quoting *Larsen v. Maggio*, 736
F.2d 215, 218 (5th Cir. 1984)).   Since Storey has not overcome the
presumption that the "challenged action 'might be considered sound trial
strategy,'" *Strickland*, 466 U.S. at 689, he cannot prove that the state court
misapplied clearly established federal law.

According to the attorneys' affidavits, Dr. Fallis did not review the information developed by the mitigation specialists retained before trial. SHCR 253. Numerous witnesses were interviewed; both Dr. Price and two mitigation specialists reviewed Storey's records. *Id.* at 254-257. Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies. *Richter*, 131 S. Ct. at 789; *Mirzayance,* 556 U.S. at 125-127; *Rompilla v. Beard*, 545 U.S. 374, 383 (2005); *Wiggins*, 539 U.S. at 525; *Strickland*, 466 U.S. at 699.

"We must be particularly wary of arguments that essentially come down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second guessing." *Skinner v. Quarterman*, 576 F.3d 214, 220 (5th Cir. 2009) (quoting *Dowthitt*, 230 F.3d at 743). "Reliance on 'the harsh light of hindsight' to cast doubt on a trial that took place . . . years ago is precisely what *Strickland* and AEDPA seek to prevent." *Richter*, 131 S. Ct. at 789; *Bell v. Cone*, 535 U.S. 685, 702 (2002); *see also Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

### 3.   The state court reasonably determined the facts.

Storey contends that the state court violated state law by considering the exhibits both sides supplied with their pleadings without designating fact issues, requesting the affidavits, and holding a hearing.  Petition, ECF No. 14, at 33-36.  It is axiomatic that habeas relief is available only if Storey is incarcerated in violation of his federal constitutional rights.  *Green v. Johnson*, 160 F.3d 1029, 1036 (5th Cir. 1998).  To the extent Storey claims that his continued incarceration violates the Texas Code of Criminal Procedure, his claim is not cognizable under federal habeas review.  It is not a federal habeas court's function to review a state's interpretation of its own law.  *Creel v. Johnson*, 162 F.3d 385, 395 (5th Cir. 1998); *Weeks v. Scott*, 55 F.3d 1059, 1063 (5th Cir. 1995); *Moreno v. Estelle*, 717 F.2d 171, 179 (5th Cir. 1983).  There is no federal law requiring state courts to designate controverted factual issues and request affidavits prior to receiving such evidence from the parties.  The state court obviously considered both sides' exhibits in reaching its findings and conclusions, because it cited to these sources quite frequently.  SHCR at 355-356 *et seq.*

The state court was not impressed with the argument Storey continues to make about the conflict between labeling his intellectual function as either "Borderline" or "Low average."  Petition, ECF No. 14, at 36; SHCR at 357-

359. Storey asserts that this conflict between the experts is a "dramatic disagreement" on a "material" fact and it is "completely unreasonable to assert . . . that a decision could be made [without] any factfinding process." Petition, ECF No. 14, at 36. To the contrary there is no disagreement in the record available to the state court that his IQ is 81. SHCR 87. Storey fails to articulate any reason why the label "borderline" would affect his jury more positively than the label "low average." Storey weakly contends that this difference is "hugely significant" without explaining why. Petition, ECF No. 14, at 39. Further, on the Wechsler scale, an 81 is considered "low average." Appendix 1, IQ reference chart. Storey's new testing would have been even worse for his defense, as Dr. Fallis obtained a higher IQ than that available to the state court. Petition, ECF No. 14, Exhibit 1.

Storey's second "material fact issue" that he feels was not properly resolved is that Dr. Price, the defense's trial expert, did not test Storey with the Wechsler Adult Intelligence Scale 4th edition (the WAIS IV). Petition, ECF No. 14, at 37 (citing Dr. Fallis's report, SHCR 98). However, it was reasonable for the state court to resolve this in the State's favor because Dr. Price examined Storey before the WAIS IV was published. Price examined Storey on July 14, 2008. SHCR 233. The WAIS IV was published on August 28, 2008. Appendix 2, Press Release.

32

The third allegedly unreasonable fact finding by the state court is that none of the new information relied on by the postconviction defense team came from someone other than Storey himself.  Petition, ECF No. 14, at 38. Storey complains that Dr. Fallis discovered the borderline-versus-low-average issue without Storey's input, and that the personality tests Dr. Fallis administered to Storey's mother in June 2012 turned up new evidence as well.  *Id.*  This is unpersuasive, as the label applied to his intellectual function is hardly new evidence nor is it sufficient to dismiss all the state court's fact finding as unreasonable.  Further, the personality tests are unexhausted, procedurally barred, and cannot form the basis to find the state court unreasonably determined the facts.

The remainder of his argument against the state court's credibility determinations consists of repeated phrases such as "Simple [sic] not true" and "Nonsensical"  in addition to the new, unexhausted evidence not presented to the state court.  Petition, ECF No. 14, at 38-40.

### 4. The state court reasonably determined Storey suffered no prejudice.

Storey fails to prove the state court's prejudice analysis was unreasonable.  Based on a review of the entire record, the state habeas court concluded that

Reweighing the evidence in aggravation against the totality of the available mitigating evidence, [Storey] has failed to show "that there is a reasonable probability that, absent the alleged errors, the jury would have answered the mitigation issue differently."  Most of the humanizing evidence [Storey] claims should have been investigated and presented is cumulative of testimony actually introduced by his trial lawyers.  The vast bulk of the mitigating evidence that [Storey] now complains should have been introduced consists of his own statements filtered through his post-conviction mitigation expert.  The non-cumulative evidence [Storey] maintains should have been introduced actually undercuts the chosen mitigation strategy at trial. . . . This chosen strategy worked on two levels: it emphasized that [Storey] was not a future danger while highlighting a possible reason the jury might show mercy, particularly in light of other evidence presented during the punishment phase that stressed the gravity of a life sentence.  In contrast to this theme, the evidence [Storey] now maintains should have been introduced constitutes an attempt simply to explain the underlying reasons for the crime.  Additional evidence that [Storey] was depressed, suffered childhood trauma, neglect and manipulation at the hands of his mother, and suffered both social and academic difficulties in school, might have been viewed by the jury as evidence that [Storey] was permanently damaged and unstable.  Such a conclusion may have undercut the suggestion that [Storey] could be a positive influence even in prison and would not post a future danger. . . . [Storey] has failed to prove that there is a reasonable probability that, but for counsel's allegedly unprofessional errors, the result of the proceeding would have been different.

SHCR 377-79 (citing *Ex parte Gonzales*, 204 S.W.3d 391, 394 (Tex. Crim. App. 2006)); *Phillips v. Bradshaw*, 607 F.3d 199, 217 (6th Cir. 2010) (additional mitigating evidence would not have "fit neatly" into mitigation theory at trial); *Cox v. Ayers*, 613 F.3d 883, 900 (9th Cir. 2010)(proposed

mitigating evidence would have contradicted theories propounded at trial), and *Strickland*, 466 U.S. at 703. Here, the state court's ultimate conclusion— no prejudice—is not unreasonable. Storey has not shown a reasonable probability that but for trial counsel's performance, the outcome would have been different. *Parr v. Quarterman*, 472 F.3d 245, 257 (5th Cir. 2006).

The *Granados v. Quarterman* decision by the Fifth Circuit articulated it well:

> Viewed through the AEDPA lens, we cannot conclude that the state court's application of Strickland and rejection of the claim of ineffective assistance of counsel was unreasonable. These are difficult and nuanced decisions the trial lawyer must make. That they were not successful does not make them unreasonable. We are not persuaded that these tactical decisions . . . were otherwise objectively unreasonable.

455 F.3d 529, 536 (5th Cir. 2006). The evidence of Storey's future dangerousness was overwhelming: he admitted robbing a number of people at gunpoint. He coldly refused Jonas Cherry's pleas for mercy. He did not express remorse afterwards. When that is the case, it is virtually impossible to establish prejudice. *E.g., Strickland*, 466 U.S. at 698 (no prejudice due to State's overwhelming evidence on aggravating factors supporting death penalty); *Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002). Thus, there is no reasonable probability that the jury "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death"

had the defense presented evidence of his obesity, depression, marijuana use and the like. *Wiggins*, 539 U.S. at 534; *Strickland*, 466 U.S. at 694-95. Nor does Dr. Fallis's report undermine confidence in the outcome of Storey's trial. *Woodford v. Visciotti*, 537 U.S. 19, 23 (2002); *Strickland*, 466 U.S. at 694. As a result, habeas relief is unwarranted.

Storey does not show that the claims involve a new rule of constitutional law or facts that could have reasonably been discovered earlier. See § 2254(e)(2)(A). Nor does he show that the facts underlying his claims establish by clear and convincing evidence that but for constitutional error no reasonable fact finder would have found him guilty of capital murder. See § 2254(e)(2)(B). Storey is not entitled to a federal evidentiary hearing. Relief should be denied.

## II.   The Prosecutor Struck Curtis Patterson for Race Neutral Reasons.

Storey urges that the prosecution was motivated by racial discrimination when it exercised a peremptory strike against Curtis Patterson, an African-American. Petition, ECF No. 14, at 40. When the Texas Court of Criminal Appeals reviewed this contention on direct appeal, it found that the trial court did not abuse its discretion in ruling that there was no *Batson* violation in the State's use of peremptory challenges. *Storey v. State,* 2010 WL 3901416 at *23. Storey raised this claim again in his state

writ, but the state court dismissed it as uncognizable for having been raised and rejected on direct appeal.  SHCR 381 (citing *Ex parte Hood*, 304 S.W.3d 397, 402 n.21 (Tex. Crim. App. 2010)).

*Batson v. Kentucky* establishes a three-step evidentiary framework for evaluating claims of racial discrimination in jury selection.  476 U.S. at 93-98.  First, the defendant must make a prima facie case of discriminatory animus.  *Id.* at 96-97.  Assuming the defendant makes such a showing, "the burden shifts to the State to come forward with a neutral explanation." *Id.* at 97.  The prosecutor's explanation "need not rise to the level justifying exercise of a challenge for cause." *Id.*  Indeed, the Supreme Court clarified that "[t]he second step of this process does not demand an explanation that is persuasive, or even plausible." *Purkett v. Elem,* 514 U.S. 765, 767-68 (1995).  Finally, the trial court must examine the explanation offered by the prosecution "to determine if the defendant has established purposeful discrimination." *Batson,* 467 U.S. at 98.

Storey at all times bears the burden of persuasion as to the existence of purposeful discrimination.  *Purkett*, 514 U.S. at 768.  Because a state court finding under *Batson* is a finding of fact, it is presumed correct on collateral review unless the petitioner rebuts that presumption with clear and

convincing evidence. *Hernandez v. New York*, 500 U.S. 352, 366-67 (1991); 28 U.S.C. § 2254(e)(1). Storey fails to rebut the presumption of correctness.

During voir dire, defense counsel made a *Batson* challenge, asserting that the State struck Patterson because he was African-American. 18 RR 112. The state court found that there were only two African-American veniremembers previously, and one was seated on the jury while one had disqualified themselves with their views on the death penalty. *Storey v. State,* 2010 WL 3901416 at *21; 18 RR 113.

During the State's voir dire, Patterson indicated that he had previously served on juries in criminal cases but he had never been called upon to reach a verdict because the cases were always dismissed or the parties reached a plea agreement. He did not recall that any of those cases involved an offense more serious than a traffic ticket. He indicated that his sister had once been employed as a jailer. *Storey v. State*, 2010 WL 3901416 at *18; 18 RR 24-25.

The state court found that the prosecutor urged four race-neutral reasons for the strike: 1) Patterson held the State to an elevated burden of proof, would require the State to prove a probability of homicide against someone in the prison system, and would require the same type of evidence to answer the mitigation question, while Storey had limited bad behavior while in custody; Patterson's questionnaire was problematic, indicating he felt the

38

best argument for the death penalty was for mass murderers while another questionnaire response said multiple homicides would merit the death penalty; 2) Patterson displayed a general distrust of the system, indicating that if you had enough money you could "beat a case" and explaining the appropriateness of a life sentence might depend on whether you could afford a good lawyer; 3) punishment was ranked last of four in a question about the purpose of the justice system; 4) in seventeen years the prosecutor never put someone on a jury who had returned a not-guilty verdict in prior felony jury service, as did Patterson, and the prosecutor was concerned that Patterson was either lying or revealing a lack of seriousness about jury service when Patterson indicated he did not recall serving on an aggravated robbery with deadly weapon jury. *Storey v. State,* 2010 WL 3901416 at *22; 18 RR 113-116.  Defense counsel agreed that "they are all potentially viable reasons." 18 RR 125.

At the conclusion of the *Batson* hearing, the trial court found that Patterson was not per se disqualified by his answers but that "he obviously said some things that the State would be very concerned with. . . .  I think the State has its neutral reasons and I'm going to deny the motion, the *Batson* motion."  18 RR 126.  The trial court did not specify which constituted

sufficiently race-neutral reasons, but the Texas Court of Criminal Appeals held

> However, all of the State's explanations were facially race-neutral. "[W]hen the State has offered more than one plausible reason for striking a venireperson, it is proper to review these reasons in their entirety in order to assess whether the State's explanation was valid or merely pretextual."

*Storey v. State*, 2010 WL 3901416 at *23 (citing *Cantu v. State*, 842 S.W.2d 667, 689 (Tex. Crim. App. 1992)).

The state court on direct appeal concluded that all the State's reasons were "reasonable and credible bases for exercising a peremptory challenge." *Id.*

> Patterson's answers during voir dire conveyed the impression that he would not answer the future dangerousness issue affirmatively unless he was persuaded that the defendant was likely to kill someone in prison, and his written questionnaire answers expressed his opinion that a criminal defendant's ability to obtain a favorable result depended on his ability to afford a good lawyer.

*Id.*

The state court noted that Storey failed to identify any similarly-situated non-African-Americans who were seated on the jury. *Storey v. State*, 2010 WL 3901416 at *17 n.12.  This is still the case.  The state court reasonably found the denial of Storey's motion was supported by the record. *Storey v. State*, 2010 WL 3901416 at *18-19. Patterson would increase the

State's burden of proof with respect to the future dangerousness question, in that he would define the issue in terms of the probability that the defendant would murder someone in the prison system. He would require the same type of evidence before he would give a negative answer to the mitigation question. Based on the facts of this case, where the defendant had a limited or nonexistent history of bad behavior while in custody, the State could never prove to Patterson's satisfaction that the answers to the punishment questions should result in the death penalty. *Id.*

Patterson's answers during voir dire on the mitigation special issue reveal the full picture of his bias:

Q. Would you be inclined at this point to always want to answer [the mitigation special issue] yes to spare somebody the death penalty?

A. It has a lot to do with—if the person, to me, is going to go out and do all this over again, if—it has a lot to do with, you know, just like I say, his background, everything. Because this all has to play in there whether he's going to continue to do this.

Q. Okay. Remember, I don't have to prove he's going to kill again. All right?  He's—you know, a life sentence would be that he be locked up the rest of his life.

A. Well, I can—you know, I can see a life sentence for all that's been done, but as far as if you give him the death penalty, that's—you going to have to—you know, to me, I have to see it in my mind that he's going to be worse in the—in the prison system and go out there and hurt the population in the prison system to even go death penalty.

18 RR 71.

> Q. So do you think that's something I would be—ever be able to prove to you, knowing that he would be locked up for the rest of his life?  I mean, would you require me to prove—I mean, you already required me to prove—or I'm required to prove that first question should be yes. Okay? . . .  But I want to make sure I understood . . . your answer that—when you said that I would have to prove it to you that he would continue to do this in prison?

> A. Well, see, it's—it's just like that. Prison system is a population, too. It's just they're locked down. . .  I mean, if you're going to go into the prison system and take lives, I mean, that tells me that it doesn't make any difference where you are, inside or out. That would probably be—I would lean—lean more towards, you know ...

> Q. Lean toward—more as toward what?

> A. The—the death penalty.

18 RR 72-73.

And the crucial exchange, containing the "no, no, no" answer Storey now makes much of, but which in context appears wholly different, and which ended in the defense preventing the State from asking the very questions they now fault the State for not getting answers to:

> A. Yeah. You—but as far as I'm concerned, I mean, there's a population inside prison, there's a population outside of prison. And the person shows repentance as he's going to prison and I know he's not going to hurt anybody else, well, then, you know, life sentence seems reasonable.  Now, did I confuse you?

Q. I'm not sure.  So I guess what you're telling me is that you'd need a pattern of conduct or threat of violence before you could ever answer that question?

A. No, not really. I—you know, I mean, if he's proved that—you can prove that he's done the deed and he's guilty of it, I can find him guilty, you know. . . Give him a life sentence. Now, if he's a real bad character to the point where he's rabid and he's going to hurt even the prison population, you know, there's no point—you already convicted him. All you can do is give him life, okay, sentence.  He gets in there, he decides, I'm already here, might as well kill a few people while I'm here, hey, just go ahead and give him the death penalty and be done with it.

Q. Okay. Just so I—I mean, are you saying that you want me to show you that he'd kill again?

A. No, no, no. . . . His—his—his behavior— . . . up to this point will tell you that, you know. That he's going to go and do his time and he's going to do whatever he has to do and—and act accordingly while he's there. Okay? . . . And then, you know, he's not going to be a danger to anybody else in the prison system because you still got wardens, guards, and everything else.  And if he's likely to hurt people outside for just a few dollars, and he has no, you know, conscience, no repentance over that, then you put him into a prison system and he's going to take out a guard, regardless. . . . Well, I'm—you know, then that person, to my mind, is—you know, is more likely to need the death penalty.

Q. Uh-huh.  I guess—you—you used the—take out a guard or—or kill again in prison.

A. Yeah, because he—my—that could easily have been my sister. . . . You see what I mean?

Q. Yeah. I'm just curious how someone could prove that to you.

Q. Well—

MR. RAY: Judge, I'm going to object to asking for a specific set of facts. That would be binding.

THE COURT: Okay. I'll sustain the objection.

Q. (by Mr. Foran) Do you think that's some—well, based on your answers, are you going to require the State to prove to you that he would kill again?

MR. RAY: I object again. That's binding.

THE COURT: I'll sustain the objection again. I think he's answered that anyway, but I'll sustain the objection to the question that's being asked.

Q. (By Mr. Foran) Well, let's go back to the question number one, then, where we—you know, where we would have to prove to you that a person would commit criminal acts of violence.  In your mind, criminal acts of violence, would that mean that someone would have to kill again?

MR. RAY: I object again, Judge. It's binding.
. . .
THE COURT: I'll sustain the objection to it.

18 RR 74-77.

Finally, Patterson summarized his view of what "hurting someone else" meant for the purposes of the mitigation issue:

A.  But if he's—his behavior is so bad that if he's in the penal system that he's likely to hurt someone else, you know, why are you going to put him into a situation where he's going to go and hurt someone else in the penal system? You know what I mean?

Q. Well, and you said, "hurt someone else." Okay?

A. As far as taking a life.

Q. Taking another life?

A. Yeah.

Q. Okay.

A. And in—in that—in that venue.

Q. So that's what it means to you?

A. Yeah.

18 RR 78.  Moments later, the trial court informed the prosecutor his hour was up.  *Id.* at 79.  The state court held that Patterson's questionnaire was consistent with his view on mitigation and future dangerousness, in that he listed "mass murderers" as the best argument in favor of the death penalty.  *Storey v. State*, 2010 WL 3901416 at *22.

Storey contends that the trial court's denial of the State's challenge for cause renders this rationale pretextual.  Petition, ECF No. 14, at 40, 44.  Storey forgets that attorneys are entitled to draw inferences about veniremembers' answers, answers that may not be sufficient to support a challenge for cause yet nonetheless reveal a legitimate strategic reason for striking that person from the jury.  *Batson* says the prosecutor's explanation "need not rise to the level justifying exercise of a challenge for cause."  476 U.S. at 97.  And the Supreme Court clarified that "[t]he second step of this

process does not demand an explanation that is persuasive, or even plausible." *Purkett,* 514 U.S. at 767-68.

Storey also complains that the State did not ask questions about Patterson's service on the prior felony jury, yet the trial court had limited the time available for voir dire. Petition, ECF No. 14 at 45. He cites "*Batson* and the cases that follow *Batson*, including *Snyder* [*v. Louisiana,* 552 U.S. 472, 485 (2008)]," for the proposition that failure to ask at least one question on a particular issue establishes the presumption of discriminatory intent. Petition, ECF No. 14, at 45. This is waived as unbriefed. *See Cavallini v. State Farm Mut. Auto Ins. Co.,* 44 F.3d 256, 260 n. 9 (5th Cir. 1995) (holding that "failure to provide any legal or factual analysis of an issue results in waiver"). Neither *Batson*, *Snyder,* nor some unnamed cases stand for such a proposition and Storey fails to brief this with clearly established federal law in support. Further, the State had asked more than one question about Patterson's prior jury service, so if this *were* a requirement, the State would have met it. 18 RR 24-25, 79.

The State was justified in exercising a peremptory strike on Patterson. The trial court explicitly accepted the reasons offered by the State, and that finding of fact is entitled to a presumption of correctness. 6 RR 320; 28

U.S.C. § 2254(e)(1).  Storey failed to rebut that finding by clear and convincing evidence, and accordingly this claim must fail.

III.  **Storey's Numerous Challenges to the Texas Death-Penalty Statute do not Entitle Him to Relief.**

In Claims Three and Four, Storey compiles a number of challenges to the constitutionality of the jury instructions given during the punishment phase of his trial.  Petition, ECF No. 14, at 49-66.  Each of his subclaims was rejected by the state court during Storey's direct appeal and state habeas proceedings.  *Storey v. State,* No. AP-76,018, 2010 WL 3901416 at *25; SHCR at 352-53, 381.  As discussed below, each of these claims have been litigated *ad nauseam* in, and consistently rejected by, the Supreme Court and the Fifth Circuit.  Therefore, because the constitutionality of the jury instructions given to capital murder juries in Texas has been settled for some time, the lower court's rejection of these claims was clearly not contrary to, or an unreasonable application of, clearly established precedent.  Federal habeas relief should thus be denied.

A.  **The special issues constitutionally allocate the appropriate burden of proof.**

Storey first contends that the mitigation special issue violates the Eighth and Fourteenth Amendments because it does not place the burden of proof on the State to prove "aggravating factors."  Petition, ECF No. 14, at 49

(citing *Walton v. Arizona*).  He complains that the mitigation special issue "is a conduit for aggravating as well as mitigating factors" as it tells jurors to weigh aggravation against mitigation.  *Id.* at 49.  This argument was denied by the Texas court on direct appeal.  *Storey v. State*, 2010 WL 3901416 at *25 (referring to 1 CR 181) (citing *Busby v. State*, 253 S.W.3d 661, 667 (Tex. Crim. App. 2008); *Russeau v. State*, 171 S.W.3d 871, 886 (Tex. Crim. App. 2005); *Sells v. State*, 121 S.W.3d 748, 767–68 (Tex. Crim. App. 2003); *Brooks v. State*, 990 S.W.2d 278, 288 (Tex. Crim. App. 1999); *Raby v. State*, 970 S.W.2d 1, 9 (Tex. Crim. App. 1998)).  This is consistent with clearly established federal law.

In truth, Storey's jury was instructed that *the State* had the burden to prove "aggravating" evidence such as his future dangerousness and the foreseeability of his victim's death.  2 CR 420-21.  A reasonable juror would not have believed otherwise, as "[j]uries are presumed to follow their instructions."  *Richardson v. Marsh*, 481 U.S. 200, 211 (1987).

Contrary to Storey's assertion, the mitigation special issue does not function as an aggravating factor, even if a reasonable juror does not find sufficient mitigation evidence.  Petition, ECF No. 14, at 49.  The actual function of that special issue is plainly meant to inure to the defendant's benefit by allowing the jury an avenue to give effect to mitigating evidence.

Capital-punishment jurisprudence has traditionally recognized the distinction between aggravating factors and mitigating circumstances. *Tuilaepa v. California*, 512 U.S. 967, 971 (1994). The Texas mitigation special issue is not an aggravating circumstance as defined by *Tuilaepa*. Rather, it is the vehicle through which the jury is given the opportunity to make an individualized determination of the offender's moral culpability, as required by the Supreme Court. *Penry v. Johnson*, 532 U.S. 782, 797 (2001)(*Penry II*); *Eddings v. Oklahoma*, 455 U.S. 104, 111-12 (1982); *oodson v. North Carolina*, 428 U.S. 280, 303-04 (1976). In making the decision, the jury is instructed to consider all of the evidence, including the circumstances of the offense, the defendant's character and background, and the defendant's general moral culpability. Tex. Code Crim. Proc. art. 37.071 § 2 (e) & (f). The jury is not required to agree on what evidence supports an affirmative answer. *Id.* Clearly, the mitigation issue confers upon the jury a broad ability to show leniency and *reduce* the defendant's sentence to life imprisonment. Thus, it is untenable that this special issue is functionally equivalent to an aggravating factor.

Equally important here is the portion of *Walton* left untouched by the majority in *Ring*, wherein the Supreme Court stated that the Eighth Amendment did not bar a state from imposing a burden of proof *on the*

*defendant* to "establish, by a preponderance of the evidence, the existence of mitigating circumstances sufficiently substantial to call for leniency." *Walton*, 497 U.S. at 649-51.   The Court noted that nothing in its Eighth Amendment jurisprudence precluded the State from "specifying how mitigating circumstances are to be proved."  *Id.* at 649.   Indeed, it noted that in several other capital cases, it found it constitutional for a state to impose a burden of proof on the defendant to prove issues such as self-defense, insanity, and "the affirmative defense of extreme emotional disturbance."  *Id.* at 650 (citations omitted).   The *Walton* Court gleaned from these cases the following rule:

> So long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove every element of the offense charged, or in this case to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden to prove mitigating circumstances sufficiently substantial to call for leniency.

*Id.*

The practical implications of Storey's argument preclude the adoption of his reading of *Walton*.   Prosecutors would be in the absurd position of proving a negative beyond a reasonable doubt.   This is impossible under the Texas system in which jurors are left to decide what evidence is mitigating and whether that evidence suggests that mercy is appropriate, and where

individual jurors need not agree on what evidence is mitigating when voting on this issue.  Thus, not only would accepting Storey's assertion improperly extend *Walton* without basis and pervert much of this Court's Eighth Amendment jurisprudence, it would also be highly impractical.

Much later, Storey asserts a different rationale for his contention that the Texas death-penalty scheme unconstitutionally fails to allocate a burden of proof concerning the mitigation special issue.  Petition, ECF No. 14, at 56-67 (citing *Apprendi v. New Jersey*[4]).  According to Storey, the failure to impose a burden of proof on the State violates *Apprendi*'s rule that a fact that increases the penalty for a crime beyond the prescribed statutory maximum must be proved to a jury beyond a reasonable doubt.  *Id.*  Storey insists that the mitigation special issue "increases the maximum penalty for the crime of capital murder," and thus the current statutory scheme "is unconstitutional for not requiring this issue to be submitted, proved and found by the jury beyond a reasonable doubt."  *Id.* at 57.  This argument was denied by the Texas court on direct appeal.  *Storey v. State*, 2010 WL 3901416 at *25 (citing *Busby,* 253 S.W.3d at 667; *Russeau,* 171 S.W.3d at 886; *Sells,* 121

---

[4]      530 U.S. 466 (2000).

S.W.3d at 767–68; *Brooks*, 990 S.W.2d at 288; and *Raby*, 970 S.W.2d at 9).

This is also consistent with clearly established federal law.

Storey's interpretation again absurdly requires prosecutors to prove a negative beyond a reasonable doubt. It is impossible under the Texas capital sentencing system—as mentioned above—to prove the *absence* of mitigating evidence. *Penry II*, 532 U.S. at 797; *Eddings*, 455 U.S. at 111-12; *Woodson*, 428 U.S. at 303-04. Texas's mitigation special issue does not need to be assigned a burden of proof. *Blue v. Thaler*, 665 F.3d 647, 668 (5th Cir. 2011); *Druery v. Thaler*, 647 F.3d 535, 546 (5th Cir. 2011); *Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir. 2005). Texas impliedly places the burden on the defendant. *Lawton v. State*, 913 S.W.2d 542, 557 (Tex. Crim. App. 1995); *Eldridge v. State*, 940 S.W.2d 646, 652 & n.9 (Tex. Crim. App. 1996). Texas's death-penalty statute "does not violate *Apprendi* or *Ring* by failing to require the State to prove beyond a reasonable doubt the absence of mitigating circumstances." *Ortiz v. Quarterman*, 504 F.3d 492, 505 (5th Cir. 2007) (citing *Scheanette v. Quarterman*, 482 F.3d 815, 828 (5th Cir. 2007), and *Granados*, 455 F.3d 536.) The state court's denial of this claim is not objectively unreasonable. *Avila v. Quarterman*, 560 F.3d 299, 314-15 (5th Cir. 2009).

*Cunningham v. California* is inapposite as it dealt with a judge's finding of aggravation factors, whereas in Texas the sentencing decision is made wholly by the jury. Petition, ECF No. 14, at 60. As a result, Storey simply cannot demonstrate that the state court's decision to deny relief on these grounds was an unreasonable application of federal law. *Storey v. State,* 2010 WL 3901416 at *25. Accordingly, the state court's ruling on the merits was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court. *See Simpson v. Quarterman,* 2007 WL 1008193 (E.D. Tex. 2007) at *20. Because Storey seeks to extend *Walton* and *Ring* beyond their current holdings and because there is no clearly established Supreme Court precedent authorizing the relief Storey seeks, his claims are barred by *Teague v. Lane,* 489 U.S. 288 (1989). *Schriro v. Summerlin,* 542 U.S. 348, 357-58 (2004). This Court should deny habeas corpus relief on Storey's meritless and *Teague*-barred claim.

## B. The Texas special issues adequately guide juries to exercise discretion in accordance with *Gregg v. Georgia*.

Storey next briefly argues that the mitigation special issue unconstitutionally permits open-ended discretion. Petition, ECF No. 14, at 50-51 (citing *Furman v. Georgia*, 408 U.S. 238 (1972) and *Gregg v. Georgia*.)

This argument was denied by the Texas court on direct appeal. *Storey v. State*, 2010 WL 3901416 at *25 (referring to 1 CR 178-79) (citing *Busby,* 253 S.W.3d at 667; *Russeau,* 171 S.W.3d at 886; *Sells,* 121 S.W.3d at 767-68; *Brooks,* 990 S.W.2d at 288; and *Raby,* 970 S.W.2d at 9).

Such an argument is also foreclosed by clearly established Supreme Court precedent. *See Johnson v. Texas*, 509 U.S. 350, 373 (1993)(finding that the Texas sentencing scheme accommodates the competing concerns of allowing mitigating evidence to be considered while guiding the discretion of the sentencer); *Franklin v. Lynaugh*, 487 U.S. 164, 181-82 (1988)(holding that the Texas special issues adequately guide "the jury's consideration of the mitigating evidence while still providing for sufficient jury discretion").

The Fifth Circuit has also repeatedly rejected claims that the Texas special issues allow juries unfettered discretion in violation of the Eighth Amendment. *Sonnier v. Quarterman*, 476 F.3d 349, 367 (5th Cir. 2007); *Hughes v. Dretke*, 412 F.3d 582, 594 (5th Cir. 2005); *see also Jasper v. Thaler*, 466 Fed. Appx. 429, 441-42 (5th Cir. 2012) (unpublished). As explained by the Court in *Sonnier*, by retaining the future dangerousness special issue, the amended Texas capital sentencing scheme continues to rationally narrow the class of death-eligible defendants as required by the Eighth Amendment, thus preventing the death penalty from being imposed

in an "arbitrary, erratic, wanton, or freakish" manner.   476 F.3d at 367.

Because Storey's complaint concerning the mitigation special issue, which

was created to work entirely to a defendant's benefit, has been consistently

rejected by the Fifth Circuit and Supreme Court, he cannot demonstrate that

the state court's decision to deny relief was an unreasonable application of

federal law.  Relief should therefore be denied.

C.    **The Constitution does not require appellate review of the mitigation special issue.**

Storey complains that his death sentence offends the Eighth and

Fourteenth Amendments because the Texas courts cannot know what

aggravating and mitigating factors were considered by the jury.   Petition,

ECF No. 14, at 51-53 (citing *Sawyer v. Whitley*, 505 U.S. 333 (1992)).   This

argument was denied by the Texas court on direct appeal.   *Storey v. State*,

2010 WL 3901416 at *25 (referring to 1 CR 179-80) (citing *Busby,* 253 S.W.3d

at 667; *Russeau,* 171 S.W.3d at 886; *Sells,* 121 S.W.3d at 767–68; *Brooks,* 990

S.W.2d at 288; and *Raby,* 970 S.W.2d at 9).   This is consistent with clearly

established federal law.

In *Woods v. Cockrell*, the Fifth Circuit explained why the Texas capital

punishment scheme was not constitutionally obligated to provide appellate

review of the mitigation special issue:

> We held in *Moore* that Texas is within the ambit of federal law as interpreted by the United States Supreme Court.   We did so in view of *Tuilaepa,* in which the Supreme Court distinguished between the jury's "eligibility decision" and its "selection decision."   It is the eligibility decision that must be made with maximum transparency to "make rationally reviewable the process for imposing a sentence of death." On the other hand, a jury is free to consider a "myriad of factors to determine whether death is the appropriate punishment. Indeed, the sentencer may be given unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty." . . .  It is the jury's subjective and "narrowly cabined but unbridled discretion to consider any mitigating factors," . . . that Texas refrains from independently reviewing. We continue to hold that Texas may correctly do so.

307 F.3d. 353, 359 (5th Cir. 2002) (citations omitted).  This has consistently been the Fifth Circuit's stance. *Reneau v. Cockrell*, 31 Fed. Appx. 151 (5th Cir. 2001); *Moore v. Johnson*, 225 F.3d 495, 506-507 (5th Cir. 2000); *Hughes v. Johnson*, 191 F.3d 607, 621 (5th Cir. 1999).

So long as the jury is not precluded by law from considering constitutionally relevant mitigating evidence, this special issue serves its purpose. *See Payne v. Tennessee,* 501 U.S. 808, 822 (1991) ("We have held that a State cannot preclude the sentencer from considering 'any relevant mitigating evidence' 'that the defendant proffers in support of a sentence less than death . . . [V]irtually no limits are placed on the relevant mitigating

evidence a capital defendant may introduce concerning his own circumstances.") (quoting *Eddings,* 455 U.S. at 114).

Texas law provides for appellate review of the future dangerousness special issue. *Russeau*, 171 S.W.3d at 878-79 (reviewing the legal sufficiency of the evidence to support the jury's affirmative finding to the future dangerousness special issue); *Ross v. State*, 133 S.W.3d 621-22 (Tex. Crim. App. 2004). The Supreme Court has held that the Constitution does not require comparative proportionality review in death penalty cases. *Hughes v. Johnson*, 191 F. 3d at 622 (citing *Pulley v. Harris*, 465 U.S. 37, 43-44 (1984)). Because no precedent currently dictates the rule Storey seeks, consideration of those attacks is foreclosed under *Teague*. And because no such clearly established federal law exists, he cannot receive relief under AEDPA.

**D.     The parties special issue does not run afoul of *Tison v. Arizona* or *Enmund v. Florida*.**

Next, Storey challenges the second special issue given his jury, called the anti-parties special issue, as facially unconstitutional because he claims it violates *Tison v. Arizona* and *Enmund v. Florida*. Petition, ECF No. 14, at 53. His argument on this subject is conclusory at best and contains no legal analysis or explanation whatsoever. *Id.* This argument is waived. Storey

failed to adequately brief his claim and has, accordingly, waived it on appeal. *See Green v. Johnson*, 160 F.3d 1029, 1036 n.2 (5th Cir. 1998) ("It is not the job of an appellate court to go on a fishing expedition through the record to find facts favoring or disfavoring an appellant's arguments. Rather, it is the job of a party before this court to supply in its brief relevant record cites in order that this court may properly review his arguments."); *see also, e.g., Yohey v. Collins*, 985 F.2d 222, 224-25 (5th Cir. 1993) ("[Appellant] has abandoned these arguments by failing to argue them in the body of his brief."). *Cavallini,* 44 F.3d at 260 n. 9 (holding that "failure to provide any legal or factual analysis of an issue results in waiver"); *United States v. Maldonado*, 42 F.3d 906, 910 n. 7 (5th Cir. 1995) (reasoning that failure to do more than vaguely refer to an issue constitutes waiver).

Storey's argument was no better in the pretrial motion presented to the trial court, 1 CR 181, or in his brief on direct appeal to the Texas Court of Criminal Appeals. Appellant's Brief at 51. This argument was denied by the Texas court on direct appeal. *Storey v. State*, 2010 WL 3901416 at *25 (referring to 1 CR 181) (citing *Busby,* 253 S.W.3d at 667; *Russeau,* 171 S.W.3d at 886; *Sells,* 121 S.W.3d at 767–68; *Brooks,* 990 S.W.2d at 288; and *Raby,* 970 S.W.2d at 9). It is impossible for the Director to determine why

Storey complains that this special issue violates either precedent, nor has he identified any clearly established federal law which supports his argument.

In the hypothetical, his claim is unpersuasive.  If Storey is contending that the parties question weakens the degree of culpability required to obtain a capital murder conviction, he fails to take into account that the absence of the deliberateness issue does not change the mental state that must be proven to obtain a guilty verdict.  *Sonnier*, 913 S.W.2d at 517.

The prior version of Article 37.071, before its amendment in 1991, included the deliberateness question as one of three capital sentencing issues. *Sonnier*, 913 S.W.2d at 519 n.3.  The deliberateness issue was "whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would occur." *See* Acts 1973, 63rd Leg., ch. 426, p. 1125, §1, eff. June 14, 1973.  The deliberateness special issue was replaced with the parties special issue, to be given in cases like Storey's where the jury might have found the defendant guilty as a party, *see* Tex. Penal Code §§ 7.01, 7.02, asking "whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken." *See* Acts 1991, 72nd Leg., ch. 838, p. 2899, § 1, eff. Sept. 1, 1991.  Under

neither version of Article 37.071 was the deliberateness question an element of the crime; it was a special issue question that helped meaningfully channel the jury's interpretation of penalty phase evidence in answering the future dangerousness question. *Sonnier*, 913 S.W.2d at 517.

In *Jurek v. Texas,* the Supreme Court focused on two aspects of the Texas sentencing scheme. First, the Court focused on the narrow statutory definition of capital murder found in Section 19.03 of the Texas Penal Code. 428 U.S. 262, 270-271 (1976). Then, the Court focused on Article 37.071 and asked whether it provided a vehicle for consideration of mitigating evidence; focusing entirely on the future dangerousness special issue, the Court found it could provide a sufficient vehicle for the consideration of mitigating evidence. *Id.* at 271-273. The *Jurek* Court in no way suggested that the question of deliberation was pivotal to its decision; to the contrary, an honest reading suggests that the question of deliberation was irrelevant to the Court's concerns and analysis under *Furman. Sonnier*, 913 S.W.2d at 519-20.

There is nothing in the 1991 amendment to Article 37.071 which would change the *Jurek* holding. 428 U.S. at 273-274. Indeed, the addition of the new special issue regarding mitigating evidence brings Article 37.071 into further compliance with the concerns of the Eighth Amendment as expressed by *Jurek*. The absence of the deliberateness issue does not change the

mental state that must be proven to obtain a guilty verdict. *Sonnier,* 913 S.W.2d at 517. Storey's jury was instructed that they could not find him guilty unless they believed beyond a reasonable doubt that he acted intentionally or knowingly. 2 CR 405. Whether his jury had to answer the deliberateness special issue or not, Storey's guilty verdict would still have hinged on the mens rea of intentional or knowing.

No constitutional error is apparent. But even if this were error of federal constitutional origin, under Supreme Court precedent such an error would not be structural. In *Neder v. United States,* the Supreme Court addressed a trial court's complete failure to submit an element of the offense to the jury. The Supreme Court held that such an error "differs markedly from the constitutional violations we have found to defy harmless error review." 527 U.S. 1, 8 (1999). The Supreme Court concluded that the complete omission of an element of an offense was not structural error but was subject to harmless error review. *Id.* If the omission of an element of an offense is not structural, the omission of a punishment issue would not seem to be structural error either. And, more to the point, the Supreme Court has not labeled it as structural. Storey fails to show how the omission of the deliberateness question was contrary to clearly established federal law, nor can he demonstrate that it caused him any harm whatsoever.

Under *Enmund* and *Tison*, the deliberateness special issue was not constitutionally required because Storey was the actual murderer, not a party to the murder. *Tison* says even if Storey did not intentionally kill Jonas Cherry, just the reckless disregard for his life implicit in shooting a pistol at Cherry's head represents the highly culpable mental state sufficient to sentence him to death. 481 U.S. at 157. If recklessness is adequate mens rea for Eighth Amendment purposes, then certainly "intentionally and knowingly" is constitutionally sound. Storey can cite no clearly established federal law declaring capital murder based on intentional or knowing conduct to be unconstitutional. While the Fifth Circuit has not addressed this directly, the Tenth Circuit found "willful, purposeful and knowing" actions that allowed a child to be murdered by another to be proportional and constitutionally sound under *Enmund* and *Tison*. *Gilson v. Sirmons*, 520 F.3d 1196, 1225-26 (10th Cir. 2008). Storey fails to prove he is entitled to relief.

**E.    The mitigation special issue does not need to require jurors to consider all mitigating evidence.**

Next, Storey argues that the Texas death penalty scheme is unconstitutional because it impermissibly fails to instruct the jury it *must* consider *all* mitigating evidence. Petition, ECF No. 14, at 54-55. In Storey's

own words, "Jurors in a capital case in Texas should be required to consider mitigating evidence, not simply to consider whether there is sufficient mitigating evidence to warrant a life sentence." *Id.* Storey insists that *Johnson v. Texas*, *Boyde v. California*,[10] and *Blystone v. Pennsylvania*[11] "require that the jury be told that it *must* consider *all* mitigating evidence." Petition, ECF No. 14, at 54. This argument was denied by the Texas court on direct appeal. *Storey v. State*, 2010 WL 3901416 at *25 (referring to 1 CR 178-181)(citing *Busby,* 253 S.W.3d at 667; *Russeau,* 171 S.W.3d at 886; *Sells,* 121 S.W.3d at 767–68; *Brooks,* 990 S.W.2d at 288; and *Raby,* 970 S.W.2d at 9).

Storey's penalty-phase jury charge instructed the jury that they "may take into consideration all the facts shown by the evidence" and the mitigation special issue specifically asked:

> Taking into consideration *all of the evidence*, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, do you find from the evidence that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed?

---

[10] 494 U.S. 370 (1990).
[11] 494 U.S. 299 (1990).

2 CR 420, 422 (citing Tex. Code Crim. Proc. art. 37.071, § 2(e)) (emphasis added).

Because he has provided no point citations, he forces the Director and this Court to do his work for him.  None of the three cases he cited stand for his proposition; the Supreme Court has never required that juries *must consider* all evidence; instead, the jury must be *able to consider* all mitigating evidence.  In *Johnson*, the Court described the approved instructions this way: "The jury also was told that, in answering the special issues, it *could* consider all the mitigating evidence that had been presented during the guilt and punishment phases of petitioner's trial." 509 U.S. at 368 (emphasis added).  In *Blystone,* the Court rejected a challenge to an instruction with language mandating a death sentence if a jury found the aggravation outweighed the mitigation (an entirely separate issue from Storey's claim) and held that "[t]he requirement of individualized sentencing in capital cases is satisfied by *allowing* the jury to consider all relevant mitigating evidence." 494 U.S. at 307.   In *Jurek*, the Court also used permissive language ("*allow* consideration of particularized mitigating factors" and "the jury *could* consider whether…") instead of mandatory language. 428 US at 272-273 (opinion of Stewart, Powell and Stevens, JJ.).

A capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision. *Tuilaepa*, 512 U.S. at 979-80. In *California v. Ramos,* the Court upheld an instruction informing the jury that the Governor had the power to commute life sentences and stated that "the fact that the jury is given no specific guidance on how the commutation factor is to figure into its determination presents no constitutional problem." 463 U.S. 992, 1008-1009, n. 22 (1983).

Because Storey has identified no clearly established federal law supporting his position, he is not entitled to habeas relief.

**F.      The mitigation special issue does not unconstitutionally limit the jury's consideration of evidence during the punishment phase of trial.**

Storey next challenges the constitutionality of Texas's statutory definition of "mitigating evidence," arguing that it is too restrictive and overlimits the jury's discretion to consider certain evidence that may favor the imposition of a life sentence, in violation of the Eighth and Fourteenth Amendments. Petition, ECF No. 14, at 54-55. Ironically, in other points of error Storey complains that the special issue is too broad and unlimits the jury's deliberations. *Id.* at 51-52. According to Storey, the definition of mitigating evidence submitted to the jury pursuant to Texas Code of Criminal Procedure article 37.071 Section 2(f)(4) unconstitutionally restricts

the definition of mitigating evidence to only evidence which reduces the defendant's moral blameworthiness, which essentially encourages jurors to disregard certain other types of mitigating evidence. *Id.* This argument was denied by the Texas court on direct appeal. *Storey v. State*, 2010 WL 3901416 at *25 (referring to 1 CR 181) (citing *Busby,* 253 S.W.3d at 667; *Russeau,* 171 S.W.3d at 886; *Sells,* 121 S.W.3d at 767–68; *Brooks,* 990 S.W.2d at 288; and *Raby,* 970 S.W.2d at 9). Storey's line of argument has already been squarely rejected by the Fifth Circuit over ten years ago in *Beazley v. Johnson*, 242 F.3d 248, 259 (5th Cir. 2001).

In *Beazley*, the Court considered the exact allegation now raised by Storey and held that the post-1991 capital sentencing scheme as currently codified in Article 37.071 "does *not* unconstitutionally 'preclude the jury from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'" *Id.* at 260 (citing *Lockett*, 438 U.S. at 604) (emphasis in original). The Court determined that "all mitigating evidence can be given effect under the broad definition of mitigating evidence" given by the mitigation special issue, and concluded that § 2(f)(4)'s definition of mitigation evidence does not limit the evidence that can be considered under the statute. *Id.* Specifically, the court explained that

"virtually *any* mitigating evidence is capable of being viewed as having some bearing on the defendant's moral culpability apart from its relevance to the particular concerns embodied in the Texas special issues." *Id.* (citing *Graham v. Collins,* 506 U.S. 461, 476 (1993)) (emphasis in original).

The Fifth Circuit has repeatedly reaffirmed *Beazley* since its decision over ten years ago.  *Blue*, 665 F. 3d at 665-669; *see also Cantu v. Quarterman*, 341 Fed. Appx. 55, 60-61 (5th Cir. 2009)(unpublished); *Roach v. Quarterman*, 220 Fed. Appx. 270, 277 (5th Cir. 2007)(unpublished); *O'Brien v. Dretke*, 156 Fed. Appx. 724, 735-36 (5th Cir. 2005).  Further, although the current special issues have not been reviewed by the Supreme Court since their enactment in 1991, the Court has commented favorably on the mitigation special issue, noting the "brevity and clarity of this instruction" and suggesting that such a "clearly drafted catchall instruction on mitigating evidence" likely would "have complied with *Penry I*."  *Penry II*, 532 U.S. at 803 (referring to the Court's decision in *Penry v. Lynaugh*, 492 U.S. 302 (1989)(*Penry I*)).  Storey fails to provide any sufficient reason for this Court to rule contrary to the Fifth Circuit's explicit holding in *Beazley, supra*.

Regardless, even if he were able to prove the merits of his claim, federal habeas relief is *Teague*-barred because it would require the creation of a new constitutional rule of law.  489 U.S. at 306-307.  "The question is 'whether a

state court considering [the defendant's] claim at the time his conviction became final would have felt compelled by existing precedent  to conclude that the rule [he] seeks was required by the Constitution.'" *Goeke v. Branch,* 514 U.S. 115, 118 (1995) (quoting *Caspari v. Bohlen,* 510 U.S. 383, 390 (1994) (internal quotations omitted)).   Nor can Storey demonstrate that a *Teague* exception applies.   Under *Teague,* "a new rule should be applied retroactively if it places 'certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe.'"   489 U.S. at 307 (quoting *Mackey v. United States,* 401 U.S. 667, 692 (1971)).   "Second, a new rule should be applied retroactively if it requires the observance of 'those procedures that ... are implicit in the concept of ordered liberty.'"  *Id.* (quoting *Mackey,* 401 U.S. at 693 (internal quotations omitted)).   Thus, to the extent Storey advances a new interpretation of the Eighth and Fourteenth Amendments, the non-retroactivity doctrine of *Teague* bars relief.

As a result, his request for federal habeas relief on this claim should be denied.

### G.  The state court reasonably concluded that failure to define terms in the punishment-phase special issues did not render Storey's death sentence arbitrary and capricious.

Storey proceeds to argue that the punishment-phase special issues were unconstitutionally vague because the special issues "are couched in

68

nebulous terms that defy a realistic answer." Petition, ECF No. 14, at 55. He summarily asserts that Texas's statute is "so vague and indefinite as to be incapable of interpretation by reasonable men, and is therefore facially void as [sic] violating the Defendant's rights. . ." *Id.* at 56. This resulted in an arbitrary and capricious sentence of death in violation of the Fifth, Eighth and Fourteenth Amendments. *Id.*

These claims are procedurally barred on federal habeas review due to Storey's failure to properly preserve error for review in state court with a contemporaneous objection and proposed charge. The motion he filed to declare the statute unconstitutional only claimed a violation of the Eighth and Fourteenth Amendments and omitted the Fifth. 1 CR 172, 182. Further, as the state court reasonably determined, the claims are without merit. *Storey v. State*, 2010 WL 3901416 at *25 (referring to 1 CR 181) (citing *Busby,* 253 S.W.3d at 667; *Russeau,* 171 S.W.3d at 886; *Sells,* 121 S.W.3d at 767–68; *Brooks,* 990 S.W.2d at 288; and *Raby,* 970 S.W.2d at 9).

Indeed, the Fifth Circuit has repeatedly rejected identical claims by other Texas capital inmates. *See West v. Johnson*, 92 F.3d 1385, 1406 (5th Cir. 1996); *Woods v. Johnson*, 75 F.3d at 1033-34; *James v. Collins*, 987 F.2d 1116, 1119-20 (5th Cir. 1993). The special issues have a "common-sense core of meaning . . . that criminal juries should be capable of understanding," and

are more than adequate to perform their function of permitting jury consideration of a broad array of evidence, while at the same time minimizing the possibility of arbitrariness by focusing the jury's consideration on the particularized circumstances of the offense and the offender. *Tuilaepa,* 512 U.S. at 973. The Court also held that review of vagueness claims must be quite deferential because "the proper degree of definition" of factors often "is not susceptible of mathematical precision." *Id.* The Court also noted the "obvious utility" to the capital defendant "of these open-ended [selection-phase] factors as part of a neutral sentencing process." *Id.* at 973-974. And finally, the Court found that the controlling objective when examining eligibility *or* selection factors for vagueness is whether the state's sentencing procedure is "neutral and principled so as to guard against bias or caprice in the sentencing decision," which was condemned in *Furman. Id.* at 973.

Applying the deferential standard of review recognized by the Court in *Tuilaepa,* the terms in the Texas special issues are not unconstitutionally vague. These terms are meaningful, evidentiary inquiries to be determined from facts and circumstances. The terms "deliberately," "probability," "criminal acts of violence," and "continuing threat to society" do not even resemble the kinds of "pejorative adjectives . . . that describe a crime as a whole and that [the Supreme] Court has held to be unconstitutionally vague."

70

*Arave v. Creech*, 507 U.S. 463, 475-476 (1993); *see Tuilaepa*, 512 U.S. at 974. Rather, the Court has expressly held that the Texas issues possess a "common-sense core of meaning" and "criminal juries should be capable of understanding them," and thus are not unconstitutionally vague. *Jurek*, 428 U.S. at 279 (White, J., concurring opinion). Therefore, the special issues, while permitting the jury to consider a broad array of evidence, minimize the possibility of arbitrariness by focusing the jury's consideration on the particularized circumstances of the offense and the offender. In light of the state court's reasonable rejection of this claim, *see Storey v. State*, 2010 WL 3901416 at *25, the AEDPA mandates the denial of federal habeas corpus relief as well.

## CONCLUSION

Given the deference due the state court's factual findings and Storey's failure to show that the state court misapplied clearly established federal law or wrongly determined the facts, his claims for relief must fail. For the foregoing reasons, Storey's petition for writ of habeas corpus and request for evidentiary hearing should be denied and the Director's motion for summary judgment should be granted.

Respectfully submitted,

GREG ABBOTT

Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

DON CLEMMER
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Postconviction Litigation Division

\*      /s/ Georgette P. Oden
GEORGETTE P. ODEN
Assistant Attorney General
\*Attorney-in-charge
State Bar No. 24029752

P.O. Box 12548, Capitol Station
Austin, Texas  78711-2548
(512) 936-1400
facsimile (512) 320-8132
Georgette.Oden@oag.state.tx.us

## CERTIFICATE OF SERVICE

I do hereby certify that on March 15, 2013, I electronically mailed a copy of this pleading to Counsel for Storey, Mike Ware, at the following address: ware@mikewarelaw.com.

/s/ Georgette P. Oden
GEORGETTE P. ODEN
Assistant Attorney General