# EXHIBIT A

## AFFIDAVIT OF DR. EMILY FALLIS

Before me, the undersigned Notary Public, in and for the State of Texas, appeared, Dr. Emily Fallis, who after being duly sworn, stated as follows:

"My name is Dr. Emily Fallis. I am the same Dr. Emily Fallis whose report of Psychological Evaluation, dated June 13, 2012, was submitted with Paul Storey's federal writ on June 14, 2012. I have reviewed the State's Motion for Summary Judgment with Brief in Support" filed in response to Paul Storey's federal writ. Some of the State's Motion is directed at the work I have done on this case as reflected in my June 13, 2012 report. The State's Motion for Summary Judgment is in many instances inaccurate and misleading. This affidavit is given in order to address some of the areas in which the State asserted inaccurate and misleading positions as to the work I performed in this case.

The State argues that information on which I based my professional opinions was "solely" from Mr. Storey and was uncorroborated by other sources. That assertion is simply untrue. A list of sources and information I reviewed was attached to my June 13, 2012 report and is extensive. The State's own Motion and Brief in support acknowledge that I interviewed Mr. Storey's mother and reviewed documents in order to confirm his self-report. Further, Mr. Storey's mother testified under oath at trial about several historical points which, in fact, also confirmed his self-report to me. Even Dr. Price's notes reflect his opinion that the information Storey gave to him was "reliable". Thus, the repeated reference to my opinions or my alleged failure "to corroborate any of [Storey's] claims" is inaccurate on its face and, in truth, highly inaccurate. The trial court's "finding" on the same matter is also inaccurate.

1

Dr. Price allegedly told or, at least implied to the trial attorneys that Mr. Storey demonstrated poor effort during intelligence testing. First, it is not clear why the trial attorneys took this to mean that there was nothing mitigating about Mr. Storey which could be discovered and/or confirmed through further testing. In fact, the further testing I performed has done exactly that. See June 13, 2012 Report.

Second, Dr. Price's notes indicate that Mr. Storey was cooperative and gave valid and reliable information, the opposite of what he allegedly told the trial attorneys. Third, the part of the test administered by Dr. Price which is designed to detect malingering, indicated that Mr. Storey in fact did demonstrate good effort. It was unreasonable for the trial attorneys to decide not to further explore mitigating evidence through psychological testing and otherwise based on Dr. Price's bare representation that Paul Storey did not take the testing seriously, particularly when all of the objective evidence available at the time indicated the opposite.

As I have said previously, I used a well-validated, reliable test to assess Mr. Storey's effort (Validity Indicator Profile) and found that, indeed, he did put forth good effort on the intellectual testing I administered.

In both Dr. Price's test and my tests, Mr. Storey's scores put him squarely at "Borderline Intellectual Functioning" according to the DSM-IV-TR. This important information should have shaped the entire mitigation investigation and the prism through which all information about Mr. Storey was viewed. For these purposes, the difference between "Borderline" and "Low Average" is *highly* significant. Of course, since Dr. Price did not perform his assessment until more than one and one-half years after his appointment and shortly before jury selection began, the defense's mitigation investigation was probably almost complete. Further, there may not have

been sufficient time for further testing by Dr. Price or any other professional, much less sufficient time to incorporate the new information into a mitigation presentation in time for trial.

The State's assertion that my June 2012 testing "revealed an even higher IQ Score" is not accurate and is an opinion based on ignorance of test construction and interpretation. In fact, the difference between the two IQ scores (Price's and mine) is not statistically significant. Likewise, the State's asserted position that my testing "confirmed" Dr. Price's purported judgment that, notwithstanding all objective indicators, "Mr. Storey did not take the testing seriously" is erroneous because the two scores are not statistically significantly different.

Dr. Price reportedly told the defense attorneys that Mr. Storey "was probably an antisocial personality;" however, such a statement is not the same as diagnosing Antisocial Personality Disorder. Once again, it seems unreasonable that the defense attorneys took this seemingly little more than off-the-cuff statement by Dr. Price as a reason to forego any further personality testing or psychological evaluations, particularly since the state would not have access to the results unless the results were favorable for Mr. Storey and the defense decided to use them in mitigation. In other words, it was unreasonable for the defense to run away from a course of action (further testing by Dr. Price or another professional) in which there was absolutely no downside (other than the shortness of time), and potentially a very strong upside. My further testing, as reflected in my June 13, 2012 Report, shows that there would have been a very strong upside and that Mr. Storey does not suffer from Antisocial Personality Disorder.

Another argument in the State's Motion for Summary judgment focuses on the fact that Dr. Price could not have used a WAIS-IV as this edition of the WAIS was not published until one month after Dr. Price examined Mr. Storey in July 2008. The point is that Dr. Price should

have used the best test available instead of the one he did use. If the WAIS-IV was not available until one month later, Dr. Price should have at least used the earlier edition of the WAIS.

Note that the Response indicates that Mr. Storey "did not present this information to his defense team before trial," referring to my account from Mr. Storey about depression, exposure to violence, substance abuse, and criminal activity at home while growing up. At the same time, the argument in the Response states that Dr. Price knew of Mr. Storey's report that he had suffered from depression, but Dr. Price discounted the self-report. Moreover, the Response states that Mr. Storey's mother told the defense team and, later, testified about depression, exposure to violence, and other matters. Furthermore, Mr. Storey's mother corroborated that he was exposed to domestic violence and criminal activity. Apparently, Mr. Storey *did* present this information to his defense team prior to trial.

The State's argument that an 81 is considered "low average" on a Wechsler Scale clearly is based on erroneous information. The IQ reference chart in Appendix 1 of the State's Response comes from Wikipedia, rather than a professional source such as the DSM-IV-TR. Moreover, as noted in the State's Appendix, the "Wechsler Classification" presented is for the Wechsler Intelligence Scale for *Children*. This information suggests that the labeling provided in this source was chosen so that feedback may be given to parents and children without using labels that have a negative connotation (such as Borderline). Per the DSM-IV-TR (pg. 741), Borderline Intellectual Functioning is the appropriate label for someone with an "IQ in the 71-84 range."

According to the Response, the information about Mr. Storey's history of depression, neglect, trauma, etc., could have persuaded a trial jury that he was "permanently damaged and unstable" and, thus, a future danger. This argument does not take into consideration that such

information is not related to the prediction of future risk in the research. Moreover, the history of these negative events could have been presented to help a jury understand how Mr. Storey came to be involved in the crime and, thus, could have been a basis for mercy.

I swear that the above statements are true, to the best of my memory, SO HELP ME GOD."

FURTHER AFFIANT SAYEHT NAUGHT.

_____
DR. EMILY FALLIS
AFFIANT

SWORN to be before me, the undersigned Notary Public, on the /__ day of July, 2013.

_____
NOTARY

JENA PARKER
Notary Public, State of Texas
My Commission Expires
July 16, 2017