IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| **PAUL DAVID STOREY,** § | |
| § | |
| **Petitioner,** § | |
| § | |
| **V.** § | **Civil Action No. 4:11-CV-433-O** |
| § | **(death-penalty case)** |
| **WILLIAM STEPHENS, Director,** § | |
| **Texas Department of Criminal Jus-** § | |
| **tice, Correctional Institutions** § | |
| **Division,** § | |
| | |
| **Respondent.** | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Paul David Storey petitions the Court for a writ of habeas corpus, contending that his conviction and death sentence are unconstitutional because he received ineffective assistance of trial counsel, the prosecution improperly struck a potential juror based on his race, and the Texas death penalty statute is unconstitutional. Having reviewed the record, the briefs, and the exhibits tendered by the parties, the Court concludes that Storey is not entitled to relief under the standards prescribed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), denies the petition, and dismisses this action with prejudice.

## I. PROCEDURAL BACKGROUND

In 2008, Storey was convicted and sentenced to death for the 2006 robbery and murder of Jonas Cherry, an employee of Putt-Putt Golf and Games in Tarrant County, Texas. *State v. Storey*, Cause No. 1042204D (Crim. Dist. Ct. No. 3, Tarrant Co., Tex. Sept. 15, 2008). The Texas Court of Criminal Appeals ("CCA") unanimously affirmed the conviction in an unpublished opinion on appeal. *Storey*

*v. State*, No. AP-76018, 2010 WL 3901416 (Tex. Crim. App. Oct. 6, 2010).  The Court takes the

following recitation of facts from that opinion:

> Appellant was charged with intentionally causing the death of Jonas Cherry while in the course of committing or attempting to commit robbery. The record reflects that around 8:15 a.m. on October 16, 2006, Cherry left his house and went to work at the Putt–Putt Golf and Games in Hurst, Texas ("the Putt–Putt"). When Cherry arrived for work, he passed through the east door, which was the employees' entrance, and at 8:43 a.m., he disarmed the security alarm system. When a co-worker, Timothy Flow, arrived about ten minutes later, he found Cherry lying in a pool of blood in the office area. Flow noticed that Cherry was holding a key to the door of the manager's office, which was locked. Concerned that the perpetrator might still be present, Flow retreated outside. Once he saw that only his and Cherry's cars were in the parking lot, he went back inside to check on Cherry. Based on his observations, he believed that Cherry was dead. Flow then walked back outside while calling 9–1–1 on his cell phone, and he waited in his truck until the police arrived. Officer Samantha Wilburn and Corporal Lonnie Brazell responded first. After speaking with Flow and observing Cherry's body, they called for the assistance of additional officers.

> With the help of the manager, Patrick Arenare, police officers gained entry to the manager's office, where the business's surveillance equipment was kept. Four separate videocassette recorders ("VCRs") should have been set up for surveillance. However, one VCR had been stolen, and videotapes had been stolen from two other VCRs. The fourth VCR still contained a surveillance videotape and was functioning. It was connected to a video camera that monitored a section of the business's driveway that led from the road and into the parking areas. When officers played the videotape, they observed a red two-door Ford Explorer with its hood up and its lights flashing, rolling from the direction of the road into the public parking area, and then moving out of view as it continued through the parking lot. A few minutes later, the Explorer came back into view, and then it passed out of view again as it rolled toward the employees' parking area. This videotape was released to the media and aired on the local news.

> One of appellant's friends reported that appellant had told her he was present during the offense and saw who committed it. She provided the police with appellant's telephone number. Detective Rick Shelby, a Hurst police officer, contacted appellant by telephone. Appellant acknowledged that he was a former employee of the Putt–Putt, and he admitted that the Explorer that was being shown on the news was his.[1] He stated that he was willing to meet with Shelby at the police station but that he did not have transportation because his Explorer was not working. He accepted Shelby's offer of

---

[1] The record reflects that the Explorer was owned by appellant's mother, but appellant drove it regularly.

2

a ride and provided Shelby with directions to his house. Shelby and Sergeant Craig Teague then drove to appellant's house, where they met appellant, appellant's brother, and a friend. Appellant and his brother showed them the Explorer. Appellant explained that the license plates on the Explorer did not match the ones in the video that was being shown on the news because he had switched the plates in order to do a "gas run."[2] Appellant then accompanied Shelby and Teague to the police station to make a statement.

Over the next few days, appellant made three oral statements to police. In his first statement, he denied participating in any offense but admitted that he was a witness. In his second statement, he admitted to participating in the offense, but only as a lookout and by helping others gain entry to the Putt–Putt and by warning them to collect the surveillance tapes. In his third statement, he admitted that he had planned and participated in the robbery and that he had shot Cherry.

All three of appellant's statements were presented to the jury. The medical examiner testified that Cherry suffered two gunshots to his head. One shot entered from the back, where there was a contact wound. Another shot entered from the front, where the entry wound indicated a shot fired at close range. Either shot would have been fatal. Cherry also suffered additional gunshot wounds to both legs and one hand.

While the appeal was pending, Storey's habeas counsel petitioned the convicting court for a writ of habeas corpus. The CCA adopted the convicting court's findings and conclusions and denied relief. *Ex parte Storey*, No. WR-75828-01, 2011 WL 2420707 (Tex. Crim. App. June 15, 2011); SHR 348 (Findings of Fact and Conclusions of Law).[3]

The Court appointed federal counsel, and Storey filed a petition for writ of habeas corpus and supporting brief on June 14, 2012. Respondent filed a motion for summary judgment, answer, and supporting brief on March 15, 2013,[4] and Storey filed a reply on July 2, 2013.

---

[2] Appellant explained that this was his term for pumping gas into a vehicle and then driving away without paying.

[3] The single-volume state habeas record is cited "SHR" followed by the page number. The 3-volume trial court clerk's record is cited "CR," preceded by the volume number and followed by the page number. The 40-volume reporter's record from trial is cited similarly with "RR." State and defense trial exhibits are SX and DX, respectively.

[4] The Court denied the motion for summary judgment as unnecessary. *Order* (ECF No. 37).

## II. STANDARD OF REVIEW

The petition is subject to the AEDPA. *See* 28 U.S.C. § 2254. When a federal habeas petitioner challenges a prior state court adjudication on the merits, the AEDPA bars relitigation of the claim in federal court unless it (1) is "contrary to" federal law then clearly established in the holdings of the Supreme Court or "involved an unreasonable application of" such law, or (2) "is based on an unreasonable determination of the facts" in light of the record before the state court. *See* § 2254(d); *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011). This determination is limited to the record that was before the state court that adjudicated the claim on the merits. § 2254(d)(2); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). These conditions are meant to be difficult to meet and stop short of imposing a complete bar on the relitigation of claims already rejected in state proceedings. *Richter*, 131 S. Ct. at 786.

A state court's decision is "contrary to" Supreme Court precedent if the state court applies a rule that contradicts governing law or confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an different result. *Coleman v. Thaler,* 716 F.3d 895, 901 (5th Cir. 2013) (quoting *Williams v. Taylor*, 529 U.S. 362 (2000)). A state court's application of law is "unreasonable" when the state court identifies the correct governing legal principle but applies it unreasonably to the facts of a particular case. *Id*. at 901-02. The petitioner must show that the state court ruling was "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 131 S. Ct. at 786-87; *see also White v. Woodall,* 134 S. Ct. 1697, 1702 (2014) . Thus, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter*, 131 S. Ct. at 786; *Woodall*, 134. S. Ct. at 1702 (stating a "merely wrong" holding or "clear error" will not suffice).

4

Factual determinations in a state court's decision are presumed correct, and a petitioner bears the burden of rebutting them by clear and convincing evidence. § 2254(e)(1); *see Burt v. Titlow*, 134 S. Ct. 10, 15 (2013). A "decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." § 2254(d)(2); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). A "state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Titlow*, 134 S. Ct. at 15 (citing *Wood v. Allen*, 558 U.S. 290 (2010)). The presumption of correctness attaches to explicit findings of fact as well as "unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Pippin v. Dretke*, 434 F.3d 782, 788 (5th Cir. 2005) (quoting *Pondexter v. Dretke*, 346 F.3d 142 (5th Cir. 2003)). With this framework in mind, the Court turns to Storey's claims.

### III. ASSISTANCE OF COUNSEL (CLAIM 1)

Storey asserts that the state court unreasonably denied his claim that trial counsel rendered ineffective assistance by limiting the investigation into Storey's mental health and overlooking allegedly mitigating circumstances of his life and his lack of future dangerousness. *Petition* at 10-13. Storey supports this claim with the reports of psychologist Emily Fallis, who interviewed Storey in 2010 for the state habeas proceedings and again in 2012 for these proceedings. *Petition Exhibits 1, 2.* Storey also asserts that the state habeas court improperly denied his request for a hearing on this issue.

### A. Applicable Law

The clearly established federal law governing claims of ineffective assistance of trial counsel is *Strickland v. Washington*, 466 U.S. 668 (1984). *See Williams v. Taylor*, 529 U.S. 362, 398-99 (2000). Under this well known standard, Storey must demonstrate (1) that counsel's representation fell below

5

an objective standard of reasonableness and (2) a reasonable probability that prejudice, sufficient to undermine confidence in the trial outcome, resulted from counsel's deficiency. *See Strickland*, 466 U.S. at 688, 694. Counsel are "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Pinholster*, 131 S. Ct. at 1403 (quoting *Strickland*, 466 U.S. at 690)). This standard not only gives trial counsel the benefit of the doubt, but affirmatively entertains the range of possible reasons counsel may have had for proceeding as they did. *Id*. at 1407.

In habeas proceedings, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable," not whether defense counsel's performance fell below *Strickland*'s standard. *Richter*, 131 S. Ct. at 785. This review is "doubly deferential" and gives both the state court and the defense attorney the benefit of the doubt. *Titlow*, 134 S. Ct. at 13. Here, Storey must demonstrate that it was necessarily unreasonable for the CCA to conclude (1) that he did not overcome the strong presumption of counsel's competence and (2) that he failed to undermine confidence in the jury's sentence of death. *See Pinholster*, 131 S. Ct. at 1403.

## B. Factual Background

### 1. Trial Proceedings

At the sentencing phase of trial, the State introduced a previously redacted portion of Storey's third police statement containing Storey's admission that he robbed drug dealers while attending truck driving school in Waco.[5] The State also presented testimony from the victim's wife. 37 RR 55. The

---

[5] Although the videotape was not transcribed as it was playing, the Court infers its content from the record. *See* 30 RR 22 (redaction of robbery statements); 37 RR 54-55 (publishing redacted portion, SX 6B); 38 RR 201, 226 (cross-examination on robberies); 39 RR 46 (argument referencing robberies); 40 RR (part 2) 27, 62 (SX 6A-unredacted transcript); 40 RR (part 2) 69 (SX 6B-videotape); 40 RR (part 2) 70 (SX 6C-redacted transcript). Exhibit page numbers are .pdf pages; the reporter's record does not paginate the exhibits.

6

State attempted to present testimony that Storey acted like the "tank boss" while in jail and that Storey had brandished a gun during a road rage incident, but the witnesses refused to cooperate on direct examination. 35 RR 63-66; 38 RR 16-20, 24-25. The State was able to present only impeachment testimony from the district attorney's investigator regarding the "tank boss" allegation. 38 RR 32-38.

Storey's counsel presented thirteen witnesses at punishment, including two close friends of Storey's mother (38 RR 126, 146), Storey's estranged father (38 RR 159), a cousin (38 RR 167), his mother's former boyfriend, Charles Holmes, as well as Holmes's mother (38 RR 180, 186), Storey's girlfriend (38 RR 203), his high school's vice principal (38 RR 209), two high school teachers (38 RR 228, 237), his younger brother, Larry Jr. (38 RR 247), his mother (38 RR 259), and an expert on prison classification. (38 RR 62). The testimony of these witnesses can be summarized as follows: If incarcerated, Storey would never be classified better than level "G3"; he can conform to prison rules, be a force for good, and be of value in the lives of his family and other people. 38 RR 81, 136, 195-96, 254, 269. In the past, Storey was helpful to his mother's friends, counseled a teenager, tutored kids in the neighborhood, and took care of his cousin's children. 38 RR 131-35, 148-49, 171, 268. Storey made a mistake, but he is a good guy, good-hearted, kind, helpful, trustworthy, caring, loving, respectful, appropriate, quiet, likeable, well-liked, always happy, a "model kid," a great student, "very aware of God" and enjoyed church. 38 RR 135-36, 150, 171-74, 182-83, 208, 222, 231-32, 239-40, 243-44, 278. Storey is not a gangster or a street kid and was not a discipline or truancy problem in high school. 38 RR 196, 216-19, 231. Storey did not get kicked out of regular high school, but failed to graduate with his class due to absenteeism caused by depression, and he asked to go to alternative school so he could graduate. 38 RR 263-64. Storey became very depressed when his grandmother died and when he could not get into the Navy because he was overweight. He was always embarrassed

7

about his weight.  38 RR 264-65.  Storey pursued truck driving school, got a commercial driver's license, and had one or two jobs before his trainer quit.  38 RR 194.  Storey used to care for Larry Jr., who is now enlisted in the Navy.  Storey told Larry Jr. to do right, honor their mother, and go farther than Storey did.  38 RR 248, 251, 253, 267.  Storey's father had not seen or talked to Storey since he was three or four years old.  38 RR 160, 164.  Storey's mother noticed a drastic change in Storey when he started hanging around the co-defendant, Mark Porter.  38 RR 279.

In jury argument, the prosecution emphasized that Storey had almost gotten away with a premeditated capital murder, that he was smart and sophisticated and that his criminal behavior had escalated from robbing dope dealers.  The State argued that Storey was nothing like the boy his mitigation witnesses knew, that there was no mitigation in the form of drug or alcohol abuse, sexual, physical or mental abuse, or poverty, and that Storey's mother had worked hard as a single parent to teach him right from wrong.  The prosecution emphasized that Storey waited six years to rob the business where he had once worked and could similarly bide his time in prison until an opportunity presented itself.  39 RR 4-18.  The State emphasized the facts of the murder, the written plan that was recovered from his backyard, and Storey's calculated preparation, including buying guns and changing the license plate on his mother's car.  They argued that Storey had expressed no remorse, was concerned about only himself, and willingly blamed an innocent man who had nothing to do with the crime.  39 RR 42-52.

Defense counsel argued that the State did not meet its burden on future dangerousness, emphasizing that after two years of investigation, the State could not present evidence of criminal violence other than what Storey had willingly told the police.  Counsel pointed out that Storey had no bad conduct in jail and that he would never leave the penitentiary alive if given a life sentence.

8

Counsel emphasized that, even though Storey's upbringing lacked a father's discipline, he made sure Larry Jr. would not be the disappointment he turned out to be.  Counsel argued that Storey's weight, which affected his self-esteem and prevented him from joining the Navy, combined with the death of his grandmother, caused Storey to get behind in school; it was Storey's choice to attend alternative school so he could graduate.  Counsel pointed out that Mark Porter was a bad influence, argued that Porter shot the victim because the victim could identify him from a prior visit, and reminded the jury that a ring they redeemed at a pawn shop after the murder belonged to Porter's girlfriend, not Storey's. Counsel argued that the murder was not planned as the State suggested because Storey was not supposed to have his mother's car that morning.  Counsel argued that Storey could be a force for good, pointing out that a State's witness testified that Storey led a prayer group in the jail.  39 RR 19-31.  Counsel compared the mound of evidence presented by the State to meet its burden of proof at guilt against the small amount of evidence it presented to meet the same burden at punishment.  Counsel stated that the written plans recovered in the search of Storey's home read like a burglary plan, not a murder plan and that there was nothing at the murder scene inconsistent with the version of events that Storey told the police.  39 RR 31-42.

    2.  <u>State Habeas Proceedings</u>

    The state habeas application challenged trial counsel's mitigation and mental health investigations.  SHR 51-78.  In support, Storey presented the 2010 affidavit of psychologist Emily Fallis and an affidavit from a juror stating that, based upon Fallis's report, he "would not have voted that Mr. Storey was a future danger."  SHR 82-103.  The juror affidavit was apparently stricken on the State's motion.  SHR 165 (motion to strike juror affidavit); SHR 282 (Storey's objection to trial court striking the affidavit); SHR 327-28 (Storey's acknowledgment that juror affidavit was stricken).

*2010 Report of Dr. Fallis:*  Dr. Fallis's report is based on her interviews with Storey and his mother, as well as various unnamed legal, medical, and mental health documents.  SHR 103.[6]  Her report addresses the following subjects: the circumstances of Storey's birth and his early years with his mother and father; the results of Dr. Fallis's evaluation of Storey's mother, her personality, and parenting style; Storey's description of his brother and his mother, and her relationships with men; Storey's lack of a relationship with his biological father; circumstances of Storey's childhood, education, employment, and criminal history; his marijuana and alcohol use; friendships and romantic relationships; his behavior in jail; his medical history and episodes of depression, including his struggle with weight and significant deaths in his family; Dr. Fallis's current mental status exam, which was within normal; Dr. Fallis's disagreement with Dr. Randy Price's evaluation and assessment of Storey's IQ as "low average" at the time of trial; her diagnosis of Storey, which included major depressive disorder, recurrent--in remission, cannabis abuse--in remission, adult antisocial behavior, and borderline intellectual functioning; her opinion that Storey presents a low risk of harm to others; and her overall critique of trial counsel's performance.  SHR 103-18.

*Affidavit of Trial Counsel Bill Ray:*  The State filed with its answer affidavits from trial counsel Bill Ray and Larry Moore, as well as Dr. Price's interview notes, test results, and letter report.  SHR 233-76.  Mr. Ray's affidavit states that he chose a psychological expert who was well respected by the State in the hope that he would bear a strong opinion for the State to overcome.  Although Ray believed Storey had a "serious set" of mitigating facts such as depression, his home life, lack of a father figure, and being overweight, he believed none of these things could be presented in the best

---

[6] These citations reference a copy of the Fallis affidavit that is attached as an exhibit to the juror affidavit because the actual writ exhibit is missing page 3.

light without an admission of guilt from Storey, which never came.  In addition to the twelve family and friends who testified, Ray had other witnesses who were not called because they could not be located, or they had criminal backgrounds or knew things they did not want the jury to know.  Ray stated that Storey unrealistically believed he would get released and marry his girlfriend, and therefore refused the State's offer of a life sentence.   SHR 269-74.

*Information from Dr. Price*:  The letter report from Dr. Price indicates that Price conducted a six-hour neuropsychological evaluation of Storey on July 14, 2008 which yielded no useful information.  It contains the scores for three neuropsychological tests which show average, low average, or borderline classification on various subtests. SHR 275-76.  Dr. Price's interview notes indicate Storey had been depressed in the past, had no physical ailments, no overnight hospital stays, a head injury from a car wreck at age ten, no criminal history except one attempted burglary as a juvenile, had smoked a pack of cigarettes a day before jail, did not regularly drink alcohol, never used illegal drugs, never received psychiatric treatment, graduated with a 2.7 grade point average, had difficulty in math and repeated the ninth grade, but was never in special education.  SHR 233-46.

*Affidavit of Co-Counsel Larry Moore:*  Moore's affidavit asserts that Moore has been Board Certified in criminal law since 1982, participated in a dozen death penalty trials, served on the Bar committee that formulated the Standards for Qualification of Attorneys for Appointment in Death Penalty cases, participated in drafting the State Bar Standards for Representation in Death Penalty cases, and has testified as an expert on criminal law and procedure.  He and Mr. Ray discussed the appointment of Dr. Price, who he had used before and was respected and frequently used by the District Attorney.  As a neuropsychologist, Dr. Price could do the testing necessary to uncover organic brain injuries or cognitive disabilities.  They decided against further personality testing and testing geared

11

toward the future dangerousness question because Dr. Price felt Storey would score fairly high on future dangerousness testing and probably meet the criteria for anti-social personality disorder. Counsel believed that Dr. Price could not provide helpful testimony on punishment which would not be "greatly overshadowed" by the possible harm on cross-examination or through the evaluation and testimony of a State's expert. Because of this, counsel asked Dr. Price to create a short report for inclusion in his case file.

Counsel described the defense team's mitigation investigation and said they were aware of Storey's mother's shortcomings as a parent. Counsel said that much of the information that Storey provided to Dr. Fallis was incomplete, incorrect, or otherwise inconsistent with what trial counsel knew. Because of the problems with calling Dr. Price, counsel developed some of the future dangerousness issue through lay witnesses, but counsel did not believe the information regarding depression and obesity were compelling enough to spare Storey's life. They believed the best approach was to focus on Storey's positive attributes, and their biggest concern was Storey's lack of significant remorse, which was documented in his recorded statements to the police. SHR 261-264.

*State Habeas Ruling:* On December 8, 2010, the convicting trial court entered an order pursuant to article 11.071, section 8(a) of the Texas Code of Criminal Procedure, finding that there "are no controverted, previously unresolved factual issues material to the legality of Applicant's confinement" and that "Applicant's complaints may be resolved on the basis of the present record in this cause." SHR 279. The habeas judge, who presided over Storey's trial, issued findings of fact and conclusions of law recommending the denial of relief on April 29, 2011. SHR 348, 383, 387.

Among other things, the state court discounted Storey's argument that his low intelligence mitigated the offense given the facts, and it found that counsel had strategic reasons for down-playing

12

Storey's level of intellectual functioning and for not introducing evidence that Storey "does not fit the criteria for Antisocial Personality Disorder." SHR 358-59, 361. The state court found counsel's investigation and strategy regarding Storey's lack of violent history fell within the objective standard of reasonableness, especially given his criminal behavior that was unknown to the State. SHR 359, 360-62. The court determined that Storey failed to establish that the investigation supporting counsel's decisions was unreasonable and also found that trial counsel had good reason to believe that they had thoroughly and appropriately investigated Storey's case and that further investigation would have been a waste of time and resources. SHR 366. The court reweighed the aggravating evidence against the totality of the available mitigating evidence and concluded that Storey failed to show a reasonable probability that, but for counsel's alleged errors, the result of the proceeding would have been different. SHR 377-79.

      3. <u>Federal Habeas Proceedings</u>

      This Court authorized federal counsel to retain Dr. Fallis again. Her 2012 report, attached to the petition, is an amended version of her 2010 report. After a side-by-side comparison of the two reports, it appears to the Court that the 2012 report contains additional results from the following psychological tests: Wechsler Adult Intelligence Scale-IV (WAIS-IV) (on which Storey scored an 83), Wide Range Achievement Test (WRAT-IV), Validity Indicator Profile (VIP), and Gudjonsson Suggestibility Scale (GSS1). The 2012 report also includes an appendix listing the documents Dr. Fallis reviewed in 2010 but did not identify in the earlier report. *Petition Exhibit 1*. The juror affidavit that was stricken by the state court was also filed with Storey's petition. *Petition Exhibit 3*. With his Reply, Storey filed a third affidavit from Dr. Fallis in which she responds to arguments in the summary judgment motion. *Reply Exhibit A*.

13

## C.  Analysis

The Court may reach the merits of the ineffective-assistance claim only if the state court's decision was contrary to or involved an unreasonable application of the already deferential *Strickland* standard.  *See* § 2254(d).  Storey makes multiple arguments respecting the state court decision, and the Court will address them in turn.

1.     Alleged Error in the State Habeas Procedure

Storey argues that the state court decision was unreasonable because the court concluded that there was no "controverted, previously unresolved factual issue material to the legality of [his] confinement" and refused to hold a live hearing.  Storey asserts that state habeas counsel identified unresolved, material fact issues in the conclusions reached by Dr. Price and Dr. Fallis.  He also contends that the affidavits of trial counsel filed by the State were "mere proffers," have no status as evidence under Texas law, and could not be considered by the state court because they were not refiled pursuant to a court order *after* a finding of unresolved material fact issues.  *Petition* at 33-36. .

The state court's "no-hearing" order of December 8, 2010 explicitly states that the court considered the "exhibits submitted by the parties" in its determination to deny a hearing.  SHR 279.  Other than his own interpretation of how the Texas statute should operate, Storey provides no authority for the contention that the state court could not consider counsel's affidavits attached to the State's answer unless and until the procedure for an evidentiary hearing was followed.  *Petition* at 33-37.  The statutory text does not prohibit it.  *See* Tex. Code Crim. Proc. Ann. art. 11.071, §§ 8, 9 (West 2009).[7]  Irrespective of whether the affidavits were properly considered under Texas law, however,

---

[7] The pertinent part of Section 8 provides:

(a) not later than the 20th day after the last date the state answers the application, the convicting

14

alleged violations of state law in the state habeas proceedings do not furnish a basis for federal habeas corpus relief.  *See Green v. Johnson*, 160 F.3d 1029, 1035 (5th Cir. 1998).  Moreover, this circuit has repeatedly held that a paper hearing is sufficient to afford a petitioner "a full and fair hearing on the factual issues underlying his claims, especially where as here, the trial court and the state habeas court were one and the same."  *Murphy v. Johnson*, 205 F.3d 809, 816 (5th Cir. 2000).

    2.    <u>Challenges to Individual Findings and Conclusions</u>

To exemplify how the state court was unreasonable in its adjudication of his claim, Storey asserts that certain individual findings and conclusions are at odds with evidence in his favor or are "illogical," "non-sensical," "irrational," or a "complete non sequitur."  To the extent these argumentative

---

court shall determine whether controverted, previously unresolved factual issues material to the legality of the applicant's confinement exist and shall issue a written order of the determination.

(b) If the convicting court determines that the issues do not exist, the parties shall file proposed findings of fact and conclusion of law for the court to consider on or before a date set by the court that is not later than the 30th day after the date the order is issued.

(c) After argument of counsel, if requested by the court, the convicting court shall make appropriate written findings of fact and conclusion of law not later than the 15th day after the date the parties filed proposed findings or not later than the 45th day after the date the court's determination is made under Subsection (a), whichever occurs first.

Section 9 provides, in pertinent part:

(a) If the convicting court determines that controverted, previously unresolved factual issues material to the legality of the applicant's confinement exist, the court shall enter an order, not later than the 20th day after the last date the state answers the application, designating the issues of fact to be resolved and the manner in which the issues shall be resolved.  To resolve the issues, the court may require affidavits, depositions, interrogatories, and evidentiary hearings and may use personal recollection.

(b) The convicting court shall hold the evidentiary hearing not later than the 30th day after the date on which the court enters the order designating issues under Subsection (a).  The convicting court may grant a motion to postpone the hearing, but not for more than 30 days, and only if the court states, on the record, good cause for delay.

contentions fail to discuss substantive law and simply reassert facts in Storey's favor, they do not satisfy the standard in § 2254(d) to show an unreasonable determination of facts or law. *See Petition* at 38 (Findings 24, 25, 30); *Reply* at 9-16 (Findings 9, 10, 11,  12-14, 15, 16, 21, 24, 30, 34, 46). Storey's additional contention that trial counsel's affidavits had to be corroborated by an affidavit from Dr. Price is not supported by Supreme Court precedent.  And the arguments based on Dr. Fallis's 2012 affidavit contravene *Pinholster,* which holds that review under § 2254(d) is limited to the record that was before the state court that adjudicated the claim on the merits. *See Pinholster*, 131 S. Ct. at 1398.[8]  Finally, Storey's disagreement with the individual findings and conclusions are subsumed in large part by the substantive *Strickland* analysis below.

The Court will not further parse the individual findings here because, for the reasons stated both here and below,  they did not result in an unreasonable state court decision.  In this Circuit, federal habeas courts focus on the propriety of the ultimate decision reached by the state court and do not evaluate the quality, or lack thereof, of its supporting written opinion. *See Maldonado v. Thaler*, 625 F.3d 229, 239 (5th Cir. 2010) (citing *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002)) (holding that a  federal habeas court reviews "only a state court's 'decision and not the written opinion explaining that decision"); *Morrow v. Dretke,* 367 F.3d 309, 314 (5th Cir. 2010) (citing *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001)) (holding that it is the state court's ultimate decision that is tested, not every jot of its reasoning).

---

[8] In his Reply, Storey asserts that, while *Pinholster* limits scrutiny under § 2254(d) to the state court record, a federal court may consider new evidence under § 2254(e)(2) "when and if" the claim has satisfied an exception in § 2254(d). *Reply* at 17-18. Since the Court ultimately concludes that Storey has *not* cleared the litigation bar in § 2254(d), it need not address this argument.

3.     The Mental Health Investigation

The Court next addresses counsel's representation with respect to the mental health investigation. Storey asserts that trial counsel unreasonably curtailed Dr. Price's evaluation, thereby failing to discover (1) Storey's borderline intellectual functioning (2) the fact that Storey does not have antisocial personality disorder (ASPD) as Dr. Price believed, (3) that Storey presented a low risk of future dangerousness, which Dr. Price had been unwilling to say, and (4) Storey's history of depression. *Petition* at 11, 14.[9] To be clear, Storey does not dispute Dr. Price's qualifications or his obtained IQ score of 81, but only his conclusions that were unhelpful to the defense.[10]

Trial counsel's affidavit reflects that counsel hired Dr. Price to do "a complete and thorough psychological and neuropsychological evaluation of Mr. Storey, with an eye towards developing any information which could possibly be submitted before the jury as mitigating evidence." SHR 257. Trial counsel provided school records, medical records, employment records, juvenile services records, and jail records to Dr. Price. SHR 255-56. Counsel visited Dr. Price on different occasions to discuss Storey's records, his background, the results of neuropsychological testing, and the information that potential mitigating witnesses might provide. Dr. Price did not believe that Storey took the testing seriously, believed that Storey's depression was mostly "situational" rather than indicative of major depressive illness, and felt that Storey exaggerated his state of depression. SHR 257-59. Through Storey himself and other potential witnesses, counsel became aware of a number of violent or otherwise

---

[9] In his Reply, Storey states for the first time that trial counsel failed to investigate Storey's "tendency to follow rather than lead," which is based on Dr. Fallis's 2012 suggestibility testing. *Reply* at 3-4. This argument will not be addressed because, as previously noted, new evidence is not a basis for reviewing the earlier state court ruling under section 2254(d). *See Pinholster*, 131 S. Ct. at 1398.

[10] In fact, Dr. Fallis describes her obtained IQ score of 83 in 2012 as "consistent with" the 81 obtained by Dr. Price in 2008. *Exhibit 1*, p. 14.

serious offenses committed by Storey that were unknown to the State.  SHR 257, 260-61.  Counsel

and Dr. Price discussed Storey's prior criminal acts and whether Storey would constitute a future danger,

as this issue was of critical importance, and counsel believed Dr. Price's opinion could greatly impact

the prosecutor's assessment of the case.  SHR 257-58.  Dr. Price felt Storey would score fairly high

on any future dangerousness testing, however, and he believed that Storey probably met the criteria

for ASPD.  Consequently, counsel did not conduct the testing which could have resulted in these

diagnoses.  SHR 258.  Dr. Price found no indicia of impaired brain functioning, organic brain injury,

or disability resulting from prior trauma that would suggest the need for additional testing.  Dr. Price's

opinion that Storey fell into the "low average" range of intellectual functioning was based on intelligence

testing and his assessment of Storey's effort.  SHR 258-59.  In the end, counsel determined that Dr.

Price could not give any helpful testimony that would not be greatly overshadowed by the harm that

would be done on cross-examination or through the evaluation and rebuttal testimony of the State's

own expert.  SHR 259.

"The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]'

that, when made 'after thorough investigation of [the] law and facts,' is 'virtually unchallengeable'."

*Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014) (per curiam) (quoting *Strickland*, 466 U.S. at 690)).

When counsel recognizes the possible issues regarding a client's mental capacity and the need for

expert assistance and employs an expert at trial, counsel is not ineffective for failing to canvass the

field to find a more favorable expert.  *Dowthitt v. Johnson*, 230 F.3d 733, 748 (5th Cir. 2000), *abrogated*

*on other grounds*, *Lewis v. Thaler*, 701 F.3d 783, 791 (5th Cir. 2012).

The record supports the conclusion that counsel relied upon a qualified mental health expert

and conducted a reasonable investigation into Storey's background.  The state court could therefore

reasonably determine that counsel had an adequate basis to conclude that additional testing in support

of a mental health-based defense was not the best strategy.  *See Bell v. Thompson*, 545 U.S. 794, 810

(2005) (acknowledging that counsel's investigation and reliance on experts adequately supported the

chosen mitigation strategy to present evidence of defendant's good character and the capacity to adjust

to prison, rather than evidence of mental illness).  Counsel was not deficient for curtailing mental

health testing when counsel had reason to believe it would result in unhelpful diagnoses of ASPD

and future dangerousness, which Dr. Price thought likely.  *See Charles v. Stephens*, 736 F.3d 380,

391 (5th Cir. 2013) (holding that counsel is not ineffective for failing to obtain mental health records

whose mitigating nature "was not altogether clear," and where counsel had reason to believe they

would not be helpful or worse, harmful).

At the same time, counsel avoided subjecting Storey to a state-sponsored psychiatric examination

and prevented the possible disclosure of Storey's unknown prior criminal acts.  *See generally Yowell*

*v. Thaler*, 442 Fed. App'x 100, 102 n.1 (5th Cir. Sept. 12, 2011) (noting that trial counsel, who made

strategic decision not to present psychiatric expert testimony, had  stated, "Based on my experience

in the past, there's probably no way on God's green earth that we're going to do anything to allow

the State to examine our client with one of their own experts").  The trial court had already granted

the State's discovery motion to disclose the defense experts, 2 CR 250, and the State had also filed

a motion to conduct voir dire examination of any defense expert, directed to the underlying facts and

data upon which the opinion is based.  2 CR 257; Tex. R. Evid. 705(b).  The State had also filed a

motion to examine Storey in the event trial counsel chose to present psychiatric testimony.  2 CR 251.

While Storey argues that he would not have had to disclose the results of any psychological exam

to the State unless and until Dr. Price testified, this argument misses the point:  to demonstrate

19

*Strickland* prejudice, Storey must show that further psychological testing would have revealed information sufficient to alter the jury's verdict, which presumes Dr. Price (or some other expert) would have testified before the jury, thereby triggering the state-sponsored exam and risking potentially damaging rebuttal.

In short, the fact that state habeas counsel could obtain an expert opinion to conflict with Dr. Price's opinion does not make Dr. Price wrong or trial counsel ineffective.  *See Williams v. Cain*, 125 F.3d 269, 278 (5th Cir. 1997) (concluding counsel is not deficient in failing to locate an expert to testify that his client was retarded or mentally ill when initial expert concluded otherwise, especially when counsel knows of the state's ability to rebut any such evidence with its own experts).  Storey fails to show that the state habeas court unreasonably concluded that counsel was not deficient in his use of the mental health expert.

Assuming counsel was ineffective, however, Storey also fails to demonstrate that the state court's conclusion as to lack of prejudice was unreasonable.[11]  The Court begins with the observation that the use of expert testimony would have triggered a state-sponsored examination and could have resulted in a competing diagnosis by the state's expert (such as ASPD) and the exposure of Storey's criminal history that was known to Dr. Price.  With these associated risks in mind, the Court turns to Storey's argument that Dr. Fallis's psychological evaluation would have resulted in a life sentence.

---

[11] Relying on a juror's affidavit that was stricken by the state habeas court, Storey asserts he was prejudiced because Dr. Fallis's evaluation would have caused at least one juror to answer one of the special issues in his favor.  *Petition* at 13; *Exhibit 3*.  The Court does not give this affidavit any weight, as Storey fails to argue or demonstrate that the state court's decision to strike it was unreasonable under federal law. *See generally Salazar v. Dretke*, 419 F.3d 384, 399-400 (5th Cir. 2005) (stating that no Supreme Court precedent obligates a state court to admit testimony from jurors concerning their internal discussions during deliberations).

Storey's contention that a diagnosis of "borderline" intellectual functioning would have been hugely significant to the jury is not supported by the record. Such a diagnosis would have been weakened by the evidence of Storey's high adaptive functioning, particularly, his graduation from high school and obtaining a commercial driver's license, his extensive planning, execution, and attempt to cover up this capital murder, his decision to rob drug dealers because they do not call the police, and his performance during three extended police interviews which included blaming an innocent party. It would have come with the additional, contrary information in Dr. Fallis's report that Storey "loved learning," worked his first job at age fifteen but quit to "work on his grades," and was never in special education. SHR 108-10. The State could have also explored Storey's work history at the same Putt-Putt he later robbed, emphasized his ability to get multiple jobs through a temporary job placement service, and the fact that he was fired from only one. SHR 110. Evidence of low intellect can also be a double-edged sword in that it can demonstrate an inability to learn from mistakes. *See Penry v. Lynaugh*, 492 U.S. 302, 324 (1989) (recognizing that mental retardation is a "two-edged sword" that may indicate there is a probability the defendant will be dangerous in the future); *see also Vasquez v. Thaler*, 389 F. App'x 419, 429 (5th Cir. 2010) ("The Supreme Court has held that evidence of mental impairment can be both mitigating and aggravating"). Such evidence would have undermined counsel's chosen strategy to depict Storey as a potentially positive influence on other inmates with little risk of reoffending in prison.

Furthermore, Dr. Fallis's opinion regarding Storey's depression and lack of future dangerousness would have added little to the totality of the trial evidence. It was trial counsel's main argument, based on lay testimony, that Storey presented a low risk of future dangerousness. Counsel presented good-character evidence from friends and family and emphasized that, after two years of investigating, the

21

State could not present evidence of any criminal violence other than what Storey had willingly told the police.  Counsel was able to do this because the conflicting information Dr. Price knew about Storey's criminal and violent history was not provided to the State in an exchange of expert reports. The jury heard lay testimony of Storey's bouts with depression related to his grandmother's death and his inability to join the Navy because of his weight.  38 RR 263-65.  To the extent Storey now suggests that Dr. Farris could have provided additional evidence on these matters in the form of her expert opinion, it would simply be more of the same, and it would have come with the previously mentioned risks associated with expert testimony.  Courts must be "particularly wary of arguments that essentially come down to a matter of degrees," as these questions are "even less susceptible to judicial second-guessing." *Skinner v. Quarterman*, 576 F.3d 214, 220 (5th Cir. 2009) (quoting *Dowthitt*, 230 F.3d at 743).  The state court reasonably chose not to second-guess counsel's decision to present evidence of depression and lack of future dangerousness through lay testimony rather than an expert.

Finally, Dr. Farris's opinion regarding Storey's lack of ASPD does not undermine confidence in the jury's verdict because there was no evidence that he *did* have ASPD.  Trial counsel's strategy avoided this diagnosis, and testimony from an expert that Storey did *not* have ASPD would have simply opened the door to a state's expert arriving at the opposite conclusion.  Furthermore, Dr. Fallis's opinion would not have been unequivocally helpful.  While she did not diagnose Storey with ASPD, she did diagnose him with "adult antisocial *behavior.*"  A jury would not necessarily draw a distinction between the two, and this fact could have been readily explored on cross-examination.  SHR 116.  For these reasons, Storey does not demonstrate that the state court's ruling with respect to prejudice was unreasonable.

4.    The Mitigation Investigation

Storey also contends that trial counsel also overlooked evidence of his early exposure to substance abuse, violence in the home, and criminal behavior by adults in his life including "his mother, her poor choices of men, and their criminal activities." *Petition* at 13-14. These assertions are supported solely by Dr. Farris's report, based on information gleaned from her post-conviction interview with Storey and his mother. The Court first addresses the reasonableness of the state court's conclusion that counsel's investigation was not deficient.

As previously noted, counsel presented trial testimony from twelve friends and family members and a prison classification expert. The defense team interviewed "every teacher, coach, relative, neighbor, friend, employer, preacher, or other interested person" who had contact with Storey and would speak with them. SHR 260. Counsel named nine potential witnesses who could not be located or called for various reasons. SHR 272. Co-counsel personally interviewed twenty to twenty-five potential witnesses in addition to some of the State's witnesses, and the mitigation specialist contacted more people who were unwilling or unable to assist. A number of potential mitigation witnesses were aware of or actually involved with Story's commission of violent or otherwise serious extraneous offenses of which the State was unaware, or had learned information from Storey regarding the capital murder which was not helpful to the defense, or had prior convictions of their own. SHR 260-61. Defense counsel stated they were aware of Storey's mother's shortcomings as a parent (evidenced by the fact that she refused to help them convince Storey to take the State's offer of a life sentence), but many of their lay witnesses, and Storey himself, strongly believed otherwise about her. SHR 262. The trial testimony bears this out. 38 RR 152-53, 175, 184. Counsel also stated that the information provided to Dr. Fallis regarding Storey's "involvement in the commission of crimes; the age at which

23

he began committing crimes; his prior assaultive behavior; his drug usage and sale of drugs; his

association with gang members; his history of depression; his ability to hold a job; and even the reasons

that he was unable to get a job as a truck driver after his graduation from truck-driving school" was

incomplete, incorrect, exaggerated, embellished, or "otherwise inconsistent with what was known"

to trial counsel. SHR 264. Dr. Price's interview notes, for example, show that Storey denied having

a history of illegal drug use, while Storey told Dr. Fallis that he began using marijuana at age fourteen

and selling it at seventeen. SHR 94, 239. Trial counsel further stated they presented lay witnesses'

testimony regarding Storey's depression and obesity, but they could not use Dr. Price for the reasons

discussed above. SHR 261. They also believed that such evidence did not present a compelling reason

for the jury to spare Storey's life, their biggest hurdle being Storey's recorded police statements

demonstrating a lack of any significant remorse.[12] SHR 261-62. Counsel therefore focused on Storey's

positive attributes and lay testimony regarding the future dangerousness issue. SHR 262.

The Court first observes that evidence of a difficult childhood, exposure to violence and crime,

and early drug use can have a negative impact if the jurors believe it demonstrates a defendant's inability

to change his ways. *See Rector v. Johnson*, 120 F.3d 551, 564 (5th Cir. 1997) (noting that tactical

decision not to present evidence of alleged child abuse, family instability, poor educational background,

low IQ, gunshot injuries, and that his mother was chronically mentally ill, is objectively reasonable

and not deficient performance because the jury might very well consider it aggravating). This is

---

[12] In his third police statement, Storey complained, "I'm not even built for jail. Let alone the penitentiary," and there's "not a lick of sunlight." He also expressed concern about whether the police had contacted the man he had falsely accused of the murder. 40 RR (part 2) 90, 101, 104. Later, Storey lamented, "I just wish I would've had a chance to tell a lot of people goodbye," apparently oblivious to the murder victim's same fate. 40 RR (part 2) 105.

especially true where, as here, counsel's main strategy was to present Storey as a potential force for good with a low risk of future dangerousness in prison.

Second, generally speaking, complaints of uncalled witnesses are not favored in federal habeas corpus review because the presentation of testimonial evidence is a matter of trial strategy and allegations of what a witness would have stated are largely speculative. *See Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010); *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985). To prevail on this type of claim, the petitioner must name the witness, demonstrate that he was available to testify and would have done so, set out the content of the proposed testimony, and show that the testimony would have been favorable to a particular defense. *Id*. This showing is required for claims regarding uncalled lay and expert witnesses alike. *See, e.g., Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002).

Storey does not name one overlooked witness who would have testified about his substance abuse, violence in his home, or the criminal behavior by the adults in his life, including his mother and her poor choices of men. Storey's mother testified at his trial, and he does not allege that counsel should have advised him to testify. Having failed to name one overlooked witness, the state court reasonably rejected the assertion that counsel's mitigation investigation was deficient in this regard. To the extent Storey may be claiming that Dr. Farris could have testified to these facts, perhaps as the basis for her expert opinions, her affidavit does not address her willingness or availability to testify. And, in any event, her testimony would have come with risks, and the reasonableness of counsel's strategy to avoid an expert-based defense has already been addressed.

Storey relatedly complains that the state court implicitly assumed he was not credible when it observed that there was no newly discovered evidence "from any source or witness except the

25

Applicant himself." *Reply* at 14-15.  He asserts that, if his credibility was in issue, the state court should have followed state procedural law before making that determination. The record supports this particular finding, however, because of the two people interviewed by Dr. Farris, only Storey could be considered "new," given that his mother testified.  Moreover, the state court did not necessarily find that Storey lacked credibility.  It could have assumed Dr. Farris's report was based on the truth, and nevertheless found it insufficient to overcome the *Strickland* presumption because it does not identify an overlooked witness and because of the extent of counsel's investigation that is evident in the record.  This is especially true given that state habeas counsel apparently chose not to submit what is arguably the best evidence of trial counsel's investigation, the psychosocial history report prepared by their mitigation investigator.  *See* SHR 252, 255.  For the foregoing reasons, the state court's conclusion that Storey did not overcome the presumption of a constitutionally adequate representation regarding the mitigation investigation was not unreasonable.

The state court record also does not undermine the state court's decision as to the lack of *Strickland* prejudice on this aspect of the claim.  A review of the trial testimony shows that additional information related to Storey's drug use, violence in the home, and his mother's poorly chosen relationships would have been mildly mitigating, if at all.  The jury heard Storey's father testify that Storey's mother had turned Storey against him, so he ended all contact when Storey was about three years old.  38 RR 163.  Storey's mother testified that Storey would see his father on the street, and his father would look away.  38 RR 259-61. Since that time, the father had received one letter from Storey, which was sent from jail after his arrest, and he responded to it.  38 RR 164-65.  Storey's father was "not real proud" of the situation, but Storey's mother had called and asked him if Storey could write to him, and he said yes. 38 RR 165.  Storey's mother testified that she left Storey's father

because he was abusive to her after Storey was born.  38 RR 259-60.  It was extremely painful for Storey not to have a relationship with his father, especially when he learned that his father had maintained a relationship with Storey's older half-sister.  38 RR 262.  Storey's mother also said that Storey's uncles were not a positive influence for Storey.  38 RR 271.

The jury heard that Storey's mother did not marry either of her son's fathers. 38 RR 164, 261-62. Beginning when Storey was six years' old, she dated Charles Holmes, who was ten years younger than her.  38 RR 189-191.  Holmes continued to have a close relationship with Storey at the time of trial.  Holmes testified that he "got along great" and bonded with Storey because they both had no relationship with their biological fathers. 38 RR 190-91. The jury heard that, even after the relationship with Storey's mother ended, Holmes continued to see Storey and helped him enroll in truck-driving school.  38 RR 192-93, 266.  Holmes said he was proud of Storey and loved him.  38 RR 193-95. He testified that Storey is not a gangster or a street kid, but made "a very bad decision," and he told the jury, "I just never wanted this for him." 38 RR 195-96.  Holmes's mother also testified as a character witness and described Storey as an average teenager and a good guy, a "mama's baby," in fact, and "clingy to Charles."  38 RR 182.

The jury also received testimony from Storey's half-brother, Larry Jr., that he and Storey had problems with Uriel Grant, whom their mother married when Storey was twenty-one, and that their home life became a little more difficult.  38 RR 257-58.  Storey's mother elaborated that her sons were hurt by Mr. Grant's failure to spend time with them after Grant's son moved into the household. 38 RR 266-67.  Counsel also presented evidence that Storey's teachers had never met Storey's mother, and that she never showed up at parent/teacher meetings or open house.  38 RR 215-16, 231.

By comparison, Storey reported to Dr. Farris that his mother was loving and caring, always provided for her children and had a good heart, but "whupped" their "butts" when they did something wrong. She sometimes got into physical fights with women. She had Lupus but did not seem sick. She dated younger men, including one she met at the jail when Storey was arrested, who dressed like a gang member. According to Dr. Farris, Storey's mother did not properly supervise Storey when she was at work and was too focused on herself to notice his involvement with marijuana, "much less help him eat appropriately." SHR 104-05. Storey told Dr. Farris he had no significant relationship with his biological father, and no memory of his father abusing his mother or abusing alcohol; he denied his father was abusive to him and said he did not know his father's legal history. SHR 105-06. Dr. Farris's report suggests that Storey's mother was still involved with Holmes when she got involved with Larry Sr., and that Storey was "okay" with Larry Sr., who was "like a father to us." Storey thought his mother "messed around" on Larry Sr.; Larry Sr. was not physically abusive, although his mother hit him. Storey said he had called the police three or four times when his mother hit Larry Sr. and that Larry Sr. abused alcohol and crack cocaine and was jailed for "public intoxication, traffic tickets, and possession of drugs" after the relationship with Storey's mother ended. Although Dr. Farris notes that "some of these offenses occurred before the relationship with Mr. Storey's mother ended," there is no source cited for this assertion. Storey reported that his mother quarreled with her next live-in boyfriend, Jimmy. Jimmy did not abuse anyone or use drugs but he sold drugs and was arrested for possession. When Storey was in his twenties, his mother married Grant, who caused a lot of conflict when he brought his undisciplined son into the home, although Storey denied domestic violence in this relationship as well. SHR 106-07. Child Protective Services was never involved in the home, and Storey denied having many of the symptoms of childhood maladjustment, like running away from

home, wetting the bed, being cruel to animals, firesetting, gambling, and sexual abuse, either as a victim or perpetrator.  SHR 108.

Storey reported to Dr. Farris that he used marijuana twice weekly at the age of fourteen and decreased its use over time until he stopped at the age of eighteen, four years before he committed this capital murder.  SHR 111.  While Storey had difficulty managing his anger in elementary school, he took the time to think and weigh his options in high school because he did not want to get into trouble.  He "loved learning," and was never in special education classes, although he was held back in ninth grade due to having an after-school job.  SHR 108-09.  He graduated high school because he knew he needed the diploma for a good job.  SHR 109.  Storey had held various jobs but nevertheless resorted to illegal means of obtaining money in the eleventh grade, such as breaking into vehicles and houses and stealing from stores.  He continued a pattern of theft while in truck-driving school and robbed drug dealers with his capital murder co-defendant, Mark Porter, on two to four occasions. Dr. Farris concluded, "As a result of choosing to rob criminals, Mr. Storey was never arrested prior to the murder case."  Storey also described himself as a loner who liked to run the streets and spent a lot of time in an area infamous for gang activity.  SHR 110-11.

Thus, the jury heard significant information about the unfortunate circumstances of Storey's birth and absentee father, as well as his mother's relationships with four men: Storey's biological father, Larry Sr., Charles Holmes, and Uriel Grant.  The additional alcohol- and drug-related criminal behavior of Larry Sr. (much of which occurred after the relationship ended) and of Jimmy (which is general and vague) does not rise to the level of undermining confidence in the verdict.  As discussed below, the capital murder was not alcohol- or drug-related.  Other than witnessing his mother hit Larry Sr. on several occasions, there is no indication in Dr. Farris's report that his mother's choice of partners

subjected Storey to physical or sexual abuse, poverty, or violence in the home. Storey, by all accounts, did not suffer from maladjustment except perhaps through depression and obesity, which the jury already knew about. Evidence regarding Storey's childhood exposure to drug use or drug sales also could have undermined counsel's strategy to depict Storey as a good guy who could avoid criminal behavior in the future. And to the extent such evidence could provide an acceptable excuse for Storey's criminal choices, it would be diminished by the testimony of Holmes, who loved Storey, helped him plan for his future, and supported him through his formative years into adulthood.

Evidence of Storey's own minimal use of marijuana would have had little mitigating impact with the jury because it ended four years before the capital murder and had no connection to the crime. Also, it could have been the subject of damaging cross-examination by the prosecution who, even without the evidence, argued to the jury, "This is Paul David Storey, stone cold sober." SHR 197-98; 39 RR 10. Dr. Farris's report would have also allowed the jury to hear evidence that Storey not only used but sold drugs and that (contrary to Holmes's testimony) he did "run the streets" in gang areas, and despite being able to work, resorted to illegal means of obtaining money with his co-defendant Porter in eleventh grade. This testimony would have undoubtedly undermined trial counsel's attempt to portray Storey as a good person who made one mistake because Porter led him astray. In short, the state court could have reasonably decided that the jury would be unimpressed with an attempt to further humanize Storey on account of the circumstances in Dr. Fallis's report. *Cf. Wiggins v. Smith*, 539 U.S. 510, 535 (2003) (reciting "powerful" overlooked mitigation evidence of severe privation and abuse while in care of an alcoholic, absentee mother; physical torment, sexual molestation, and repeated rape while in foster care; periods of homelessness; and diminished mental capacities).

### D. Conclusion

This is not a case where counsel failed to pursue reasonable leads or ignored significantly mitigating evidence. Trial counsel chose to focus on Storey's lack of future dangerousness with lay testimony (including his mother's) and to present Storey as a good guy who made a mistake by following his co-defendant into crime after several bouts of depression about his life's circumstances. The state court could reasonably conclude that this strategy was based on a thorough background investigation, an evaluation by a qualified neuropsychologist, and the fact that Storey had no criminal convictions or prior acts of violence known to the State. Such strategic decisions are "virtually unchallengeable." *Strickland*, 466 U.S. at 690.

Using a new expert who based her opinions on post-conviction interviews with Storey and his mother, Storey argues that trial counsel should have presented expert mental health testimony and additional evidence of what can be summarized as Storey's sub-optimal upbringing. This evidence was largely cumulative of the trial evidence, however, and Storey does not identify an overlooked witness who would have testified. The non-cumulative evidence was not supported by the trial expert's opinion, it would have brought significant risks associated with the use of expert testimony, and it would have conflicted with counsel's strategy to show Storey could be a force for good in prison. The Court also weighs all of the mitigating evidence in its totality against the aggravating evidence, including: (1) Storey and his co-defendant drafted a written plan, (2) Storey drove to the location under the pretense of having car trouble and with his hood up to avoid security cameras, (3) they lay in wait for Cherry to arrive at work and Storey caught the door after Cherry entered the building, (4) Storey directed Cherry into the office with a gun to the back of his head, telling him, "You know what we want," (5) Storey shot the cooperative victim four times after he begged for his life, (5) Storey

blamed an innocent man for the crime, (6) Storey expressed remorse for only himself, and (7) even though Storey was employable as a truck driver, he chose to rob drug dealers because they could not call the police.  In doing so, the Court concludes that the state court could reasonably determine that the totality of the mitigating evidence did not undermine confidence in the verdict.  *Cf. Wiggins*, 539 U.S. at 534.  Accordingly, Storey has not demonstrated that it was necessarily unreasonable for the CCA to conclude (1) that he did not overcome the strong presumption of counsel's competence and (2) that he failed to undermine confidence in the jury's sentence of death.  This Court may not grant habeas relief on claim 1.  § 2254(d).

### IV.  *BATSON* CLAIM (CLAIM 2)

Storey argues that the State struck an African American veniremember in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986), and that the trial court erroneously overruled his *Batson* objection. Because this claim was adjudicated on the merits in the direct appeal in state court, the AEDPA deferential standard of review applies.

When a defendant makes a *Batson* challenge to a peremptory strike, the trial court must first determine whether the defendant has made a *prima facie* showing that the prosecutor exercised a peremptory challenge on the basis of race.  *Batson*, 476 U.S. at 96-97.  If the showing is made, the burden shifts to the prosecutor to present a  race-neutral explanation for the strike, after which the court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Id.* at 97-98. This final step involves evaluating "the persuasiveness of the justification" proffered by the prosecutor, but "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Rice v. Collins*, 546 U.S. 333, 338 (2005) (citing *Purkett v. Elem*, 514 U.S. 765, 768 (1995)(per curiam)).

## A.  Factual Background

The CCA opinion on appeal provides a detailed summary of the voir dire examination of veniremember number 50, the parties' arguments, and the trial court's reasoning and ruling.  *Storey*, 2010 WL 3901416, *8-24.  The following is an abbreviated version of those facts.

During questioning by the prosecution, veniremember number 50 indicated that he had served on a jury several times but did not reach a verdict.  He also said that the most serious cases he had served on were "tickets and stuff like that" and denied serving on anything like a "murder or aggravated robbery or anything like that."  18 RR 24-26.  Later, when the prosecutor questioned whether he could keep an open mind about answering the mitigation special issue, the veniremember stated, "It has a lot to do with–if the person, to me, is going to go out and do all this over again . . . ."  18 RR 71.  Further discussion ensued about whether the venireman would require the State to prove that Storey would kill again before assessing a death sentence. 18 RR 71-73.  The venireman tried to clarify his view:

> I mean, if he's proved that–you can prove that he's done the deed and he's guilty of it, I can find him guilty, you know. . . . Give him a life sentence.  Now if he's a real bad character to the point where he's rabid and he's going to hurt even the prison population, you know, there's no point–you already convicted him.  All you can do is give him life, okay, sentence.  He gets in there, he decides, I'm already here, might as well kill a few people while I'm here, hey just go ahead and give him the death penalty and be done with it.

18 RR 74-75.  The prosecutor replied, "Just so I–I mean are you saying that you want me to show you that he'd kill again?"  The venireman said,

> No, no, no, . . . his behavior up to this point will tell you that, you know. . . . [I]f he's likely to hurt people outside for just a few dollars, and he has no, you know, conscience, no repentance over that, then you put him into a prison system and he's going to take out a guard, regardless.

33

18 RR 75.  The prosecutor again sought clarification, saying, "You used the–take out a guard or–or

kill again in prison," and asked how "someone could prove that to you."  18 RR 76.  Defense counsel

objected to this inquiry, however, and the objection was sustained.  18 RR 76-77.  This final exchange

then occurred,

> [VENIREMAN]:  [I]f he's–his behavior is so bad that if he's in the penal system that
> he's likely to hurt someone else, you know why are you going to put him into a situation
> where he's going to go and hurt someone else in the penal system?  You know what
> I mean?
>
> [PROSECUTOR]: Well, and you said, "hurt someone else."  Okay?
>
> [VENIREMAN]: As far as taking a life.
>
> [PROSECUTOR]: Taking another life?
>
> [VENIREMAN]: Yeah.
>
> [PROSECUTOR]: Okay.

18 RR 78.  The prosecutor then confirmed the venireman's address and date of birth before his allotted

time for questioning expired.  18 RR 79.

The prosecution challenged the venireman for cause because they believed he would increase

the State's burden of proof on the future dangerousness issue by requiring the State to prove that Storey

would murder again.  18 RR 111.  The trial court denied the challenge, and the prosecutor exercised

a peremptory strike, to which defense counsel lodged a *Baton* objection. In response, the prosecution

initially noted that the venireman was the first African-American struck by the State; a second African-

American had been seated on the jury and a third one had been disqualified. 18 RR 113.  The

prosecution then provided four reasons for the strike:  First, they believed he would require the State

to prove that Storey would commit a future homicide in prison before assessing a death sentence and

Storey had "limited bad behavior, if any," while incarcerated.  18 RR 113-14, 121.  Second, his questionnaire exhibited a general distrust of the justice system, as he believed a person could beat a case if they had enough money.  18 RR 114-15, 121-22.  Third, Storey ranked "punishment" last as a primary goal of the justice system, and the ideal juror for the State would rank punishment first. 18 RR 115.  Fourth, the prosecution possessed information that a person of the exact same name, address, and birthdate had served on a previous jury that had acquitted an aggravated robbery defendant, and said they would never place such an individual on a jury in a felony case.  The prosecution was bothered by the fact that the venireman failed to mention the aggravated robbery trial when he was asked about his prior jury service.  18 RR 115-16, 122.

Defense counsel was given the opportunity to cross-examination the prosecutors about their reasoning.  After hearing further argument, the trial court denied the *Batson* objection saying, "I didn't think he disqualified himself, but he–he obviously said some things that the State would be very concerned with."  18 RR 123-26.

On appeal, the CCA first noted that all four reasons offered by the prosecution were race-neutral and that the case presented precisely the circumstances where a peremptory strike is appropriate: the prospective juror is not challengeable for cause but the prosecution does not believe he will make a favorable juror for the State.  *Storey*, 2010 WL 3901416 at *23.  The CCA concluded that the trial court's ruling was not clearly erroneous because (1) the venireman gave the impression that he would not answer the special issues in support of a death sentence unless he was persuaded that Storey was likely to kill in prison, and (2) Storey's written questionnaire expressed the opinion that a defendant's ability to obtain a favorable result depended on his ability to afford a good lawyer.  *Id.*  The CCA's *Batson* discussion did not specifically discuss the venireman's prior jury service and did not rely on

35

the third reason given by the prosecution (ranking punishment as the least important goal of the justice system) because the prosecution did not strike four other prospective jurors who gave a similar ranking. Nevertheless, the CCA noted that because there were other sufficient race-neutral reasons for the strike, the fact that there were other acceptable jurors who possessed this attribute was not sufficient to establish disparate treatment among minority and non-minority jurors.  *Id.*

## B.  Analysis

Under AEDPA standards, this Court can only grant relief if it was unreasonable to credit the prosecution's race-neutral explanations for the *Batson* challenge.  *Rice*, 546 U.S. at 338.  Storey argues that the trial court inherently found that the prosecution lacked credibility when it denied the State's challenge for cause and that, therefore, it could not reasonably accept what the prosecution said for purposes of the *Batson* objection.

The Court does not agree that the trial court necessarily found the prosecutor "lacked credibility" when it overruled the challenge for cause; it simply disagreed with prosecutor about the legal significance of the venireman's testimony.  As the trial court explained:  "I didn't think he disqualified himself, but *he–he obviously said some things that the State would be very concerned with*."  18 RR 126 (emphasis added).   It goes without saying that challenges for cause and peremptory strikes are governed by different legal standards.  The former requires evidence that the juror is incapable or unfit to serve, while a peremptory strike may be made without any assigned reason.  *See* Tex. Code Crim. Proc. Ann. arts. 35.14 and 35.16 (West 2005).  Storey implies that a trial court could never reject a State's argument for cause and then accept the same rationale to justify a peremptory strike. He cites no clearly established federal law for this position, it is not supported by the facts in the record, and it is at odds with the long-held rule that the evaluation of the prosecutor's credibility in *Batson*

36

matters lies "peculiarly within a trial judge's province." *Hernandez v. New York*, 500 U.S. 352, 365 (1991) (plurality op.) (citing *Wainwright v. Witt*, 469 U.S. 412 (1985)).  While Storey categorizes the prosecution's "bogus" attempt at a challenge for cause as a red flag for race discrimination, it is more reasonable to conclude on this record that the State was simply trying to avoid using one of its limited peremptory strikes on a juror who was arguably subject to challenge for cause.  This is a common strategy used by both sides during jury selection and, as the CCA observed, the exact circumstance in which a peremptory strike is appropriate.

Storey also argues that the justifications are all pretexts for race discrimination because the State did not address them during voir dire examination. *Petition* at 44-45.  Citing *Snyder v. Louisiana*, 128 S. Ct. 1203 (2008), Storey argues that state court's ruling was unreasonable because the prosecutors could have and should have asked questions about these issues, as the answers could have theoretically quelled  the State's concerns about the venireman.  Because the prosecution did not, he concludes the only reasonable inference that can be drawn is that the prosecutor's reasons were a pretext for race discrimination.  *Petition* at 46-47; *Reply* at 22.

In *Synder*, the Supreme Court concluded that the prosecutor's explanation was a pretext for race discrimination not because he simply failed to question a venireman, but because the prosecutor's reason (his concern about the venireman's teaching responsibilities) conflicted with the report of a law clerk who was ordered to independently inquire with the university about the venireman's teaching obligations.  *Snyder*, 552 U.S. at 479-81.  The prosecutor's failure to further question the venireman regarding any lingering concern over his teaching obligations was suspicious because there was no suggestion that the venireman remained troubled after hearing the report of the law clerk who had called the university.  *Id*. at 482-83.  Thus, *Snyder* stands for the notion that, where there is evidence

conflicting with the prosecutor's asserted reason (that is, evidence of pretext), the prosecutor's failure to further question the venireman can be indicative of race discrimination.

The State questioned venireman number 50 about his definition of future dangerousness "ad nauseam," as Storey puts it. *Petition* at 46. As the prosecutor stated during the *Batson* hearing, the venireman indicated on his questionnaire that the best argument in favor of the death penalty was "mass murderers" and that a future threat to society would be satisfied by "the probability of multiple homicides." 18 RR 114. At the beginning of voir dire examination, the venireman affirmed his questionnaire answers under oath as true and correct. 18 RR 19. The prosecutor then questioned him at length about whether he would require the State to prove Storey would kill again. At times he denied he would put the State to such proof (18 RR 63, 74-75), but he also said some things that suggested he would. (18 RR 71, 73, 77-78). The record does not support Storey's assertion that the prosecution failed to properly question the venireman about this issue (reason 1).

With respect to the venireman's jury service record (reason 4), the record again shows adequate questioning, and documentary evidence conflicts with the venireman's position, not the prosecutor's. The prosecutor attempted to elicit information about his prior service in a robbery case, to no avail. 18 RR 245-26. The venireman could not recall if he had served on anything more serious than tickets. 18 RR 26. The prosecutor asked for the venireman's address and birth date, which he later used to confirm conflicting information in the state's possession. 18 RR 26, 79, 116. The state provided documentation showing that the venireman had, in fact, been seated as a juror in 1994. 18 RR 116, 120-21, 122; 30 RR 25; 40 RR (part 2) 136 (SX 12A ). Thus, the record does not support Storey's assertion that the prosecution failed to properly explore this issue during voir dire examination.

Venireman number 50's distrust of the justice system (reason 2) is also supported by his questionnaire answers, which he affirmed under oath as true and correct. 18 RR 125. The prosecution said it agreed to strike venireman 53 because he likewise believed the system was corrupt. 18 RR 18, 122. Storey does not allege disparate treatment of a similarly situated juror or point to any other fact demonstrating that prosecutor used the reason as a pretext. Rather, his position is that the prosecutor should have cross-examined the venireman about his questionnaire in an effort to quell his own concern that he would be a bad state's juror. See *Petition* at 47. *Snyder* does not require this. Of course, the defense was free to question and rehabilitate the venireman about anything in his questionnaire that the State might use to strike him. But Storey provides no authority that the State itself must attempt to rehabilitate an unfavorable juror before striking him. Once it provides a race neutral reason, it is the defendant who bears the "ultimate burden of persuasion regarding racial motivation." *See Rice*, 546 U.S. at 338. This record does not show an unreasonable application of *Snyder*.

With regard to the low ranking of punishment as a goal of the justice system (reason 3), the CCA found evidence in the record conflicting with the prosecutor's assertion; namely four other prospective jurors gave a similar low ranking but were not struck. Because of this, the CCA did not rely on this asserted reason in its opinion. *Storey*, 2010 WL 3901416 at *23 n.13. In doing so, the CCA acted in accordance with the principle in *Snyder*, not against it.

Storey has not shown that the state court was unreasonable for crediting the prosecutor's race-neutral explanations under *Batson*. This Court may not grant relief on claim 2. § 2254(d).

## V.  CONSTITUTIONALITY OF THE TEXAS DEATH PENALTY STATUTE (CLAIMS 3 & 4)

Storey's remaining claims challenge the constitutionality of the Texas death penalty statute. Under the Texas statute, a sentence of death is required for a convicted capital murder defendant if

39

the jury unanimously answers the following special punishment issues "yes," "yes," and "no," respectively:

> [Future dangerousness issue:]  Do you find from the evidence beyond a reasonable doubt that there is a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society?

> [Anti-parties issue:]  Do you find from the evidence beyond a reasonable doubt that the Defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken?

> [Mitigation issue:] Taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, do you find from the evidence that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed?

2 CR 421-22 (court's charge to jury); *see* Tex. Code Crim. Proc. Ann. art. 37.071, § 2 (West 1991).

The Court turns first to the challenges asserted with respect to the mitigation special issue.

### Claim 3a

The mitigation special issue fails to allocate to the State the burden of proving aggravating circumstances that are implicitly necessary to answer the issue in the State's favor, in violation of *Walton v. Arizona*, 497 U.S. 639 (1990). *(Petition* at 49-50).

### Claim 3b

The mitigation special issue created by the Texas Legislature in response to *Penry v. Lynaugh*, 492 U.S. 302 (1989) permits the open-ended, unfettered discretion previously condemned in *Furman v. Georgia*, 408 U.S. 238 (1972). (*Petition* at 50-51).

### Claim 3c

The mitigation special issue does not allow for meaningful appellate review because it does not specify the types of mitigating factors that are relevant to the issue and the appellate court has no way of knowing whether the jury considered constitutionally relevant mitigating evidence. (*Petition* at 51-53).

### Claim 3e

The statute fails to mandate the jury's consideration of all mitigation evidence as required by *Johnson v. Texas*, 509 U.S. 350 (1993). (*Petition* at 54).

**Claim 4**

The mitigation special issue fails to allocate to the State the burden of proving an absence of sufficient mitigating circumstances, in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), *Ring v. Arizona*, 536 U.S. 584 (2002), and *Cunningham v. California*, 549 U.S. 270 (2007) (*Petition* 56-67).

Respondent asserts that these claims were exhausted on direct appeal and that the state court ruling is not inconsistent with clearly established federal law, as determined by the Fifth Circuit. The Court agrees. *See Storey*, 2010 WL 3901416, *25; 1 CR 177 (pretrial motion no. 45). The claims listed above seek to change the existing law. *See Kansas v. Marsh*, 548 U.S. 163, 173 (2006) (holding that, even after *Walton*, a state death penalty statute may place on the defendant the burden of proving that mitigation circumstances outweigh aggravating circumstances); *Schriro v. Summerlin*, 542 U.S. 348, 354 (2004) (rejecting holding that *Ring* reshaped the state's capital murder law or modified the elements of the offense, and clarifying that *Ring* only required that certain aggravating facts, which the state made essential to the death penalty, be found by a jury); *Tuilaepa v. California*, 512 U.S. 967, 979-80 (1994) (recognizing that juries may be given unbridled discretion in determining whether to impose the death penalty once it is determined that the defendant is eligible to receive it); *Nelson v. Quarterman*, 472 F.3d 287, 294-95 (5th Cir. 2006) (summarizing case law requiring only that the jury not be precluded from considering evidence that has mitigating relevance and that sentencer determines the weight to be given to relevant mitigating evidence); *Hughes v. Dretke*, 412 F.3d 582, 594 (5th Cir. 2005) (agreeing that the "unfettered discretion" argument is entirely without merit and *Teague* barred, citing *Callins v. Collins*, 510 U.S. 1141 (1994)); *Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir. 2005) (holding that no Supreme Court or circuit precedent requires that the mitigation issue be assigned a burden of proof and that circuit precedent rejects the argument that it be subject to appellate review by the state); *Woods v. Cockrell*, 307 F.3d 353, 359-60 (5th Cir. 2002) (explaining

41

that Texas death penalty statute is not constitutionally obligated to provide appellate review of mitigation special issue because jury may be given unbridled discretion to consider mitigating factors); *see generally Penry v. Johnson*, 532 U.S. 782, 803 (2001) (referring to the mitigating special issue as a helpful frame of reference for a "clearly drafted catchall instruction."). Under the law as it currently exists, Storey fails to demonstrate that the state court unreasonably denied these claims. § 2254(d).

### Claim 3f
The definition of mitigating evidence as evidence that "a juror might regard as reducing the defendant's moral blameworthiness" is unconstitutionally narrow (*Petition* at 54-55).

This issue was also rejected on direct appeal. *Storey*, 2010 WL 3901416 at *25. Respondent asserts that the claim contradicts Fifth Circuit precedent and is *Teague*-barred because it would require the creation of a new constitutional rule of law. *See Teague v. Lane*, 489 U.S. 288, 306-07 (1989).

The Court has found no Supreme Court opinion that mandates a definition of mitigating evidence broader than the one provided by the Texas statute. *See* Tex. Code Crim. Proc. Ann. art. 37.071, § 2(f)(4); *accord Bartee v. Quarterman*, 574 F. Supp. 2d 624, 710 (W.D. Tex. 2008). Storey relies on *Skipper v. South Carolina*, which held that the sentencer "must not be precluded from considering as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for as sentence less than death." 476 U.S. 1, 4 (1986) (citing *Eddings v. Oklahoma*, 455 U.S. 104 (1982)). Storey argues that the Texas definition prevents the jury from considering evidence–such as positive character traits, kindness toward children and animals, and artistic talent–that may be constitutionally relevant but have nothing to do with a defendant's moral blameworthiness. The Fifth Circuit has rejected this argument, stressing that such "good character" evidence may be adequately considered under the future dangerousness special issue and that virtually *any* mitigating evidence is capable of being viewed as having some bearing on the

defendant's moral culpability. *Beazley v. Johnson*, 242 F.3d 248, 260 (5th Cir. 2001) (citing *Lockett v. Ohio*, 438 U.S. 586, 604 (1978)). The holding in *Beazley* has been reaffirmed in *Blue v. Thaler,* and several unpublished opinions. 665 F.3d 647, 666-67 (5th Cir. 2011). Without federal law to the contrary, Storey fails to show the issue was unreasonably decided by the state court.

Furthermore, Storey's argument seeks to establish a new constitutional rule that would require jurors to be able to base their sentencing decision on evidence unrelated to the defendant's moral blameworthiness–essentially, based on sympathy. Such a rule would violate *Teague. See Saffle v. Parks*, 494 U.S. 484, 489 (1990) (holding Constitution does not require that jurors be allowed to base their sentencing decisions on sympathy they feel for the defendant after hearing his mitigating evidence and that the adoption of such a rule would be barred by *Teague*). As the Supreme Court noted, "It is no doubt constitutionally permissible, if not constitutionally required, for the state to insist that the 'individualized assessment of the appropriateness of the death penalty [be] a moral inquiry into the culpability of the defendant, and not an emotional response to the mitigating evidence.'" *Saffle*, 494 U.S. at 492-93 (citations omitted); *see also California v. Brown*, 479 U.S. 538, 841 (1987) (O'Connor, J., concurring) (stating that the sentence imposed at the penalty stage should reflect "a reasoned *moral* response to the defendant's background, character, and crime rather than mere sympathy or emotion.").

### Claim 3g

The special issues fail to define "various terms and phrases" that would permit a jury to give full mitigating significance to those "nebulous" terms, in violation of the Eighth and Fifth Amendments (*Petition* at 55).

Storey raised this claim on appeal as well as in state habeas court. SHR 35-36 ("Claim 3e"), 381; *Appellant's Appeal Brief* at 53. Respondent contends the claim is procedurally barred to the

extent it relies on the Fifth Amendment rather than the Eighth Amendment because Storey did not present a Fifth Amendment objection to the trial court. The Court disagrees. A nearly identical copy of this claim containing Eighth and Fifth Amendment arguments was presented by Storey in a supplemental motion to declare the Texas statute unconstitutional on its face, which the trial court denied and the CCA reviewed on appeal. 1 CR 182-83 (Motion No. 45), 185 (trial court order); *Storey*, 2010 WL 3901416 at 25.

Nevertheless, Storey fails to demonstrate that the appellate court's ruling runs afoul of clearly established federal law, as his argument cites no case law. Moreover, the Fifth Circuit has repeatedly rejected the argument that the Texas statute is unconstitutionally vague. *See Turner v. Quarterman*, 481 F.3d 292, 299 (5th Cir. 2007) (recognizing that the circuit has rejected claims alleging vagueness of future dangerousness terms); *Woods v. Johnson*, 75 F.3d 1017, 1033-34 (5th Cir. 1996) (rejecting claim that Texas special issues are unconstitutionally vague); *James v. Collins*, 987 F.2d 1116, 1119-20 (5th Cir. 1993) (acknowledging that "[t]o the extent that the words strike distinct chords in individual jurors, or play to differing philosophies and attitudes, nothing more is at work than the jury system . . . . [S]uch words . . . ultimately mean what the jury says by their verdict they mean") (citing *Milton v. Procunier*, 744 F.2d 1091 (5th Cir. 1984)). Storey therefore fails to demonstrate that the state court ruling on this claim is unreasonable. § 2254(d).

### Claim 3d

The antiparties special issue is facially unconstitutional because it violates *Tison v. Arizona*, 481 U.S. 137 (1987) and *Enmund v. Florida*, 458 U.S. 782 (1982) (*Petition* at 53).

Storey raised this issue in a pretrial motion and on direct appeal. 1 CR 180-81; *Appellant's Brief* at 51. It was summarily denied. *Storey*, 2010 WL 3901416 at *25. Respondent argues the issue

44

is unbriefed and waived, has no support under existing Supreme Court case law, and that any error would be harmless because Storey is the actual murderer and not a party.

The Court agrees that Storey has failed to brief the issue. Storey does not identify any facts that he believes justify relief and fails to apply the holdings in *Enmund* and *Tison*. The issue is presented simply in the abstract, as a conclusion. As such, there is nothing for this Court to decide.

Alternatively, were this Court to attempt to make Storey's arguments for him, the contention would lack merit. The *Enmund* opinion held that the death penalty could not be imposed on a defendant who "aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." *Edmund*, 458 U.S. at 797-98. In *Tison*, the Supreme Court created an exception to *Enmund* for an accomplice whose participation in the crime was "major" and who displayed "reckless indifference to human life." *Tison*, 481 U.S. at 158. There is no requirement that a jury make the requisite finding; a state can comply with *Enmund* at sentencing, on appeal, or "at some point thereafter." *Hopkins v. Reeves*, 524 U.S. 88, 100 (1998) (citing *Cabana v. Bullock*, 474 U.S. 376 (1986)).

The trial court's guilt-phase charge to the jury permitted the jury to convict Storey as a principal actor or as a party. 2 CR 408-10. Under one theory of party liability submitted, the jury was permitted to convict Storey if, in an attempt to carry out a conspiracy with Mark Porter to rob Cherry, Cherry was intentionally murdered by Porter in furtherance of the conspiracy and the murder "should have been anticipated" by Storey as a result of carrying out the conspiracy. 2 CR 409. Because the jury returned a general verdict, this Court cannot be certain that Storey was not convicted as a party-conspirator under this provision. It is this provision, Storey argued in state court, that violates *Enmund*

and *Tison* because it permits the imposition of a death sentence upon the finding that the defendant simply "anticipated" that death might occur.  1 CR 181.

In its findings of fact, however, the state habeas court specifically found that Storey planned and prepared for the offense by making detailed notes that included a checklist of weapons and ammunition they would need.  SHR 366.  Storey drove Porter to the location and opened the hood of his SUV to prevent security cameras from photographing the vehicle's interior.  The state habeas court found that Storey and Porter waited for Cherry to arrive at work and open the facility and that Storey followed closely behind Cherry and caught the door before it fully closed.  Storey took no steps to conceal his identity, although he had previously been employed at the Putt-Putt.  Storey placed his pistol on Cherry's neck as they walked into the building, and told him, "You know what we want." When Cherry finished taking money out of the safe, Porter told Cherry (who was begging for his life) to shut up, placed the pistol to back of Cherry's head, and it "went off."  Storey claimed to then shoot the victim four more times.  SHR 367-68.

These findings are supported by the trial testimony and by Storey's third statement to police. 34 RR 8-21; 40 RR (part 2) 70, 89-100 (SX 6C).[13]  They show the specific intent that is required under *Enmund* or, at the least, demonstrate Storey's major participation in a felony committed with reckless indifference to human life, as required by *Tison*.  *See, e.g., Clark v. Johnson*, 227 F.3d 273, 282 (5th Cir. 2000) (concluding that state court's findings on appeal satisfied *Enmund* and *Tison*).  Accordingly,

---

[13] Again, the pages cited in the police statement are the .pdf page numbers, not the court reporter's.

Storey fails to demonstrate that the state court's rejection of his argument under *Enmund* and *Tison* was unreasonable.[14]

## VI.  REQUEST FOR HEARING

Storey requests a hearing on claims 1 and 2.  The Court has discretion to grant an evidentiary hearing if one is not barred under § 2254(e)(2).[15]  *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). In exercising that discretion, the Court considers whether a hearing could enable petitioner to prove the petition's factual allegations which, if true, would entitle him to relief.  *Landrigan*, 550 U.S. at 474.  The Court also must consider the deferential standards in § 2254(d), which limit the Court's ability to grant habeas relief.  *Id.*  In practical effect, if the state court record precludes habeas relief under § 2254(d), a district court is not required to hold an evidentiary hearing.  *Id.; Pinholster*, 131 S. Ct. at 1399.

---

[14] Respondent presents a different argument for affirming the state court's denial of this claim, specifically, that *Enmund* and *Tison* do not require Texas to reinstate its former "deliberateness" special issue. In affirming the state court's ruling under *Clark*, the Court does not implicitly or explicitly reject Respondent's argument.  Rather, the dichotomy in interpreting Storey's argument is simply a result of Storey's failure to brief his complaint.

[15] Section 2254(e)(2) provides:

(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that–

(A) the claim relies on–
      (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
      (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Storey has failed to demonstrate, based on the record that was before the state court, that the state-court ruling on claim 1 or claim 2 was unreasonable.  Habeas relief is therefore precluded by § 2254(d), rendering a hearing on those claims inappropriate.  The Court denies the request for a hearing.

## VII.  CONCLUSION

The Court denies Storey's petition for a writ of habeas corpus.

In accordance with Federal Rule of Appellate Procedure 22(b) and 28 U.S.C. § 2253(c), and after considering the record in this case, the Court denies Storey a certificate of appealability because he has failed to make a substantial showing of the denial of a constitutional right.  *See Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000); 28 U.S.C. § 2253(c)(2).  If Storey files a notice of appeal, he may proceed in forma pauperis on appeal.

**SO ORDERED** on this **9th day** of **June, 2014**.


Reed O'Connor
UNITED STATES DISTRICT JUDGE